1   MATTHEW D. POWERS (Bar No. 104795)
Email:  matthew.powers@weil.com

2   EDWARD R. REINES (Bar No. 135960)
Email:  edward.reines@weil.com

3   WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway

4   Redwood Shores, CA  94065
Telephone:  (650) 802-3000

5   Facsimile:  (650) 802-3100

6   DAVID J. HEALEY
Email: david.healey@weil.com

7   ANITA E. KADALA
Email: anita.kadala@weil.com

8   WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600

9   Houston, Texas 77002
Telephone:  (713) 546-5000

10   Facsimile:  (713) 224-9511

11   DAVID C. RADULESCU
Email: david.radulescu@weil.com

12   WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue

13   New York, New York  10153-0119
Telephone:  (212) 310-8000

14   Facsimile:  (212) 310-8007

15   BRIAN C. RIOPELLE
E-mail:  briopelle@mcguirewoods.com

16   MCGUIRE WOODS, LLP
One James Center

17   901 East Cary Street
Richmond, Virginia 23219-4030

18   Telephone: (804) 775-1000
Facsimile: (804) 775-1061

19

20   Attorneys for Defendants
SAMSUNG ELECTRONICS CO., LTD.,

21   SAMSUNG ELECTRONICS AMERICA, INC.,
SAMSUNG SEMICONDUCTOR, INC., and

22   SAMSUNG AUSTIN SEMICONDUCTOR, L.P.

23

24

25

26

27

28

1

2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

3

4

5

6

7

8

9

10

11

RAMBUS INC.,
          Plaintiff,

v.

HYNIX SEMICONDUCTOR INC., HYNIX
SEMICONDUCTOR AMERICA INC., HYNIX
SEMICONDUCTOR MANUFACTURING
AMERICA INC.,

SAMSUNG ELECTRONICS CO., LTD., SAMSUNG
ELECTRONICS AMERICA, INC., SAMSUNG
SEMICONDUCTOR, INC., SAMSUNG AUSTIN
SEMICONDUCTOR, L.P.,

NANYA TECHNOLOGY CORPORATION,
NANYA TECHNOLOGY CORPORATION U.S.A.,

INOTERA MEMORIES, INC.,
          Defendants.

Case No. C 05 00334 RMW

SECOND AMENDED ANSWER TO
FIRST AMENDED COMPLAINT FOR
PATENT INFRINGEMENT AND
JURY DEMAND AND
AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS

JURY TRIAL DEMANDED

12

**SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

13        Defendants and Counterclaim Plaintiffs Samsung Electronics Co., Ltd., Samsung

14   Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor,

15   L.P., (collectively "Samsung") respectfully answer Plaintiff Rambus Inc.'s ("Rambus") First

16   Amended Complaint for Patent Infringement and Jury Demand ("Complaint") in correspondingly

17   numbered paragraphs as follows:

18                                    **THE PARTIES**

19        Samsung admits that Rambus is a corporation organized and existing under the laws

20   of Delaware.  Samsung is without knowledge or information sufficient to form a belief as to the

21   truth of the remaining allegations in Paragraph 1 of the Complaint, and, on that basis, denies the

22   same.

23        1.     Samsung is without knowledge or information sufficient to form a belief as

24   to the truth of the allegations in Paragraph 2 of the Complaint, and, on that basis, denies the same.

25        2.     Samsung admits that Samsung Electronics Co., Ltd. is a corporation

26   organized and existing under the laws of Korea, with a principal place of business at 250, 2-Ka,

27   Taepyung-Ro, Chung-Ku, Seoul, South Korea, 100-742.  Samsung admits that Samsung

28   Electronics America, Inc. is a wholly owned subsidiary of Samsung Electronics Co., Ltd., with its

principal place of business at 105 Challenger Road, Ridgefield Park, NJ 07660.  Samsung admits that Samsung Semiconductor, Inc. is a wholly owned subsidiary of Samsung Electronics Co., Ltd., with its principal place of business at 3655 North First Street, San Jose, CA 95134.  Samsung admits that Samsung Austin Semiconductor, L.P. is a limited partnership owned by Samsung Electronics Co., Ltd., with its principal place of business at 12100 Samsung Boulevard, Austin, TX 78754.  Samsung denies that it transacts substantial business in this district on an ongoing basis.

3.     Samsung is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 of the Complaint, and, on that basis, denies the same.

4.     Samsung is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5 of the Complaint, and, on that basis, denies the same.

5.     To the extent Paragraph 6 applies to Samsung, Samsung denies those allegations.  With respect to the other defendants, Samsung is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 of the Complaint, and, on that basis, denies the same.

**NATURE OF THE ACTION**

6.     Samsung admits the Complaint purports to be an action for patent infringement, but denies any wrongdoing or liability.

7.     To the extent Paragraph 8 applies to Samsung, Samsung denies those allegations.  With respect to the other defendants, Samsung is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 of the Complaint, and, on that basis, denies the same.

**JURISDICTION AND VENUE**

8.     Samsung admits that the Complaint purports to be an action for patent infringement, but denies any wrongdoing or liability.  Samsung admits that this Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

9.     Samsung does not contest personal jurisdiction in this Court.  With respect to the other defendants, Samsung is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 of the Complaint, and on that basis, denies the same.  To

1  the extent not expressly admitted herein, Samsung denies the remaining allegations of Paragraph

2  10.

3        10.    Samsung does not contest that venue is proper in this Court.  With respect to

4  the other defendants, Samsung is without knowledge or information sufficient to form a belief as to

5  the truth of the allegations in Paragraph 11 of the Complaint, and on that basis, denies the same.  To

6  the extent not expressly admitted herein, Samsung denies the remaining allegations of Paragraph

7  11.

8                    **PURPORTED FACTUAL BACKGROUND**

9        11.    Samsung admits that Rambus has executed licenses in the past.  To the

10 extent not expressly admitted herein, Samsung denies the remaining allegations in Paragraph 12 of

11 the Complaint.

12       12.    Samsung admits that it is in the business of, *inter alia*, making, using, selling

13 importing, and/or offering for sale products that consist of or include DDR2, GDDR2, and/or

14 GDDR3 memory components, and DDR2 memory modules.    Defendants lack sufficient

15 information to admit or deny the remaining allegations of Paragraph 13, and on that basis, deny the

16 same.  To the extent not expressly admitted herein, Samsung denies the remaining allegations of

17 Paragraph 13 of the Complaint.

18       13.    Samsung is without knowledge or information sufficient to form a belief as

19 to the truth of the allegations in Paragraph 14 of the Complaint, and on that basis, denies the same.

20       14.    Samsung admits that it has made, used, sold, imported or offered for sale

21 products that consist of or include DDR2, GDDR2, and/or GDDR3 memory components, and

22 DDR2 memory modules.  Defendants lack sufficient information to admit or deny the remaining

23 allegations of Paragraph 15, and on that basis, deny the same.  To the extent not expressly admitted

24 herein, Samsung denies the remaining allegations of Paragraph 15 of the Complaint.

25       15.    Samsung is without knowledge or information sufficient to form a belief as

26 to the truth of the allegations in Paragraph 16 of the Complaint, and on that basis, denies the same.

27       16.    Samsung is without knowledge or information sufficient to form a belief as

28 to the truth of the allegations in Paragraph 17 of the Complaint, and on that basis, denies the same.

1         17.     Samsung admits that on its face, U.S. Patent No. 6,182,184 (the "'184

2 Patent") purports to have issued on January 30, 2001, and to be entitled "Method of Operating a

3 Memory Device Having a Variable Data Input Length," but denies it was duly and legally issued.

4 All other allegations of Paragraph 18 not specifically admitted herein are denied.

5         18.     Samsung admits that on its face, U.S. Patent No. 6,260,097 (the "'097

6 Patent") purports to have issued on July 10, 2001, and to be entitled "Method and Apparatus for

7 Controlling a Synchronous Memory Device," but denies it was duly it was duly and legally issued.

8 All other allegations of Paragraph 19 not specifically admitted herein are denied.

9         19.     Samsung admits that on its face, U.S. Patent No. 6,266,285 (the "'285

10 Patent") purports to have issued on July 24, 2001, and to be entitled "Method of Operating a

11 Memory Device Having Write Latency," but denies it was duly and legally issued.  All other

12 allegations of Paragraph 20 not specifically admitted herein are denied.

13         20.     Samsung admits that on its face, U.S. Patent No. 6,314,051 (the "'051

14 Patent") purports to have issued on November 6, 2001, and to be entitled "Memory Device Having

15 Write Latency," but denies it was duly and legally issued.  All other allegations of Paragraph 21 not

16 specifically admitted herein are denied.

17         21.     Samsung admits that on its face, U.S. Patent No. 6,324,120 (the "'120

18 Patent") purports to have issued on November 27, 2001, and to be entitled "Memory Device

19 Having a Variable Data Output Length," but denies it was duly and legally issued.  All other

20 allegations of Paragraph 22 not specifically admitted herein are denied.

21         22.     Samsung admits that on its face, U.S. Patent No. 6,378,020 (the "'8,020

22 Patent") purports to have issued on April 23, 2002, and to be entitled "System Having Double Data

23 Transfer Rate and Intergrated [sic] Circuit Therefor," but denies it was duly and legally issued.  All

24 other allegations of Paragraph 23 not specifically admitted herein are denied.

25         23.     Samsung admits that on its face, U.S. Patent No. 6,426,916 (the "'916

26 Patent") purports to have issued on July 30, 2002, and to be entitled "Memory Device Having a

27 Variable Data Output Length and a Programmable Register," but denies it was duly and legally

28 issued.  All other allegations of Paragraph 24 not specifically admitted herein are denied.

1     24.     Samsung admits that on its face, U.S. Patent No. 6,452,863 (the "'863

2  Patent") purports to have issued on September 17, 2002, and to be entitled "Method of Operating a

3  Memory Device Having a Variable Data Input Length," but denies it was duly and legally issued.

4  All other allegations of Paragraph 25 not specifically admitted herein are denied.

5     25.     Samsung admits that on its face, U.S. Patent No. 6,493,789 (the "'789

6  Patent") purports to have issued on December 10, 2002, and to be entitled "Memory Device Which

7  Receives Write Masking and Automatic Precharge Information," but denies it was duly and legally

8  issued.  All other allegations of Paragraph 26 not specifically admitted herein are denied.

9     26.     Samsung admits that on its face, U.S. Patent No. 6,496,897 (the "'897

10  Patent") purports to have issued on December 17, 2002, and to be entitled "Semiconductor Memory

11  Device Which Receives Write Masking Information," but denies it was duly and legally issued.  All

12  other allegations of Paragraph 27 not specifically admitted herein are denied.

13     27.     Samsung admits that on its face, U.S. Patent No. 6,546,446 (the "'6,446

14  Patent") purports to have issued on April 8, 2003, and to be entitled "Synchronous Memory Device

15  Having Automatic Precharge," but denies it was duly and legally issued.  All other allegations of

16  Paragraph 28 not specifically admitted herein are denied.

17     28.     Samsung admits that on its face, U.S. Patent No. 6,564,281 (the "'281

18  Patent") purports to have issued on May 13, 2003, and to be entitled "Synchronous Memory Device

19  Having Automatic Precharge," but denies it was duly and legally issued.  All other allegations of

20  Paragraph 29 not specifically admitted herein are denied.

21     29.     Samsung admits that on its face, U.S. Patent No. 6,584,037 (the "'037

22  Patent") purports to have issued on June 24, 2003, and to be entitled "Memory Device Which

23  Samples Data After an Amount of Time Transpires," but denies it was duly and legally issued.  All

24  other allegations of Paragraph 30 not specifically admitted herein are denied.

25     30.     Samsung admits that on its face, U.S. Patent No. 6,697,295 (the "'295

26  Patent") purports to have issued on February 24, 2004, and to be entitled "Memory Device Having

27  a Programmable Register," but denies it was duly and legally issued.  All other allegations of

28  Paragraph 31 not specifically admitted herein are denied.

31. Samsung admits that on its face, U.S. Patent No. 6,701,446 (the "'1,446 Patent") purports to have issued on March 2, 2004, and to be entitled "Power Control System for Synchronous Memory Device," but denies it was duly and legally issued. All other allegations of Paragraph 32 not specifically admitted herein are denied.

32. Samsung admits that on its face, U.S. Patent No. 6,715,020 (the "'5,020 Patent") purports to have issued on March 30, 2004, and to be entitled "Synchronous Integrated Circuit Device," but denies it was duly and legally issued. All other allegations of Paragraph 33 not specifically admitted herein are denied.

33. Samsung admits that on its face, U.S. Patent No. 6,751,696 (the "'696 Patent") purports to have issued on June 15, 2004, and to be entitled "Memory Device Having a Programmable Register," but denies it was duly and legally issued. All other allegations of Paragraph 34 not specifically admitted herein are denied.

34. Samsung admits that on its face, U.S. Patent No. 6,807,598 (the "'598 Patent") purports to have issued on October 19, 2004, and to be entitled "Integrated Circuit Device Having Double Data Rate Capability," but denies it was duly and legally issued. All other allegations of Paragraph 35 not specifically admitted herein are denied.

35. Samsung is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 of the Complaint, and on that basis, denies the same.

36. To the extent Paragraph 37 applies to Samsung, Samsung denies those allegations. With respect to the other defendants, Samsung is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 of the Complaint, and on that basis, denies the same.

37. To the extent Paragraph 38 applies to Samsung, Samsung denies those allegations. With respect to the other defendants, Samsung is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 of the Complaint, and on that basis, denies the same.

**COUNT 1:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,182,184**

38.     Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-38 above.

39.     Samsung denies the allegations in Paragraph 40 of the Complaint.

**COUNT 2:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,260,097**

40.     Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-40 above.

41.     Samsung denies the allegations in Paragraph 42 of the Complaint.

**COUNT 3:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,266,285**

42.     Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-42 above.

43.     Samsung denies the allegations in Paragraph 44 of the Complaint.

**COUNT 4:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,314,051**

44.     Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-44 above.

45.     Samsung denies the allegations in Paragraph 46 of the Complaint.

**COUNT 5:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,324,120**

46.     Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-46 above.

47.     Samsung is without knowledge or information sufficient to admit or deny the allegations in Paragraph 48, and on that basis, denies the same.

**COUNT 6:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,378,020**

48.     Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-48 above.

49.     Samsung is without knowledge or information sufficient to admit or deny the allegations in Paragraph 50, and on that basis, denies the same.

**COUNT 7:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,426,916**

50. Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-50 above.

51. Samsung is without knowledge or information sufficient to admit or deny the allegations in Paragraph 52, and on that basis, denies the same.

**COUNT 8:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,452,863**

52. Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-52 above.

53. Samsung is without knowledge or information sufficient to admit or deny the allegations in Paragraph 54, and on that basis, denies the same.

**COUNT 9:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,493,789**

54. Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-54 above.

55. Samsung denies the allegations in Paragraph 56 of the Complaint.

**COUNT 10:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,496,897**

56. Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-56 above.

57. Samsung denies the allegations in Paragraph 58 of the Complaint.

**COUNT 11:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,546,446**

58. Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-58 above.

59. Samsung denies the allegations in Paragraph 60 of the Complaint.

**COUNT 12:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,564,281**

60. Samsung refers to and incorporates herein its answers as provided in Paragraphs 1-60 above.

61. Samsung denies the allegations in Paragraph 62 of the Complaint.

1  **COUNT 13:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,584,037**

2         62.      Samsung refers to and incorporates herein its answers as provided in

3  Paragraphs 1-62 above.

4         63.      Samsung denies the allegations in Paragraph 64 of the Complaint.

5  **COUNT 14:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,697,295**

6         64.      Samsung refers to and incorporates herein its answers as provided in

7  Paragraphs 1-64 above.

8         65.      Samsung denies the allegations in Paragraph 66 of the Complaint.

9  **COUNT 15:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,701,446**

10        66.      Samsung refers to and incorporates herein its answers as provided in

11  Paragraphs 1-66 above.

12        67.      Samsung denies the allegations in Paragraph 68 of the Complaint.

13  **COUNT 16:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,715,020**

14        68.      Samsung refers to and incorporates herein its answers as provided in

15  Paragraphs 1-68 above.

16        69.      Samsung denies the allegations in Paragraph 70 of the Complaint.

17  **COUNT 17:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,751,696**

18        70.      Samsung refers to and incorporates herein its answers as provided in

19  Paragraphs 1-70 above.

20        71.      Samsung denies the allegations in Paragraph 72 of the Complaint.

21  **COUNT 18:  DENIAL OF ALLEGED INFRINGEMENT OF U.S. PATENT NO. 6,807,598**

22        72.      Samsung refers to and incorporates herein its answers as provided in

23  Paragraphs 1-72 above.

24        73.      Samsung denies the allegations in Paragraph 74 of the Complaint.

25                **DENIAL OF RAMBUS'S PRAYER FOR RELIEF**

26        74.      Samsung denies that Rambus is entitled to be awarded any of the relief

27  sought in its prayer for relief against Samsung.  Samsung has not directly, indirectly, contributorily

28  and/or by inducement, literally and/or by the doctrine of equivalents infringed—willfully or

1    otherwise—any of the patents asserted by Rambus. Rambus is not entitled to recover statutory

2    damages, compensatory damages, or accounting, injunctive relief, costs, fees, interest, or any other

3    type of recovery from Samsung. Rambus's prayer should, therefore, be denied in its entirety and

4    with prejudice, and Rambus should take nothing therefore. Samsung asks that judgment be entered

5    for it and that it be awarded attorneys' fees in defending against the Complaint, together with such

6    other and further relief the Court deems appropriate.

7    **I.  AFFIRMATIVE DEFENSES**

8    As and for its affirmative defenses, Samsung alleges as follows:

9    **First Affirmative Defense – Failure to State a Claim**

10    75. The Complaint fails to state a claim upon which relief can be granted

11    because Samsung has not performed any act or thing and is not proposing to perform any act or

12    thing in violation of any rights validly belonging to Plaintiff.

13    **Second Affirmative Defense – Noninfringement**

14    76. The '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446,

15    '5,020, '696, and '598 Patents are invalid and unenforceable as set forth herein.

16    77. Samsung does not infringe and has not infringed, either directly or indirectly,

17    does not and has not contributed to infringement, and does not and has not induced the

18    infringement of any claim of the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295,

19    '1,446, '5,020, '696, and '598 Patents.

20    **Third Affirmative Defense – Patent Invalidity**

21    78. The '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446,

22    '5,020, '696, and '598 Patents are invalid for failure to meet the "Conditions for Patentability" of

23    35 U.S.C. §§ 102 and 103 because the alleged inventions thereof are taught by, suggested by,

24    and/or are obvious in view of, the prior art, and no claim of the '184, '097, '285, '051, '789, '897,

25    '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents can be validly construed to cover

26    any Samsung device, system or operating method related to DRAM memory.

27    79. The '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446,

28    '5,020, '696, and '598 Patents are invalid for failure to meet the "Specification" requirements of 35

U.S.C. § 112 because the written specifications thereof do not describe the alleged inventions and the manner and process of making and using them in the form required by § 112, and no claim of the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents can be validly construed to cover any Samsung device, system or operating method related to DRAM memory.

### Fourth Affirmative Defense – Prosecution Laches

80.     Rambus's claims for relief and prayer for damages are barred, in whole or in part, because the equitable doctrine of prosecution laches renders the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents unenforceable.

### Fifth Affirmative Defense – Unclean Hands

81.     Rambus's claims for relief and prayer for damages are barred, in whole or in part, because the equitable doctrine of unclean hands renders the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents unenforceable.

### Sixth Affirmative Defense – Equitable Estoppel

82.     Rambus's claims for relief and prayer for damages are barred, in whole or in part, because the doctrine of equitable estoppel renders the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents unenforceable.

### Seventh Affirmative Defense – Estoppel

83.     Rambus is estopped by its conduct during the course of its membership in JEDEC from asserting, amongst others, any of the patents that originate from the 1990 Farmwald '898 application or the October, 1995 Ware '294 application, including but not limited to the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents against Samsung's SDRAM products, the facts and circumstances of which are set forth herein.

84.     JEDEC with its associated committees is and, at all time relevant herein, has been the engineering standardization body for solid-state products in the United States and is part of the larger Electronic Industries Alliance ("EIA").  JEDEC has 300 member companies and 1800 individual committee participants.  Standards promulgated by JEDEC, particularly for memories, are the predominant standards world-wide.

85.     At all times relevant herein, the semiconductor industry relied on JEDEC to develop the memory interface standard(s) for DRAMs and other memories, which are used predominantly in successive generations of computers, including mainframe, workstation, desktop, and laptop computers as well as many other electronic devices.  JEDEC operated and continues to operate through committees populated by industry representatives with a background in the engineering and marketing requirements of the industry.  In choosing standards, proposals for inclusion in or changes to existing standards or standards under consideration would be made at JEDEC meetings by its members.  In the intervals between meetings, members would invest time and resources evaluating these proposals for suitability.  Over a series of meetings, input from industry participants would be considered.  Gradually, a consensus would tend to emerge on the specific set of features that best suited the then-current requirements of the market by cost and performance measures.  JEDEC was always pushed to move the standard ahead at the pace desired by the market, and to promulgate new and evolving standards in advance of their actual need in the market.

86.     JEDEC has rules and procedures designed to guarantee that JEDEC (and its rules) is not used by its members for anticompetitive or illegal purposes.  One specific kind of anticompetitive effect that JEDEC guards against its unintended inclusion in a JEDEC standard of patented elements or requirements.  JEDEC does not prohibit standards that require the use of patented technology, but JEDEC does require that any decision to incorporate a patented element in a JEDEC standard be made with knowledge and full disclosure of the fact that a proposed standard includes or requires patented technology and any consequently required patent licenses that would be needed to implement the standard.  JEDEC's policy is neutral on incorporation of patented elements in a standard so long as:  (a) the standard setting committee has a full and fair opportunity to evaluate the existence of the patent or possible patent, and (b) the purported owner of the patent or possible patent is willing to license the patent royalty free or on reasonable and non-discriminatory terms.

87.     Recognizing that no written rule can be so clear and precise that someone cannot find a way to evade or subvert its intent, JEDEC's procedure relied on the good faith participation of its members.

88.     In 1992, Rambus joined JEDEC.   Rambus became interested in joining JEDEC for two reasons.   First, it provided Rambus with insight into the industry's efforts to develop a state-of-the-art open DRAM memory interface standard.   Second, it presented Rambus with an opportunity to meet prospective customers and pitch RDRAM license agreements to those customers.

89.     Rambus joined JEDEC at the time when many JEDEC members were advocating the adoption of a synchronous memory interface for DRAMs in place of the then-dominant asynchronous (or "conventional") DRAM interface.   JEDEC's work on synchronous DRAM interface technology was independent of any work by Rambus in this area.

90.     The first SDRAM standard was adopted in JEDEC in 1993.

91.     The current SDRAM products represent foreseeable extensions and improvements of the base SDRAM standard which were known to or anticipated by Rambus and other JEDEC members when the base SDRAM standard was adopted at JEDEC in 1993.  Many of the features first required by the JEDEC DDR SRAM, DDR2 SDRAM, and/or GDDR3 SDRAM interface standards were first included or proposed for inclusion during JEDEC's consideration, while Rambus was a JEDEC member, of standards for SDRAM and for DRAMs that would follow SDRAMs in the market.   Other features required by the JEDEC DDR SDRAM, DDR2 SDRAM, GDDR3, and/or related interface standards were originally included in and required by the JEDEC standards for SDRAM.

92.     As a result of its membership in JEDEC, Rambus agreed, both explicitly and implicitly, that it would abide by the rules governing JEDEC members.   These rules, among other things, required JEDEC members, including Rambus, to disclose to other JEDEC members any patents, patent applications or intentions to file patents that might bear upon standards being considered by JEDEC committees.

93.     By participating as a JEDEC member, Rambus knew or should have known that Samsung would be reasonably induced to rely upon Rambus's promises and representations that it would disclose any patents, patent applications, or intentions to file patents that may bear upon standards being considered by JEDEC.

94.     Samsung reasonably relied upon Rambus's promises and representations and was induced to design many of its products in accordance with standards adopted by JEDEC.

95.     Rambus's infringement allegations arise, at least in part, as a result of Samsung implementing one or more SDRAM standards adopted by JEDEC, through the design, manufacture, and sale of memory products complying with the JEDEC standards for, among others, SDRAM components and/or modules.   Samsung memory products complying with JEDEC standards are sometimes referred to herein as "JEDEC standard products."

96.     Samsung is informed and believes that Rambus never disclosed to other JEDEC committee members its intention to file any of the patents, or claims of the type or scope contained in patents that originated with the 1990 Farmwald '898 application, and/or the 1995 Ware '294 application, including, but not limited to the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents asserted herein against Samsung's SDRAM products or other products, thereby breaching its duties of disclosure and good faith toward JEDEC and the members of JEDEC and, specifically, Samsung.

97.     Through a series of licenses that began in 1994 and other ties that included Samsung's active promotion of Rambus technology and marketing of Rambus products at substantial expense to Samsung,[1] Rambus and Samsung formed a valuable business alliance in which Samsung supplied products based on Rambus technologies to the marketplace.  During one of the numerous "partner meetings" that executives of Samsung and Rambus attended together to discuss, among other things, the status of their joint plans for Samsung's manufacture, sale, and

---

[1] Samsung has spent over $200,000,000 on Rambus-related research, development, advertising, and marketing.  Meanwhile, Samsung has sold $3.2 billion worth of Rambus DRAM products to customers such as Sony for use in its Playstations, and has paid Rambus royalties of $39.8 million for use of Rambus DRAM technology.

1   advertising of RDRAMs, Dave Mooring, president of Rambus at the time, stated that "Samsung

2   continues to be a very strong and valuable partner for Rambus." Rambus encouraged Samsung to

3   develop products based on Rambus's patents. As a result, Samsung became the largest maker and

4   supplier of Rambus products.[2] The valuable business alliance between Rambus and Samsung

5   allowed Rambus to market its company and products based on Rambus technology that could not

6   otherwise have been done successfully without Samsung's assistance.

7           98.     Given the extensive and friendly business relationship outlined above,

8   Samsung reasonably relied on Rambus's assertions that Samsung was a valued business partner and

9   was dealing with Samsung in good faith and with the intent to promote the valuable business

10  alliance between them. As a result, Samsung was misled by Rambus into promoting Rambus

11  technology in faithful adherence to the business alliance. Samsung was further misled into

12  believing that Rambus was dealing with Samsung honestly, in good faith, and was not secretly

13  taking actions that would harm Samsung's business. Moreover, each of the several contracts

14  carried with them duties of good faith and fair dealing that further led Samsung to believe that its

15  business ally, Rambus, would not secretly work against Samsung's interests.

16          99.     As a direct and proximate result of Rambus's failure to perform its duties and

17  Rambus's misrepresentations, Samsung has been damaged in that it has been required to pursue its

18  legal remedies, including this suit, at great expense. Moreover, if Rambus is allowed to assert its

19  patents in breach of its duties of disclosure and good faith to Samsung and other JEDEC members,

20  and is successful, Samsung will be damaged in the amount sought by Rambus as license fees,

21  which, as yet, is unknown.

22          **Eighth Affirmative Defense – Implied License**

23          100.    Because of its conduct during the course of its membership in JEDEC as

24  outlined herein, Rambus's claims of infringement of any of the patents that originate from the 1990

25  Farmwald '898 application or the October, 1995 Ware '294 application, including but not limited to

26

27

28  ───────────────────
    [2] From 1995 until 2005, Samsung was the largest maker and seller of Rambus DRAM.

the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents against Samsung's SDRAM products, are barred by the doctrine of implied license.

101.   Because of its conduct in JEDEC and/or during the course of its business alliance with Samsung as outlined herein, Rambus's claims of infringement of any of the patents that originate from the 1990 Farmwald '898 application or the October, 1995 Ware '294 application, including but not limited to the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents against Samsung's SDRAM products, are barred by the doctrine of implied license.

### Ninth Affirmative Defense – Marking and Limitations

102.   Rambus's claims for relief and prayer for damages are barred, in whole or in part, by 35 U.S.C. §§ 286 and 287.

1

**SECOND AMENDED COUNTERCLAIMS**

2    Defendant/Counterclaim Plaintiff Samsung Electronics Co., Ltd. ("SEC") brings

3    these counterclaims against Plaintiff/Counterclaim Defendant Rambus Inc. ("Rambus").

4    Defendant/ Counterclaim Plaintiff Samsung America Electronics, Inc., ("SEA") joins in certain

5    counterclaims as stated below.

6    103.    SEC is a corporation organized and existing under the laws of Korea, with a

7    principal place of business at 250, 2-Ka, Taepyung-Ro, Chung-Ku, Seoul, South Korea, 100-742.

8    SEA is a corporation organized and existing under the laws of New Jersey, with a principal place of

9    business at 105 Challenger Road, Ridgefield Park, New Jersey, 07660.

10    104.    Rambus is a corporation incorporated and existing under the laws of

11    Delaware. Rambus's principal place of business is at 4440 El Camino Real, Los Altos, California,

12    94022.

13

**JURISDICTION AND VENUE**

14    105.    This Court has subject matter jurisdiction over SEC's and SEA's patent

15    counterclaims, which arise under the patent laws of the United States pursuant to 28 U.S.C. §§

16    1331, 1338, 2201, and 2202. This Court has subject matter jurisdiction over SEC's and SEA's state

17    law claims pursuant to 28 U.S.C. §§ 1332 and 1337, as SEC is a foreign citizen, SEA is a citizen of

18    the State of New Jersey, Rambus is a citizen of the States of California and Delaware, and the

19    amount in controversy exceeds $75,000; further, some or all of these claims fall within the Court's

20    supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because some of these claims are so related

21    to the patent claims that they form part of the same case or controversy.

22    106.    This Court has personal jurisdiction over Rambus, at least because Rambus

23    filed its claims for patent infringement in this Court, in response to which these counterclaims are

24    filed.

25    107.    Venue is established in this judicial district pursuant to 28 U.S.C. §§ 1391

26    and 1400. Venue is additionally proper in this Court because Rambus has consented to the

27    propriety of venue in this Court by filing its claim for patent infringement in this Court, in response

28

to which these counterclaims are filed.  Further, Rambus is a resident of the State of California and is generally present here.

## **GENERAL ALLEGATIONS**

108.    On or about October 31, 2000, SEC and Rambus entered into an agreement entitled "SDR/DDR IC and SDR/DDR Memory Module Patent License Agreement Between Rambus Inc. and Samsung Electronics Co., Ltd." (the "SDR/DDR License").

109.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,182,184 (the "'184 Patent"), which is entitled "Method of Operating a Memory Device Having a Variable Data Input Length," and which issued on January 30, 2001.

110.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,260,097 (the "'097 Patent"), which is entitled "Method and Apparatus for Controlling a Synchronous Memory Device," and which issued on July 10, 2001.

111.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,266,285 (the "'285 Patent"), which is entitled "Method of Operating a Memory Device Having Write Latency," and which issued on July 24, 2001.

112.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,314,051 (the "'051 Patent"), which is entitled "Memory Device Having Write Latency," and which issued on November 6, 2001.

113.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,493,789 (the "'789 Patent"), which is entitled "Memory Device Which Receives Write Masking and Automatic Precharge Information," and which issued on December 10, 2002.

114.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,496,897 (the "'897 Patent"), which is entitled "Semiconductor Memory Device Which Receives Write Masking Information," and which issued on December 17, 2002.

115.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,546,446 (the "'6,446 Patent"), which is entitled "Synchronous Memory Device Having Automatic Precharge," and which issued on April 8, 2003.

116.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,564,281 (the "'281 Patent"), which is entitled "Synchronous Memory Device Having Automatic Precharge," and which issued on May 13, 2003.

117.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,584,037 (the "'037 Patent"), which is entitled "Memory Device Which Samples Data After An Amount of Time Transpires," and which issued on June 24, 2003.

118.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,697,295 (the "'295 Patent"), which is entitled "Memory Device Having a Programmable Register," and which issued on February 24, 2004.

119.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,701,446 (the "'1,446 Patent"), which is entitled "Power Control System for Synchronous Memory Device," and which issued on March 2, 2004.

120.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,715,020 (the "'5,020 Patent"), which is entitled "Synchronous Integrated Circuit Device," and which issued on March 30, 2004.

121.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,751,696 (the "'696 Patent"), which is entitled "Memory Device Having a Programmable Register," and which issued on June 15, 2004.

122.    Rambus claims to be the owner by assignment of U.S. Patent No. 6,807,598 (the "'598 Patent"), which is entitled "Integrated Circuit Device Having Double Data Rate Capability," and which issued on October 19, 2004.

123.    Samsung and Rambus executed the first license between them, which granted Samsung a license to use Rambus's RDRAM technology, in November of 1994.  This marked the beginning of what would be, at least until the litigation between them began, an extensive and cooperative business relationship.  After two years of close cooperation on marketing and engineering to develop, market, and sell Samsung's RDRAM, the parties negotiated a First Addendum to the RDRAM license in February of 1997.  Samsung continued for the next three-and-a-half years to promote and manufacture Rambus's product, and in July 2000 the parties negotiated

1   a Second Addendum to the RDRAM license.  Samsung is still licensed to use RDRAM technology

2   and continues to manufacture and sell RDRAMs today.

3          124.    Samsung and Rambus executed the SDR/DDR License to Rambus's patents

4   that allegedly cover, among other things, specific aspects of SDRAM and DDR DRAM

5   technologies, in October 2000.  This was the first time that the parties' relationship involved

6   mainstream memory technologies, rather than just RDRAM.  The SDR/DDR License required

7   Rambus to notify Samsung if another, later license included a lower effective royalty rate; and,

8   further to adjust Samsung's rate to the lower effective rate.  (Section 3.8).  Further, the SDR/DDR

9   License also required good faith negotiation of a renewal.  (Section 8.5).  Finally, there is a duty of

10   good faith and fair dealing in the SDR/DDR License.

11          125.    The SDR/DDR License to Rambus's patents, executed between Samsung

12   and Rambus, was just the most recent in a series of agreements that evidenced what Samsung

13   believed to be a valuable business alliance between Samsung and Rambus in which both parties

14   shared common business objectives.

15          126.    Samsung's belief in Rambus's intentions towards Samsung to maintain a

16   profitable business alliance was further bolstered by Rambus's assertions during their numerous

17   "partner meetings" that Samsung was a valued business partner and was dealing with Samsung in

18   good faith and with the intent to promote the valuable business alliance between them.  Samsung

19   was further and justifiably misled into believing that Rambus was dealing with Samsung honestly,

20   in good faith, and was not secretly taking actions that would harm Samsung's business.

21          127.    Samsung, on the basis of its justified understanding that Rambus and

22   Samsung were valuable business partners in a profitable business alliance, did not suspect and

23   could not have expected Rambus to behave in a way that would jeopardize that relationship nor that

24   its business ally, Rambus, would secretly work against Samsung's interests.

25                        **Rambus's Aiding and Abetting Neil Steinberg's**

26            **Breach of Fiduciary Duties Owed to Samsung, a Current Client**

27          128.    Mr. Neil Steinberg began work for Samsung as an in-house attorney on or

28   about November 16, 1994.  He remained at Samsung as in-house counsel until on or about August

7, 1998. At all relevant times during his employment by Samsung, Mr. Steinberg had an employment agreement with Samsung. The First Employment Agreement, dated November 16, 1994, was effective until November 16, 1996. A Second Employment Agreement was effective from November 16, 1996, until Mr. Steinberg resigned from Samsung in August 1998. Both agreements contained a provision prohibiting Mr. Steinberg from engaging in any alternative employment during the term of the agreement without prior written consent from Samsung.[3]

129.    Upon information and belief, by February of 1998, Rambus had secretly engaged Mr. Steinberg to actively work for it as an outside attorney, providing legal advice and strategies for the enforcement of legal claims, including patent claims against DRAM manufacturers, such as Samsung, notwithstanding the fact that Rambus knew Mr. Steinberg was employed as a full-time, in-house counsel for Samsung.

130.    As an in-house attorney for Samsung, Mr. Steinberg owed Samsung a fiduciary duty of utmost good faith and fair dealing and undivided loyalty and honesty in fact.

131.    Upon information and belief, at the request of Rambus, Mr. Steinberg actively worked to help Rambus, both as its outside and in-house counsel, to plan patent prosecution strategies, including actually working on patent applications, patent enforcement strategies, document handling and retention strategies for use in litigation, and to take other measures to extract royalties from manufacturers of DRAMs, including Samsung. Further, upon information and belief, Mr. Steinberg used information about Samsung's business and DRAM products in working for Rambus while he was under contractual and fiduciary duties not to disclose such information about Samsung's business or to use it contrary to Samsung's interests, regardless of whether such information was trade secret.

132.    More specifically, upon information and belief, Rambus's efforts to extract royalties from Samsung for its SDR and DDR SDRAM sales began in 1997, when Rambus hired Mr. Joel Karp, a senior managing director at Samsung who negotiated, among other licenses, the RDRAM license with Rambus on behalf of Samsung. Because Samsung was not privy to

---

[3] A copy of Mr. Steinberg's Second Employment Agreement is attached as Exhibit A.

1   Rambus's patent acquisition and enforcement strategies and had no way to know that Rambus was

2   planning to target Samsung's products, it had no reason to be alarmed when Rambus, its strategic

3   business partner, hired Mr. Karp to be its Vice President of Intellectual Property.  Also unknown to

4   Samsung at the time was the fact that, after Mr. Karp left Samsung, he stayed in touch with an in-

5   house Samsung attorney, Neil Steinberg.  Indeed, while he was still at Samsung (and Mr. Karp was

6   at Rambus), Mr. Steinberg spoke with Mr. Karp on the phone three to four times a week, oftentimes

7   about Samsung matters.  Such frequent conversations could not be explained as merely friendly

8   chats, given that Samsung's subsequent internal investigation has confirmed that Mr. Karp and Mr.

9   Steinberg were not close social friends and infrequently socialized during their mutual employment

10  at Samsung.

11          133.    Upon information and belief, due to Mr. Steinberg's role as Samsung's

12  trusted in-house counsel, Mr. Steinberg was privy to extensive Samsung confidential and

13  proprietary information that he discussed with Mr. Karp while still employed by Samsung.  In

14  particular, during his employment with Samsung, Mr. Steinberg primarily worked on Samsung

15  patents relating to DRAM technology and was also involved in litigation regarding patents being

16  asserted against Samsung.  Mr. Steinberg, therefore, was privy to confidential and sensitive

17  information about DRAM products, including SDRAM and DDR SDRAM, that were still in

18  development at Samsung, as well as confidential information about inventions and innovations that

19  Samsung included in its DRAM products.  For example, Mr. Steinberg helped draft patent claims

20  during prosecution of a patent application that issued as U.S. Patent No. 5,835,956 (the "'956

21  Patent").  The '956 Patent relates to DRAM technology and is asserted as prior art to the patents-in-

22  suit in co-pending patent litigation.  In fact, Mr. Steinberg prosecuted at least eight Samsung

23  DRAM patents, including U.S. Patent Nos. 6.438,083, 6,343,036, 6,279,116, 5,838,990, 5,835,956,

24  5,703,828, 5,631,871, and 559,008.

25          134.    Mr. Steinberg was also made aware of Samsung's then-future development

26  plans for DRAM products through his use of product roadmaps in discovery in litigation and in

27  patent licensing endeavors.  In addition, Mr. Steinberg was intimately familiar with Samsung's

28  proprietary patent prosecution and licensing strategies, which he implemented while employed as

1    Samsung's in-house counsel.  Further, Mr. Steinberg had worked with Samsung employees on a

2    strategy to draft patent claims to protect Samsung's specific implementation of JEDEC standard

3    features of SDRAM and DDR SDRAM Technology, and was intimately familiar with how

4    Samsung's implementation of JEDEC features was done in its products and how Samsung planned

5    to protect those features.  The '956 patent was work product as part of this effort to protect

6    Samsung's implementation of its JEDEC-compliant products and features.

7           135.    Armed with this wealth of knowledge, Mr. Steinberg was speaking to Mr.

8    Karp at Rambus about Samsung matters three to four times a week, including such times when he

9    was working on patent protection for Samsung's implementation of JEDEC standards, such as the

10   '956 patent application and other projects.  Upon information and belief, because Mr. Karp's job at

11   Rambus was to implement a patent-enforcement strategy against DRAM manufacturers, including

12   Samsung, Mr. Karp was particularly interested in learning proprietary information from Mr.

13   Steinberg about Samsung's DRAM products and product plans.  Samsung did not even know about

14   these communications at the time, and certainly not of their content.  Upon information and belief,

15   however, the matters discussed between Mr. Steinberg and Mr. Karp during those secret

16   conversations included the projects that Mr. Steinberg was working on while at Samsung from late

17   1997 to August 1998, as well as proprietary information relating to Samsung's DRAM products

18   and technology and related inventions and innovations, future products, legal strategies, and

19   Samsung patent prosecution and licensing strategies.

20          136.    It is particularly notable that, at this same time, Mr. Karp was secretly

21   meeting with outside counsel for Rambus to plan suits against Samsung and others.  Indeed,

22   contemporaneous internal Rambus documents, revealed for the first time during the *Infineon*

23   unclean-hands trial in 2005, state that Rambus was making itself "battle ready" for litigation, and

24   was pursuing patent coverage that would include features of non-Rambus DRAMs.  This "strategic

25   licensing and litigation" strategy was being planned by Mr. Karp and presented to the Rambus

26   Board of directors at the same time that Mr. Karp was speaking with Mr. Steinberg three to four

27   times a week about Samsung matters.  Documents revealed for the first time during the *Infineon*

28

2005 trial showed that during the winter and spring of 1998, Rambus had under Mr. Karp's supervision reverse engineered Samsung products to analyze them for infringement lawsuits.

137. After Mr. Steinberg officially resigned from Samsung in August 1998, he continued working for Rambus as outside counsel, eventually joining Rambus full-time as in-house counsel. Although Mr. Steinberg was no longer employed as in-house counsel for Samsung, he still owed continuing duties to safeguard Samsung's confidential and proprietary information. These duties arose from Mr. Steinberg's employment contract, which imposed continuing duties of confidentiality, as well as from Mr. Steinberg's ethical obligations owed to Samsung as a former client. Upon information and belief, Mr. Steinberg violated these duties by continuing to disclose and use Samsung proprietary information in his work for Rambus. In particular, upon information and belief, Mr. Steinberg continued to make disclosure and use of Samsung information when he was an outside attorney for Rambus and prosecuting Rambus patents relating to SDRAM and DDR SDRAM technology. Further, upon information and belief, Mr. Steinberg also disclosed and used Samsung information as in-house counsel for Rambus, where he reported to Mr. Karp and was handling patent prosecution, licensing, and litigation matters relating to SDRAM and DDR SDRAM technologies.

138. Rambus's change in its patent posture is evidence of Mr. Steinberg's revelations of Samsung confidential information to Rambus. Before Mr. Steinberg was requested to breach his fiduciary and contractual duties to Samsung and disclose Samsung information to Mr. Karp and Rambus in 1997 and 1998, Rambus's patent claims were focused on Rambus's own proprietary RDRAM technology. Up until that time, moreover, Rambus's patent portfolio was not asserted against features of DRAMs made by Samsung. As a result of Mr. Steinberg's disclosures to Rambus, however, Rambus was able to draft new patent claims that Rambus now alleges are infringed by Samsung DRAM products. In fact, Mr. Steinberg has testified that he was the one who came up with the idea for Rambus's Strategic Patent Portfolio Project, which was designed to obtain patents that could be used as a part of a licensing and enforcement strategy against DRAM manufacturers, including Samsung. In undertaking the Strategic Patent Portfolio Project, Mr.

1  Steinberg aggressively pursued patent applications to cover DRAM technology.  As a part of this

2  Project, Rambus continued to reverse engineer Samsung products.

3  139.  Rambus was aware that Mr. Steinberg was still employed as an attorney by

4  Samsung when Rambus engaged his services.  Rambus was further aware of the fiduciary capacity

5  in which Mr. Steinberg worked for Samsung, and of the duties that Mr. Steinberg owed to

6  Samsung.  Mr. Steinberg's duties to Samsung included an obligation to disclose violations of those

7  duties.

8  140.  Mr. Steinberg remained silent and concealed from Samsung his work for

9  Rambus in contravention of his on-going obligations with Samsung, including information about

10  his dual employment with Samsung and Rambus.  Rambus likewise mislead Samsung as to its true

11  intentions regarding their strategic alliance, allowing Samsung to invest heavily in manufacturing,

12  marketing, and otherwise promoting their joint projects in RDRAM while secretly reverse

13  engineering Samsung parts for infringement lawsuits, making itself "battle ready" for a suit against

14  Samsung, and secretly consulting with Mr. Steinberg against Samsung's interests.

15  141.  Samsung justifiably relied on Mr. Steinberg faithfully fulfilling his duties

16  owed to Samsung, including the obligation to disclose violations of those duties.  Samsung further

17  justifiably relied on Mr. Steinberg's silence as indication that he did not violate his duties.

18  Samsung likewise relied upon the representations by Rambus that it was working with Samsung in

19  a strategic alliance to their mutual benefit and Rambus's encouragement that Samsung continue to

20  invest money and manpower in this strategic alliance.

21  142.  Rambus was aware of Mr. Steinberg's failure to disclose his dual

22  employment to Samsung, in contravention of his duties to Samsung.  Nevertheless, Rambus

23  secretly engaged Mr. Steinberg's services when Rambus was aware that Mr. Steinberg was still

24  employed as an attorney by Samsung and facilitated Mr. Steinberg's silence on his dual

25  employment and, upon information and belief, his use of information about Samsung's business

26  and DRAM products in working for Rambus.  Rambus likewise kept its litigation planning against

27  Samsung and its retention of Mr. Steinberg secret from Samsung.

28

143. Rambus knew or should have known that hiring Mr. Steinberg while he was still employed by Samsung would be considered contrary to the purpose of maintaining a profitable business alliance between Rambus and Samsung. Nevertheless, Rambus concealed from Samsung that it had secretly engaged Mr. Steinberg's services when Rambus was aware that he was still employed as an attorney by Samsung and facilitated Mr. Steinberg's silence on his dual employment and, upon information and belief, his use of information about Samsung's business and DRAM products in working for Rambus.

144. Rambus, by its concealment, falsely represented to Samsung that it was still interested in faithfully remaining a business partner with Samsung in their profitable business alliance at a time when, as a result of its knowledge that Mr. Steinberg was breaching his fiduciary duties to Samsung at Rambus's request and on its behalf, and because Rambus sponsored false testimony, and upon information and belief continues to sponsor false testimony, as well as destruction of documents, to conceal this wrongdoing, Rambus had a duty to speak.

145. The existence of Mr. Steinberg's dual employment with Samsung and Rambus was publicly revealed for the first time during the trial of *Rambus v. Infineon*, in the U.S. District Court for the Eastern District of Virginia in 2005, and could not have been discovered by Samsung before that time. Specifically, heavily redacted legal invoices from Mr. Steinberg to Rambus dated in June and July of 1998, two months before Mr. Steinberg resigned from Samsung, were produced by Rambus for the very first time in connection with the *Infineon* unclean-hands trial in early 2005. Furthermore, Mr. Steinberg testified in a deposition introduced by video at the unclean-hands trial that he performed legal services for Rambus beginning in June 1998. These documents and facts were not discoverable by Samsung or anyone else outside of Rambus before 2005, and would remain concealed today if Rambus had not included as entries on its *Infineon* privilege log two documents prepared by Mr. Steinberg in June and July of 1998. Indeed, Mr. Steinberg had previously falsely testified in 2001 and again in 2004 that he had *not* performed any legal work for Rambus prior to August 17, 1998, the date he resigned from Samsung. Mr. Steinberg's perjury was a specific act of fraud that concealed Rambus's aiding and abetting of Mr. Steinberg's breaches of his fiduciary duties to Samsung, its intentional interference with Mr.

1  Steinberg's employment contract with Samsung, and Rambus's unfair business practices.  Rambus

2  and Mr. Steinberg have likewise testified in this Court that Mr. Steinberg's representation of

3  Rambus while employed by Samsung was limited to a single unrelated project one weekend in

4  early June 1998.  However, documents produced by Rambus clearly imply this testimony is false as

5  they show meetings and/or interactions between Rambus and Mr. Steinberg while Mr. Steinberg

6  was employed by Samsung for business purposes at times other than this one weekend.  Upon

7  information and belief, this testimony presented by Rambus and Mr. Steinberg as recently as 2006

8  in this Court is part of a continuing fraud and deception to cover up Rambus's and Mr. Steinberg's

9  wrongful acts.

### Rambus's Aiding and Abetting Neil Steinberg's
### Breach of Contractual Duties Owed to Samsung

12  146.    During the Spring and Summer of 1998, Mr. Steinberg, in-house counsel for

13  Samsung, had a written employment contract with Samsung for a specific term, which permitted

14  Mr. Steinberg to work only for Samsung during the term of that contract unless Samsung gave him

15  permission otherwise.  This contract also included specific obligations of nondisclosure and

16  confidentiality, in addition to those imposed ethically and by law on Mr. Steinberg through his

17  fiduciary capacity as an attorney.  Specifically, the contract prohibited Mr. Steinberg from

18  disclosing "any processes, formulas, improvements, inventions, discoveries, trade secrets, or other

19  proprietary information" to any person without Samsung's prior written consent.

20  147.    Rambus was aware that Mr. Steinberg was employed as in-house counsel for

21  Samsung under a written employment contract for a specific term.  Rambus was further aware that

22  at the time Mr. Steinberg's employment began with Rambus, his written employment contract had

23  not been terminated and was still in effect.  Also during this time, Rambus knew that Mr.

24  Steinberg's contract included nondisclosure clauses and restrictions on additional employment, and

25  that Samsung had not consented to (and was unaware of) Mr. Steinberg's employment by Rambus.

26  148.    Nevertheless, contrary to Mr. Steinberg's express contractual obligations to

27  Samsung, Rambus employed Mr. Steinberg to perform work on behalf of Rambus.  Upon

28  information and belief, at the request of Rambus Mr. Steinberg actively worked to help Rambus

1   plan patent prosecution strategies, including actually working on patent applications, patent

2   enforcement strategies, document handling and retention strategies for use in litigation, and to take

3   other measures to extract royalties from manufacturers of DRAMs, including Samsung, as outlined

4   in paragraphs 131-138 above.  Further, upon information and belief, Mr. Steinberg used

5   information about Samsung's business and DRAM products in working for Rambus, as outlined in

6   paragraphs 131-138 above, including but not limited to facts developed for the prosecution of the

7   '956 patent and strategies for protection of Samsung's JEDEC-compliant products as partially

8   implemented in the '956 patent, product roadmaps (plans for development of future products and

9   plans for their release), and Samsung's own internal licensing discussions and internal litigation

10  strategy discussions, while he was under contractual and fiduciary duties not to disclose such

11  information about Samsung's business or use it contrary to Samsung's interests, regardless of

12  whether such information was trade secret.  As a result, Rambus intentionally interfered with the

13  Steinberg-Samsung employment contract by hiring Mr. Steinberg in February of 1998.

14          149.    Mr. Steinberg was obligated to disclose violations of his contractual duties to

15  Samsung.  Likewise Mr. Steinberg has continued in his testimony in later litigation, including his

16  most recent testimony in this Court, to misrepresent his relationship and work for Rambus while

17  employed by Samsung.  Upon information and belief, Rambus has sponsored and promoted this

18  false testimony.

19          150.    Mr. Steinberg remained silent and concealed from Samsung his work for

20  Rambus in contravention of his on-going obligations with Samsung, including the concealment of

21  information about his dual employment with Samsung and Rambus.

22          151.    Samsung justifiably relied on Mr. Steinberg faithfully fulfilling his duties

23  owed to Samsung, including the obligation to disclose violations of those duties.  Samsung further

24  justifiably relied on Mr. Steinberg's silence as indication that he did not violate his duties.

25          152.    Rambus was aware that Mr. Steinberg's duties to Samsung included the

26  obligation to disclose violations of those duties.  Nevertheless, Rambus secretly engaged Mr.

27  Steinberg's services when Rambus was aware that Mr. Steinberg was still employed as an attorney

28  by Samsung and facilitated Mr. Steinberg's silence on his dual employment and, upon information

1   and belief, his use of information about Samsung's business and DRAM products in working for

2   Rambus.

3          153.   Rambus knew or should have known that its intentional interference with the

4   Steinberg-Samsung employment contract would be considered contrary to the purpose of

5   maintaining a profitable business alliance between Rambus and Samsung.  Nevertheless, Rambus

6   concealed from Samsung that it had secretly interfered with the Steinberg-Samsung employment

7   contract.  Upon information and belief, Rambus continues to conceal the true nature of Mr.

8   Steinberg's employment by asserting privilege over the work product Mr. Steinberg and Rambus

9   admit he created, and presenting testimony as to the limited scope of Mr. Steinberg's work that is

10  not consistent with documents showing additional business meetings between Rambus and Mr.

11  Steinberg while Mr. Steinberg was employed by Samsung.

12         154.   Rambus, by its concealment, falsely represented to Samsung that it was still

13  interested in faithfully remaining a business partner with Samsung in their profitable business

14  alliance at a time when, as a result of its knowledge that Mr. Steinberg was breaching his fiduciary

15  duties to Samsung at Rambus's request and on its behalf, and because Rambus sponsored false

16  testimony, and upon information and belief continues to sponsor false testimony, as well as

17  destruction of documents, to conceal this wrongdoing, Rambus had a duty to speak.Rambus's

18  intentional interference with Mr. Steinberg's contract with Samsung was publicly revealed for the

19  first time during the trial of *Rambus v. Infineon*, in the U.S. District Court for the Eastern District of

20  Virginia in 2005 and could not have been discovered by Samsung before that time.  Specifically,

21  heavily redacted legal invoices from Mr. Steinberg to Rambus dated in June and July of 1998, two

22  months before Mr. Steinberg resigned from Samsung, were produced by Rambus for the very first

23  time in connection with the *Infineon* unclean-hands trial in early 2005.  Furthermore, Mr. Steinberg

24  testified in a deposition introduced by video at the unclean-hands trial that he performed legal

25  services for Rambus beginning in June 1998.  These documents and facts were not discoverable by

26  Samsung or anyone else outside of Rambus before 2005, and would remain concealed today if

27  Rambus had not included as entries on its *Infineon* privilege log two documents prepared by Mr.

28  Steinberg in June and July of 1998.  Indeed, Mr. Steinberg had previously falsely testified in 2001

and again in 2004 that he had *not* performed any legal work for Rambus prior to August 17, 1998,

the date he resigned from Samsung.  Mr. Steinberg's perjury was a specific act of fraud by both

Rambus and Mr. Steinberg that concealed Rambus's aiding and abetting of Mr. Steinberg's

breaches of his fiduciary duties to Samsung, its intentional interference with Mr. Steinberg's

employment contract with Samsung, and Rambus's unfair business practices.  Rambus and Mr.

Steinberg have likewise testified in this Court that Mr. Steinberg's representation of Rambus while

employed by Samsung was limited to a single unrelated project one weekend in early June 1998.

However, documents produced by Rambus clearly imply this testimony is false as they show

meetings and/or interactions between Rambus and Mr. Steinberg while Mr. Steinberg was

employed by Samsung for business purposes at times other than this one weekend.  Upon

information and belief, this testimony presented by Rambus and Mr. Steinberg as recently as 2006

in this Court is part of a continuing fraud and deception to cover up Rambus's and Mr. Steinberg's

wrongful acts.

### Rambus's Aiding and Abetting Neil Steinberg's
### Breach of Fiduciary Duties Owed to Samsung, a Former Client

155.    Mr. Steinberg ended his employment with Samsung in August 1998.

156.    Separate from his duties when employed at Samsung, after ending his

employment with Samsung, Mr. Steinberg owed Samsung those duties owed to a former client by a

lawyer, including the duty to not disclose information about Samsung's business or to use it

contrary to Samsung's interests, regardless of whether such information was trade secret, and the

duty to obtain informed consent before representing parties adverse to Samsung in matters

substantially related to those Mr. Steinberg worked on for Samsung.

157.    Nevertheless, upon information and belief, Mr. Steinberg continued to

actively work to help Rambus plan patent prosecution strategies, including actually working on

patent applications, patent enforcement strategies, document handling and retention strategies for

use in litigation, and to take other measures to extract royalties from manufacturers of DRAMs,

including Samsung, as outlined in paragraphs 131-138 above.  Further, upon information and

belief, Mr. Steinberg used information about Samsung's business and DRAM products in working

1  for Rambus, as outlined in paragraphs 131-138 above, including but not limited to his work on the

2  '956 patent application, Samsung product roadmaps, Samsung licensing strategies and litigation

3  strategies he had been part of while employed at Samsung, while he was under contractual and

4  fiduciary duties not to disclose such information about Samsung's business or to use it contrary to

5  Samsung's interests, regardless of whether such information was trade secret.

6            158.    Mr. Steinberg worked for Rambus without first obtaining Samsung's

7  informed consent.

8            159.    Mr. Steinberg remained silent and concealed from Samsung all the facts and

9  circumstances regarding his representation of Rambus in contravention of his on-going obligations

10 with Samsung, including, on information and belief, information about his active work to help

11 Rambus plan patent prosecution strategies, including actually working on patent applications,

12 patent enforcement strategies, document handling and retention strategies for use in litigation, and

13 to take other measures to extract royalties from manufacturers of DRAMs, including Samsung, as

14 outlined in paragraphs 131-138 above.  In addition, he failed to inform Samsung of, upon

15 information and belief, his use of information about Samsung's business and DRAM products in

16 working for Rambus, as outlined in paragraphs 131-138 above, while he was under contractual and

17 fiduciary duties not to disclose such information about Samsung's business or use it contrary to

18 Samsung's interests, regardless of whether such information was trade secret.

19            160.    Rambus was aware that Mr. Steinberg was obligated to safeguard Samsung

20 information and to obtain informed consent from Samsung before working on certain matters

21 adverse to Samsung.  Rambus was further aware of the fiduciary capacity in which Mr. Steinberg

22 had worked for Samsung, and of the duties that Mr. Steinberg continued to owe to Samsung.

23            161.    Mr. Steinberg was obligated to disclose violations of those duties to

24 Samsung.

25            162.    Mr. Steinberg remained silent and concealed from Samsung his work for

26 Rambus in contravention of his on-going obligations with Samsung, as did Rambus.

27

28

163.     Samsung justifiably relied on Mr. Steinberg faithfully fulfilling his duties owed to Samsung, including the obligation to disclose violations of those duties.  Samsung further justifiably relied on Mr. Steinberg's silence as indication that he did not violate his duties.

164.     Rambus was aware that Mr. Steinberg's duties to Samsung included the obligation to disclose violations of those duties.  Nevertheless, with awareness of Mr. Steinberg's continuing fiduciary responsibilities to Samsung, Rambus secretly engaged Mr. Steinberg's services that, upon information and belief, made use of Samsung information and dealt with matters adverse to Samsung and facilitated Mr. Steinberg's silence on, upon information and belief, his use of information about Samsung's business and DRAM products in working for Rambus.

165.     Rambus knew or should have known that allowing Mr. Steinberg to work on matters adverse to Samsung or that made use of Samsung information would be considered contrary to the purpose of maintaining a profitable business alliance between Rambus and Samsung.  Nevertheless, Rambus concealed from Samsung that it had secretly engaged Mr. Steinberg's services that, upon information and belief, made use of Samsung information and dealt with matters adverse to Samsung and facilitated Mr. Steinberg's silence on, upon information and belief, his use of information about Samsung's business and DRAM products in working for Rambus.  Upon information and belief, Rambus further sponsored false testimony by Mr. Steinberg in court proceedings to continue to conceal the nature and extent of his relationship with Rambus.

166.     Rambus, by its concealment, falsely represented to Samsung that it was still interested in faithfully remaining a business partner with Samsung in their profitable business alliance at a time when, as a result of its knowledge that Mr. Steinberg was breaching his fiduciary duties to Samsung at Rambus's request and on its behalf, and because Rambus sponsored false testimony, and upon information and belief continues to sponsor false testimony, as well as destruction of documents, to conceal this wrongdoing, Rambus had a duty to speak.

167.     The full nature of Mr. Steinberg's employment with Rambus, including work done for Rambus that was adverse to Samsung's interests or that made use of information about Samsung's business, was publicly revealed for the first time during the trial of *Rambus v. Infineon*, in the U.S. District Court for the Eastern District of Virginia in 2005, and could not have been

discovered by Samsung before that time.  Specifically, heavily redacted legal invoices from Mr. Steinberg to Rambus dated in June of 1998, two months before Mr. Steinberg resigned from Samsung, were produced by Rambus for the very first time in connection with the *Infineon* unclean-hands trial in early 2005.  Furthermore, Mr. Steinberg testified in a deposition introduced by video at the unclean-hands trial that he performed legal services for Rambus beginning in June 1998.  These documents and facts were not discoverable by Samsung or anyone else outside of Rambus before 2005, and would remain concealed today if Rambus had not included as entries on its *Infineon* privilege log two documents prepared by Mr. Steinberg in June and July of 1998.  Indeed, Mr. Steinberg had previously falsely testified in 2001 and again in 2004 that he had *not* performed any legal work for Rambus prior to August 17, 1998, the date he resigned from Samsung.  Mr. Steinberg's perjury was a specific act of fraud that concealed Rambus's aiding and abetting of Mr. Steinberg's breaches of his fiduciary duties to Samsung, its intentional interference with Mr. Steinberg's employment contract with Samsung, and Rambus's unfair business practices.  Upon information and belief, Rambus and Mr. Steinberg have continued to misrepresent their relationship in false testimony in court proceedings in 2006, where they presented evidence that the Steinberg relationship with Rambus prior to his departure was limited to one project over one weekend in June 1998 on a matter unrelated to Rambus's patents, when documents produced and other evidence show that there were other contacts between Rambus and Samsung while Samsung employed Mr. Steinberg.

**Rambus's Anticompetitive Patent Enforcement
Strategies and Intentional Spoliation of Evidence**

168.   Rambus was organized to exploit the invention claimed by Mark Horowitz and Michael Farmwald of a narrow, multiplexed bus, and a packet-based memory interface.

169.   In 1990, Rambus filed an application for a patent on the Horowitz-Farmwald claimed invention(s).  Rambus believed that this application fully and comprehensively described and claimed any and all inventions made by Horowitz and Farmwald.

170.   Rambus implemented the Horowitz-Farmwald ideas in a specific interface which it called Rambus DRAM, or "RDRAM."

171.     Rambus's original and preferred objective was to establish RDRAM as the commodity DRAM interface.

172.     To this end, Rambus began as early as 1991 to actively market RDRAM to the DRAM industry including DRAM manufacturers, PC enablers including Intel, and industrial DRAM users.

173.     From the beginning of its RDRAM marketing efforts, Rambus licensed and offered to license the whole of its interface technology, including any future patents.  Prospective licensees reasonably understood that they were bargaining for a license relating to any existing or future Rambus patents.

174.     In marketing RDRAM to the DRAM industry, Rambus described the Rambus interface extensively.  Such descriptions invariably emphasized the unique and allegedly "revolutionary" characteristics of the Horowitz-Farmwald ideas, namely the single narrow and multiplexed bus and the packet based communication protocol.

175.     In marketing RDRAM to the DRAM industry, Rambus frequently and typically contrasted RDRAM with competitive interfaces, including the conventional DRAM interfaces then in common use, and with developing DRAM interfaces, including the SDRAM interfaces being standardized at JEDEC and the SyncLink interface.

176.     During the 1990's, Rambus participated actively in industry meetings on standards for SDRAMs and DDR SDRAMs at the Joint Electron Device Engineering Council ("JEDEC").  Rambus improperly used information it obtained as a result of its membership in JEDEC to secure additional patents and claims.  Rambus's use of this information was in violation of policies applicable to all JEDEC members.  Further, Rambus's failure to disclose to other members of JEDEC that it had taken information from JEDEC to craft its patent claims, only to seek to enforce its claims against JEDEC-compliant products many years after JEDEC members had invested heavily in the technology without notice of Rambus's conduct estops Rambus from enforcing its patents against JEDEC members.

177.     By February 1998, Rambus decided to litigate in order to license its purported SDRAM and DDR SDRAM technology to the DRAM industry, as a means of

1    eliminating or disadvantaging such alternatives to Rambus technology.  By the Spring of 1998,

2    before it commenced its litigation strategy, Rambus was actively seeking to improve its SDRAM

3    and DDR SDRAM patent portfolio.

4         178.    Central to this litigation strategy was the repeated, company-wide,

5    destruction of relevant documents.  Rambus intentionally destroyed millions of pages of documents

6    that it knew would be relevant to its lawsuits against the users of competing PC DRAM interface

7    technologies, including this lawsuit against Samsung and others.  This strategy also included

8    recruiting Samsung employees to work for Rambus as employees or attorneys.

9         179.    During meetings held in February 1998, Rambus and its attorneys developed

10   a multi-step litigation strategy against DRAM manufacturers that included making Rambus "battle

11   ready" prior to litigation.  The strategy involved, among other things, destroying millions of

12   relevant documents and attempting to mask that wanton destruction under the guise of a document

13   "retention" policy.

14        180.    At the time this strategy was hatched, Rambus expressly contemplated suing

15   DRAM manufacturers on a number of theories, including breach of contract claims against those

16   manufacturers who were RDRAM licensees, patent-infringement claims against those who relied

17   on competing PC DRAM interface technology, and an action for collusion and/or unfair

18   competition against the DRAM suppliers.

19        181.    Rambus's stated goals for the third quarter of 1998 included implementing

20   its document destruction action plan.  This plan included a staff training event and a "summer

21   housecleaning."

22        182.    In September 1998, Rambus commenced its first known "shred party."

23   Rambus hired a shredding service to come to Rambus's corporate headquarters in Mountain View,

24   California on September 3, 1998.  In accordance with Rambus's litigation strategy, Rambus

25   distributed burlap bags to all of its employees a week in advance of the shredding to enable those

26   employees to identify and collect documents to be shredded.  During this first shred party, Rambus

27   began to "cleanse" its patent prosecution and related files by destroying documents related to, at

28   least, patents that Rambus was planning to enforce against the DRAM industry.  The destroyed

1   documents related to, among others, patents to which other Rambus patents claim priority,

2   including patents that issued after the first shred party.  Following "Shred Day," all Rambus

3   employees were invited to a party at 5:00 p.m. on September 3, 1998 to celebrate completion of the

4   document destruction.

5          183.   All told, Rambus employees shredded thousands of pages of documents on

6   Shred Day 1998.  In fact, so many documents were bagged for shredding that the shredding truck

7   was filled to capacity and had to return another day to finish the job.  By the end of the shredding,

8   Rambus had disposed of over 185 burlap sacks full of documents, and 60 banker's boxes full of

9   documents.  Upon information and belief, the destruction of documents deliberately included files

10  and papers that would show the projects Mr. Steinberg worked on for Rambus while employed by

11  Samsung, and misuse of Samsung's information about Samsung's products, its '956 patent

12  application, patent strategies and litigation and licensing strategies, as well as contacts between

13  Rambus and Mr. Steinberg while he was employed at Samsung.

14         184.   During April 1999, Rambus had its patent attorneys "cleanse" their files.

15         185.   In 1999, Rambus added further detail to its anticompetitive strategy.

16  Rambus's 1999 litigation strategy expressly anticipated and planned for a potential "Nuclear

17  Winter Scenario" in the event Intel was to decide to move away from RDRAM to an alternative

18  technology, such as DDR SDRAM, SLDRAM, or some other PC DRAM interface technology that

19  Rambus feared might have been created by the DRAM manufacturers.  Rambus's planned response

20  was to discipline Intel "by cutting off" Intel's access to alternative technology, thus "threatening

21  Intel's current and future microprocessor based products."

22         186.   As a central part of its litigation plan, Rambus contemplated filing

23  complaints against various DRAM manufacturers.  The claims Rambus expressly contemplated in

24  1999 included: (i) patent infringement claims against users of alternative technologies to RDRAM

25  technology; (ii) breach of contract claims "based on cancellation of RDRAM production;" (iii)

26  fraud based on a theory that the DRAM companies never intended to manufacture RDRAM, and

27  (iv) the making of statements about Rambus that the DRAM companies knew to be untrue; (v)

28  unfair competition; (vi) antitrust violations; and (vii) any other claims that might be brought based

1    on a theory that the DRAM manufacturers set out to destroy Rambus through their actions. These

2    claims planned in 1999 include the very claims Rambus has alleged in its Complaint in this action.

3              187.    In furtherance of Rambus's "nuclear winter" litigation scenario, Rambus set

4    a series of "IP Goals" for 1999. For the third quarter of 1999, the "Licensing/Litigation Readiness

5    Goals" included the following verbatim bullet-point items:

6         "E.    Prepare litigation strategy against 1 of 3 manufacturers (re: 3D)

7         "F.    Ready for Litigation with 30 days notice

8         "G.    Organize 1999 shredding party at Rambus"

9

10             188.    During August 1999, Rambus commenced its second known "shred party."

11   During this second shred party, Rambus again "cleansed" its patent prosecution and related files by

12   destroying additional documents related to, at least, patents that Rambus was planning to enforce or

13   was litigating against the DRAM industry. The destroyed documents related to, among others,

14   patents to which other Rambus patents claim priority, including patents that issued after the second

15   shred party. All told, an additional 150 burlap bags filled with documents were destroyed - the

16   equivalent of 188 banker's boxes or almost a half-a-million pages. Upon information and belief,

17   the destruction of documents deliberately included files and papers that would show the projects

18   Mr. Steinberg worked on for Rambus while employed by Samsung, and misuse of Samsung's

19   information about Samsung's products, its '956 patent application, patent strategies and litigation

20   and licensing strategies, as well as contacts between Rambus and Mr. Steinberg while he was

21   employed at Samsung.

22             189.    During the Spring of 2000, Rambus was notified by its outside counsel that it

23   had a duty to preserve all documents related to its patents and/or the litigation against DRAM

24   manufacturers.

25             190.    During June 2000 and after its litigation with Hitachi settled, Rambus again

26   asked its patent attorneys to destroy documents.

27             191.    During December 2000, while Rambus was actively litigating against

28   numerous companies on antitrust, fraud, and patent claims, Rambus commenced its third known

1   "shred party."  During this third shred party, Rambus again "cleansed" its patent prosecution and

2   related files by destroying additional documents related to, at least, patents that Rambus was

3   enforcing and litigating against the DRAM industry.  The destroyed documents related to, among

4   others, patents to which other Rambus patents claim priority, including patents that issued after the

5   third shred party.  Shred Day 2000 turned out to be the largest Shred Day of them all.  All told,

6   Rambus destroyed over 575 banker's boxes full of documents – one-and-a-half million pages – on

7   Shred Day 2000.  Although Rambus was then litigating numerous actions, Rambus employees were

8   given no instructions to retain documents related to the litigations.  To ensure that its strategy to

9   dispose of critical evidence worked, Rambus did not maintain any record of which documents it

10  destroyed.  Upon information and belief, the destruction of documents deliberately included files

11  and papers that would show the parties' interpretation of the 2000 SDR/DDR license between

12  Samsung and Rambus consistent with Samsung's claims in this case and contrary to positions

13  Rambus has taken in this lawsuit, deliberate efforts to deceive Samsung during the strategic alliance

14  between Samsung and Rambus, misuse of information from the projects Mr. Steinberg worked on

15  for Rambus while employed by Samsung, and misuse of Samsung's information about Samsung's

16  products, its '956 patent application, patent strategies and litigation and licensing strategies, as well

17  as contacts between Rambus and Mr. Steinberg while he was employed at Samsung.

18              192.     Samsung could not have discovered Rambus's destruction of documents

19  until it was revealed publicly in a trial in *Rambus v. Infineon* in the Eastern District of Virginia in

20  February 2005.  Specifically, voluminous Rambus documents produced for the very first time in

21  connection with the *Infineon* unclean-hands trial in early 2005 catalogued Rambus's adoption of a

22  document retention policy in early 1998, its massive destruction of documents during at least three

23  separate company-wide "Shred Days," and its instructions to outside patent counsel to destroy

24  numerous documents from his Rambus patent files – documents that a patent-infringement

25  defendant might use to defend against Rambus's infringement claims.  These documents and facts

26  were not discoverable by Samsung or anyone else outside of Rambus before 2005, and would

27  remain concealed today if the *Infineon* court had not broadly pierced Rambus's attorney-client

28  privilege under the crime-fraud exception during preparations for the 2005 unclean-hands trial.

193.    Rambus's document destruction covered all major categories of documents generated in the ordinary course of Rambus's business, such as e-mail communications, notes of contract negotiations, and drafts and other information useful in ascertaining the truth and in testing the validity of the positions taken by Rambus in this and its other lawsuits.  The shredding included the destruction of evidence that related to, among other things:

a.    Rambus's prosecution of its patents,

b.    the relationship of Rambus's patent applications and pending claims to industry standards,

c.    presentations to Rambus's board of directors regarding intellectual property,

d.    potentially damaging or invalidating prior art related to patents asserted against DRAM manufacturers, including Samsung, as part of Rambus's litigation strategy,

e.    Rambus's draft license agreements and documents related to the negotiations for such license agreements, and

f.    on information and belief, other documents supporting Samsung's positions and affirmative defenses in this case, and the facts alleged by Samsung in its Counterclaims, including but not limited to the interpretation and negotiation of the 2000 SDR/DDR license between Samsung and Rambus, Rambus's deception of Samsung during their strategic partnership (by planning infringement litigation against Samsung while promoting their relationship), and the nature and extent of Mr. Steinberg's breach of fiduciary duties while employed by Samsung and after his employment by Samsung.

194.    Rambus's wholesale destruction of these and other categories of documents was intended to and has prejudiced Samsung in this lawsuit, as well as other DRAM manufacturers and the end-users of DRAM technology.  Samsung can only speculate as to what documents were destroyed because Rambus kept no log of what was shredded.  Nevertheless, based on what is revealed in those documents that *were* retained, Samsung has every reason to believe the destroyed

1   documents contained information that would further bring to light the wrongs by Rambus that are

2   alleged in these Counterclaims.

3        195.   Rambus's vice president of engineering testified under oath that he was

4   ordered to purge his files at least in part because "such materials are discoverable in subsequent

5   litigations." A lawyer in Rambus's in-house legal department testified that one of the understood

6   reasons behind the "Shred Days" was that "some of that stuff is discoverable."

7        196.   While attempting to make itself "battle ready," Rambus launched its

8   litigation campaign against the DRAM manufacturers, with numerous patent suits against multiple

9   DRAM manufacturers in various U.S. federal courts, as well as patent courts in Italy, German,

10   France, and the United Kingdom.

11        197.   In the course of its lawsuits against the DRAM manufacturers, Rambus

12   engaged in further litigation misconduct, including permitting its executives, attorneys, and

13   employees to offer false or misleading testimony in multiple depositions about Rambus's

14   destruction of documents. In one such action brought by Rambus against Infineon in the Eastern

15   District of Virginia, the Honorable Robert Payne found Rambus's spoliation and perjury so

16   egregious that he dismissed summarily Rambus's claims against Infineon. Having been presented

17   with evidence of Rambus's (and its lawyers') misconduct, Judge Payne could only remark "Why

18   are all these people lying?" Judge Payne felt compelled to warn all involved that their destruction

19   of evidence could result in jail terms. Rambus sponsored false testimony by Mr. Steinberg and its

20   executives in litigation, only conceding some of the testimony was false as recently as 2006, while

21   continuing to present testimony inconsistent with its own records.

22        198.   Rambus knew or should have known that its actions in implementing its

23   strategy to exploit its anticompetitive agreements and litigation scheme against the DRAM

24   manufacturers, including Samsung, would be considered contrary to the purpose of maintaining a

25   profitable business alliance between Rambus and Samsung. Nevertheless, Rambus engaged in such

26   actions.

27        199.   Rambus, by its concealment, falsely represented to Samsung that it was still

28   interested in faithfully remaining a business partner with Samsung in their profitable business

1    alliance at a time when, as a result of its knowledge that Mr. Steinberg was breaching his fiduciary

2    duties to Samsung at Rambus's request and on its behalf, and because Rambus sponsored false

3    testimony, and upon information and belief continues to sponsor false testimony, as well as

4    destruction of documents, to conceal this wrongdoing, Rambus had a duty to speak.

5              200.     Rambus's destruction of documents in anticipation of litigation with

6    Samsung, its unfair employment of Neil Steinberg, and the full nature and extent of the unfair

7    conduct by Rambus, were publicly revealed for the first time during the trial of *Rambus v. Infineon*,

8    in the U.S. District Court for the Eastern District of Virginia in 2005, and could not have been

9    discovered by Samsung before that time.  Specifically, voluminous Rambus documents produced

10   for the very first time in connection with the *Infineon* unclean-hands trial in early 2005 catalogued

11   Rambus's adoption of a document retention policy in early 1998, its massive destruction of

12   documents during at least three separate company-wide "Shred Days," and its instructions to

13   outside patent counsel to destroy numerous documents from his Rambus patent files – documents

14   that a patent-infringement defendant might use to defend against Rambus's infringement claims.

15   These documents and facts were not discoverable by Samsung or anyone else outside of Rambus

16   before 2005, and would remain concealed today if the *Infineon* court had not broadly pierced

17   Rambus's attorney-client privilege under the crime-fraud exception during preparations for the

18   unclean-hands trial.  In addition, heavily redacted legal invoices from Mr. Steinberg to Rambus

19   dated in June and July of 1998, two months before Mr. Steinberg resigned from Samsung, were

20   produced by Rambus for the very first time in connection with the *Infineon* unclean-hands trial in

21   early 2005.  Furthermore, Mr. Steinberg testified in a deposition introduced by video at the

22   unclean-hands trial that he performed legal services for Rambus beginning in June 1998.  These

23   documents and facts were not discoverable by Samsung or anyone else outside of Rambus before

24   2005, and would remain concealed today if Rambus had not included as entries on its *Infineon*

25   privilege log two documents prepared by Mr. Steinberg in June and July of 1998.  Indeed, Mr.

26   Steinberg had previously falsely testified in 2001 and again in 2004 that he had *not* performed any

27   legal work for Rambus prior to August 17, 1998, the date he resigned from Samsung.  Mr.

28   Steinberg's perjury was a specific act of fraud that concealed Rambus's aiding and abetting of Mr.

1    Steinberg's breaches of his fiduciary duties to Samsung, its intentional interference with Mr.

2    Steinberg's employment contract with Samsung, and Rambus's unfair business practices.  Upon

3    information and belief, Mr. Steinberg and Rambus continue to conceal the true extent and nature of

4    their relationship by assertion of privilege over work Mr. Steinberg did for Rambus while employed

5    by Samsung, and by testifying to the limited engagement of one weekend in June, which is

6    inconsistent with records produced by Rambus (which appear incomplete).

7            201.    Rambus continues today its strategy to exploit its anticompetitive agreements

8    and litigation scheme in an attempt to have "[o]ur standards dominate the DRAM interface market"

9    and "[c]ollect royalties on all DRAM and controllers forever."

10

11   **Evidence Revealed for the First Time During the *Infineon* Unclean-Hands Trial in 2005**

12           202.    As described above, the documents and facts that reveal Rambus's conduct

13   upon which Samsung's counterclaims are based were revealed publicly for the first time during the

14   2005 unclean-hands trial between Rambus and Infineon in the Eastern District of Virginia, and

15   could not have been discovered by Samsung before that time.  More specifically, in addition to

16   Samsung's factual allegations above, which are based almost entirely on information first learned

17   in 2005, at least the following facts first came to light during the 2005 *Infineon* trial and were

18   included in the findings of fact in the Eastern District of Virginia court's exceptional-case opinion

19   in *Samsung v. Rambus*.[4]  Samsung was not on notice that Mr. Steinberg had acted adversely to

20   Samsung's interest until it knew of these facts because, prior to that time, Samsung was not aware

21   of Rambus's long-standing and coordinated plan to extract royalties from the DRAM industry, and

22   therefore could not have known the improper and integral role that Mr. Steinberg's employment by

23   Rambus played therein:

24   **Facts related to Rambus's strategy to extract royalties from DRAM manufacturers and its**
25   **spoliation of evidence in anticipation of litigation with those manufacturers:**

26           • In October 1997, Rambus hired Joel Karp, formerly employed by Samsung, to
27             implement its plan to secure royalties from DRAM manufacturers whose

---

28   [4] A copy of the opinion is attached as Exhibit B.

products Rambus considered to infringe its patents and tread on its technology;

• By February and March of 1998, Rambus believed that a number of DRAM manufacturers, some of which held Rambus licenses for RDRAMs, and others of which did not, were making SDR and DDR DRAMs using Rambus technology. Rambus intended to do what was necessary to secure royalties for the use of its inventions;

• Rambus's litigation plans were sufficiently concrete, even by the spring of 1998, that it had identified potential litigation targets by industry type (DRAM manufacturers) and by name, and it had identified potential venues in which to prosecute the litigation and the theories of liability (breach of contract or patent infringement) to assert in it. In fact, Rambus had identified, as components of aggressive readiness, the need to prepare a discovery database and the need to select experts. And, as the Rambus board was told, the litigation strategy involved the near term actions of establishing a document retention policy and cleansing the patent prosecution files;

• Rambus reverse engineered Samsung parts for litigation in 1998;

• Rambus consulted with Mr. Steinberg while he was employed by Samsung in 1998 to prepare for litigation;

• In a section entitled "NEGOTIATION TACTICS," Rambus's patent enforcement plan for 1999 suggested meetings at which litigation targets would be shown how they infringe by using claim charts. The proposed royalties would be high (5% to 10%), if settlement was not thought desirable in a particular case, or low (1% to 2%), if settlement was desired by Rambus;

• Rambus's board of directors was informed in 1998 that, of 13 potential litigation adversaries, those achieving the highest score on the legal matrix were, in order, Hitachi, NEC, Samsung, Fujitsu, and Toshiba, while those achieving the highest score on the business matrix were, in order, Micron, Hitachi, A&D, Hyundai (now Hynix), and Samsung. The overall combined weighting (60% for legal factors, 40% for the business factors) produced the following overall rankings, in order: Hitachi, Samsung, Hyundai (now Hynix), NEC, and Micron;

• The licensing component of Rambus's patent enforcement strategy called for such high royalties that Rambus expected to be in litigation soon after seeking those royalties. Indeed, the company expected that litigation would be necessary to establish both its intellectual property rights and its royalty rates. Rambus's official business records demonstrate that the document retention program was an integral component of this litigation strategy;

• By the time Rambus implemented its document destruction policy on Shred Day in September 1998, it had identified the most likely and attractive litigation targets, and had settled on a number of possible legal theories to press against specific targets, depending upon whether the target was already a licensee. Rambus had also begun its reverse engineering efforts and planned to develop claim charts shortly thereafter. Additionally, Rambus had selected three fora it thought would be most advantageous to it. All of

1    these efforts on the part of Rambus were components of its overarching Licensing and Litigation Strategy.

2    **Facts related to Rambus's document retention policy:**

3    - Beginning in early 1998, Rambus developed a document retention policy;

4    - Anthony Diepenbrock, formerly the in-house patent lawyer at Rambus,
5    testified that one reason for implementing a document retention policy was concern about documents being discoverable in litigation. Mr. Diepenbrock
6    recalled that a particular focus of that concern was email communications. Allen Roberts, Rambus's Vice President of Engineering, testified that one of
7    the reasons given by Karp for purging files was that they were discoverable in litigation;

8    - Joel Karp and outside litigation counsel Dan Johnson gave a presentation to
9    Rambus's managerial staff on July 22, 1998. That presentation specified that special care should be taken with email and electronic documents because,
10   *inter alia*, email communications 'are generally less formal and thoughtful than written correspondence." Mr. Johnson explained that emails should be
11   treated like written documents for discovery or destruction purposes.

12   **Facts relating to Rambus's document destruction:**

13   - On September 3, 1998, burlap bags were handed out to every Rambus
14   employee and documents were placed in the bags and delivered to an outside contractor for shredding which incidentally occurred on site. On Shred Day
15   and the next day, Rambus destroyed the equivalent of 291 boxes (or 757,531 pages) of documents;

16   - In April 1999, Rambus, through Joel Karp, instructed its outside patent
17   counsel, Lester Vincent of the Blakely Sokoloff firm, to comply with Rambus's document retention policy and to "clean out all the Rambus files
18   that had issued." According to Mr. Vincent, by April 19, 1999, he had followed Mr. Karp's April 5th request and cleaned 11 of 49 issued patent
19   files at Blakely Sokoloff in accord with the Rambus document retention policy. At that time, Mr. Karp asked Mr. Vincent to speed the process up
20   and a secretary was assigned full time to file clearance;

21   - A second shredding event occurred on August 26, 1999. On this occasion,
22   the company's chief executive officer, Geoff Tate, advised that he was aware of, but would not be attending the shredding party. On Shred Day 1999
23   (August 26, 1999), Rambus destroyed 188 boxes (or 487,688 pages) of documents;

24   - Lester Vincent, acting on his own, stopped "cleaning" the patent prosecution
25   files in his office when he learned that Hitachi had been sued. No one at Rambus gave him that instruction. One June 22, 2000, Mr. Vincent learned,
26   by email from Mr. Karp, that the Hitachi litigation had settled. The next day, June 23, 2000, Mr. Vincent resumed cleaning out his Rambus prosecution
27   files in accord with the previous instructions from Mr. Karp to act expeditiously in completing that task;

28

- Also on June 23, 2000, Rambus first asserted the '804 patent against Infineon by way of a letter from Mr. Steinberg to Infineon's vice president, Dr. Andreas von Zitzewitz. On that day, Mr. Vincent cleaned out his '804 prosecution file;

- On July 17, 2000, approximately one month after having first asserted the '804 patent against Infineon and six months after suing Hitachi and approximately three weeks before filing the action against Infineon, Mr. Steinberg issued a memorandum to all Rambus executives that was entitled "Reminder of Document Destruction Policy re: Contracts." Mr. Steinberg instructed the Rambus executives to destroy draft contracts and materials used during negotiations that are not part of the final contract. According to Mr. Steinberg, that pertained to "all licenses." At the time that Mr. Steinberg issued the July 17 destruction order, Rambus had negotiated license contracts with at least 14 different DRAM manufacturers, at least seven of which were on the litigation target list;

- In December 2000, some three and a half months after filing the action against Infineon, a company-wide document destruction plan was conducted in conjunction with a transfer of offices from one location to another. At that time, during the pendency of *Rambus v. Infineon* and in the midst of discovery in that case, Rambus destroyed 575 boxes (or 1,495,575 pages) of documents;

- Rambus instructed its outside patent counsel, Lester Vincent, to purge the patent prosecution files so as to make them conform to the file wrapper and thereby to eliminate much information that typically is useful in patent litigation in addressing validity and infringement issues as well as the conduct of the applicant before the PTO;

- Rambus also destroyed email archives and other electronic files. Many of Rambus's Macintosh backup tapes were destroyed in the implementation of the document retention policy. By virtue of the document retention policy, the backup tapes for emails were destroyed every three months from its inception in September 1998 forward;

- Prior art documents were discarded by Rambus. Mr. Steinberg admitted that, in 1999, he threw away prior art documents on which he had made substantive notations.

**Facts relating to Neil Steinberg's employment at Rambus and his involvement in Rambus's plan to extract royalties from DRAM manufacturers:**

- In the middle of 1998, Mr. Karp arranged to retain, as outside counsel for Rambus, Neil Steinberg. At the time he began to represent Rambus in mid-1998, Mr. Steinberg testifies that his responsibility was 'licensing and preparation for litigation, and of course, prosecution . . . related to Rambus technology and Rambus patents.' According to Mr. Steinberg, the 'licensing and preparation for litigation' to which he referred was related to Rambus's patents that were thought to relate to third parties who used RDRAMs and third parties who used SDRAMs and DDR-SDRAMs;

- On October 1, 1998, Mr. Steinberg gave a presentation to Rambus executives which, on Rambus's privilege log, is identified as "Patent Litigation Strategy Update." This presentation helps to explain why Rambus did not actually implement its Licensing/Litigation Strategy until late 1999. Although Rambus had filed the '898 application in 1990, its progress in securing patents was slowed because the PTO required Rambus to reconfigure its applications and that led to the necessity to file continuation and divisional applications. Also, in late 1991, Rambus joined JEDEC and, as reflected in the company's 1992 business plan, learned that JEDEC was formulating a standard applicable to SDRAMs. The process of developing the standard was a slow one. As Rambus attended the meetings, its representatives, Messrs. Crisp and Garrett, obtained information that was used to improve existing applications or to file new ones in a deliberate effort to cover the evolving SDRAM standard.   Further, Mr. Steinberg ascertained that some of the pending applications might not be effective in covering SDRAM products to be made in compliance with JEDEC standard. Therefore, he took over the patent prosecution of a number of patents in 1998 with a view to strengthening the Rambus portfolio as to SDRAM and DDR-DRAM products;

- Mr. Steinberg prepared a strategy update for October 1998.  On the page entitled "Strategy Update 1098-1," Mr. Steinberg advised the Rambus executives:

    o DO NOT ROCK THE DIRECT BOAT
    o We should not assert patents against Direct partners until ramp reaches a point of no return (TBD)
    o Probably not until Q1/00

  Testimony established that the term "Direct" means the RDRAM and thus, in effect, Mr. Steinberg advised the Rambus executives not to assert Rambus's patents against DRAM manufacturers who had licenses for the RDRAM technology until those manufacturers had "reached a point of no return." In other words, he advised that Rambus should forestall an assertion of its patent rights against DRAM manufacturers with whom it had licenses until those manufacturers had become committed to use of RDRAM technology. At the same time, Mr. Steinberg posed a significant question:

    o However, Big Question Is--WHAT'S THE RUSH?
    o What is compelling business reason? I can't think of any
    o Let's not snatch defeat from the jaws of victory

- The next slide, Strategy Update, 10/98-2, specifies that Rambus should give top priority to strengthening its portfolio by filing continuation cases based on the '898 filing in 1990, the objective of which was to "cover SDRAM, DDR, SLDRAM, any and all forms of synchronous memory (static and dynamic)." To that end, a new series of filings were recommended. Meanwhile, Rambus was proceeding with reverse engineering efforts and Mr. Steinberg advised that the company should "Continue In Stealth Mode During '99."

- The following slide, Strategy Update, 10/98-3, suggested to the Rambus board a way to implement the point made on slide 2. Specifically, all prosecutions based on the ˙898 filing were then to be given to Mr. Steinberg, who would add eight to twelve new continuation cases and continue with the five then being prosecuted by the Blakely Sokoloff law firm.  It was Mr. Steinberg's expectation that all of the cases would issue within 12 to 18 months from filing.  Thus, he suggested that the strategic portfolio of Rambus patents would be ready to present to the industry during calendar year 2000.  He advised also that all reverse engineering should be completed in advance of that time.   The purpose of strengthening the strategic portfolios was also outlined by Mr. Steinberg. In his view, it "Should Result In Quick Settlements By Several Companies;"

- In June 1999, Mr. Steinberg made a presentation to Rambus executives. According to a Rambus privilege log, the topics were intellectual property and litigation strategy.  In a section of the presentation entitled "KR99.5 Update for IP," the executives were given a status report. ("KR" stands for "key results" and "99.5" stands for "half way through 1999").  Under the category "Current: IP ACQUISITION AND PROTECTION," Mr. Steinberg advised that more than ten continuation cases based on the 1990 filing (the '898 application) with claims directed to SDRAM, DDR SDRAM, and SLR-DRAM had been filed.  Mr. Steinberg further announced as an objective, the commencement of license negotiation with at least one company with the purpose of starting the "clock for calculation of damages by Q4/99-Q1/00." Mr. Steinberg then proposed amended goals, the second of which was to begin license negotiations with one company, thereby starting the clock for calculation of damages by Q4/99, and then to begin license negotiations with two additional companies during Q1/00. Finally, he advised that the amended goal would include the choosing of "one company to litigate with during Q1/00" and to "[c]ommence litigation during Q2/00 upon ex/board approval."   Mr. Steinberg also informed the Rambus executives of the selected "SDRAM Targets" for whom infringement cases would be prepared in "Q4'99." Those targets included Hitachi and Infineon, against whom Rambus actually filed patent litigation actions in January 1999 and August 2000, respectively. It was the stated objective to select the first target by "early Q4'99" and the second and third target by "mid-Q4'99." The factors to be considered in selecting the target included the opponent's "Licensing and Litigation Capabilities," and the "Economic Impact of Licensing and Litigation" in the United States, Europe, and Korea.

- Thus, by June 1999, the scheduled slowdown proposed by Mr. Steinberg in October 1998 went by the wayside and planning for litigation resumed apace.  Indeed, in June 1999, Mr. Karp and Mr. Steinberg were preparing Rambus's intellectual property department's third quarter goals. A first cut of those goals was prepared on June 27, 1999.   The third section of the "IPQ3'99 Goals" was addressed to the company's "Licensing/Litigation Readiness." The goals included the preparation of licensing positions against three manufacturers (item 3D), the preparation of a litigation strategy against one of the three manufacturers thusly identified (item 3E), to be ready for

litigation with 30 days notice (item 3F), and to "organize 1999 shredding party at Rambus" (item 3G).

## COUNT I (BREACH OF SECTION 3.8 OF THE SDR/DDR LICENSE)

203.    SEC and SEA reallege and incorporate by reference Paragraphs 1- 204 above as though fully set forth herein.

204.    Section 3.8 of the SDR/DDR License requires Rambus to notify SEC of any lower effective royalty rate paid by any third party for specific products defined in the SDR/DDR License.

205.    Rambus and Infineon entered into a license agreement during the Spring of 2005 (the "Rambus/Infineon License").  On information and belief, the Rambus/Infineon License provided for an effective royalty rate that was lower than that being paid by SEC under the SDR/DDR License.

206.    Rambus failed to notify SEC of the lower effective royalty rate agreed to be paid by Infineon as provided for in the Rambus/Infineon License.

207.    Rambus breached Section 3.8 of the SDR/DDR License Agreement by failing to notify SEC of the lower effective royalty rate provided for in the Rambus/Infineon License.

208.    Section 3.8 of the SDR/DDR License required Rambus to adjust the royalty rate paid by SEC to match any lower effective royalty rate paid by a third party.

209.    Rambus failed to adjust SEC's royalty rate following the execution of the Rambus/Infineon License.

210.    Rambus breached Section 3.8 of the SDR/DDR License Agreement by failing to adjust SEC's royalty rate based upon the lower effective royalty rate provided for in the Rambus/Infineon License.

211.    All conditions precedent have been met.

212.    SEC has suffered damages as a result of the breach by Rambus of Section 3.8 of the SDR/DDR License.

**COUNT II (BREACH OF SECTION 8.5 OF THE SDR/DDR LICENSE)**

213.   SEC and SEA reallege and incorporate by reference Paragraphs 1-212 above as though fully set forth herein.

214.   Section 8.5 of the SDR/DDR License provides that SEC and Rambus will negotiate an extension or renewal of the SDR/DDR License in good faith.

215.   Rambus failed to provide notice of certain terms of the Rambus/Infineon License as required under Section 3.8 of the SDR/DDR License, thereby precluding good faith negotiations for the extension or renewal of the SDR/DDR License.

216.   Rambus breached Section 8.5 of the SDR/DDR License by failing to provide SEC with notice of those certain terms of the Rambus/Infineon License as required under Section 3.8 of the SDR/DDR License.  By withholding notice of the terms, Rambus did not and could not negotiate a new license agreement with SEC in good faith.

217.   All conditions precedent have been met.

218.   SEC has suffered damages as a result of the breach by Rambus of Section 8.5 of the SDR/DDR License.

**COUNT III (BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING OF SECTIONS 3.8 AND 8.5 OF THE SDR/DDR LICENSE)**

219.   SEC and SEA reallege and incorporate by reference Paragraphs 1-218 above as though fully set forth herein.

220.   Under Section 9.1, the SDR/DDR License is to be governed by, and interpreted in accordance with, U.S. federal law and California law.

221.   Under California law, Section 3.8 of the SDR/DDR License includes a duty of good faith and fair dealing owed by Rambus to SEC to inform SEC of the lower royalty rate provided for in the Rambus/Infineon License and to adjust Samsung's rate to the lower rate.

222.   Rambus failed to inform SEC of the lower effective royalty rate provided for in the Rambus/Infineon License.

223.     Rambus breached the duty of good faith and fair dealing of the SDR/DDR License by failing to inform SEC of the lower effective royalty rate provided for in the Rambus/Infineon License.

224.     Under California law, the duty of good faith and fair dealing required Rambus to adjust the royalty rate paid by SEC to match any lower effective royalty rate paid by a third party.

225.     Rambus failed to adjust the royalty rate paid by SEC to match the lower effective royalty rate provided for in the Rambus/Infineon License.

226.     Rambus breached the duty of good faith and fair dealing by failing to adjust the royalty rate paid by SEC to match the lower effective royalty rate provided for in the Rambus/Infineon License.

227.     Under California law, Section 8.5 of the SDR/DDR License includes a duty owed by Rambus to SEC to negotiate an extension or renewal of the SDR/DDR License in good faith.

228.     Rambus failed to provide notice of the terms of the Rambus/Infineon License to SEC, thereby precluding good faith negotiations for the extension or renewal of the SDR/DDR License.

229.     Rambus breached the duty of good faith and fair dealing of the SDR/DDR License by failing to provide notice of the terms of the Rambus/Infineon License to SEC.  By withholding notice of the terms, Rambus did not and could not negotiate a new license agreement with SEC in good faith.

230.     All conditions precedent have been met.

231.     SEC has suffered damages as a result of the breach of the duty of good faith and fair dealing by Rambus of the SDR/DDR License.

## COUNT IV (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY TO A CURRENT CLIENT)

232.     SEC and SEA reallege and incorporate by reference Paragraphs 1-231 above as though fully set forth herein.

233.    As an in-house attorney for Samsung, Mr. Steinberg owed Samsung a fiduciary duty of utmost good faith and fair dealing and undivided loyalty and honesty in fact.

234.    By actively working for Rambus in secret and contrary to Samsung's interests during the time he was employed as an attorney for Samsung, Mr. Steinberg breached his fiduciary duty to Samsung.

235.    While an employee for Samsung, Mr. Steinberg concealed his dual representation of Samsung and Rambus and represented to Samsung that he was not working for both Rambus and Samsung at the same time.  Thus, Samsung had no notice of any deception on Mr. Steinberg's part and had no reason to investigate whether Mr. Steinberg worked for Rambus while employed as an attorney by Samsung.

236.    Mr. Steinberg's failure to disclose his breach of his fiduciary duty to Samsung further violated his fiduciary duty toward Samsung.

237.    Samsung was entitled to reasonably rely on Mr. Steinberg's silence because of its expectation that Mr. Steinberg would faithfully fulfill his fiduciary obligations.

238.    Because Samsung was justifiably misled by Mr. Steinberg's misrepresentation and concealment of facts surrounding his dual employment by Samsung and Rambus, it did not discover, nor was it put on notice to investigate, Mr. Steinberg's breach of fiduciary duties he owed to Samsung as a current client.

239.    Rambus knew that Mr. Steinberg was still employed as an attorney by Samsung when it engaged his services.  It further knew that Samsung had not given permission for Mr. Steinberg to dually represent Samsung and Rambus.  Rambus also knew of the fiduciary capacity in which Mr. Steinberg worked for Samsung and the duties that Mr. Steinberg owed to Samsung as a result.

240.    By engaging Mr. Steinberg to represent Rambus knowing Mr. Steinberg owed fiduciary duties to Samsung as a current client, Rambus aided and abetted Mr. Steinberg in breaching those fiduciary duties.

241.    Rambus also knew that Mr. Steinberg had a duty to disclose to Samsung, a current client, any breach of his fiduciary duty, and that Mr. Steinberg in fact failed to carry out this

1    duty.  As a result, Rambus facilitated Mr. Steinberg's failure of his obligation to Samsung by

2    secretly engaging Mr. Steinberg's services when it was aware that Mr. Steinberg was still employed

3    as an attorney by Samsung.

4            242.    Rambus knew that hiring Mr. Steinberg while he was still employed by

5    Samsung would be considered contrary to the purpose of maintaining a profitable business alliance

6    between Rambus and Samsung.  Nevertheless, Rambus concealed from Samsung that it had

7    secretly engaged Mr. Steinberg's services when Rambus was aware that Mr. Steinberg was still

8    employed as an attorney by Samsung and facilitated Mr. Steinberg's silence on his dual

9    employment and, upon information and belief, his use of information about Samsung's business

10   and DRAM products in working for Rambus.  Rambus actively concealed Mr. Steinberg's role by

11   sponsoring false testimony in different courts by Mr. Steinberg, and upon information and belief,

12   even when grudgingly admitting in 2006 that he did in fact do some work for Rambus while

13   employed by Samsung, misrepresenting the nature and scope of that work.  Upon information and

14   belief Rambus destroyed documents showing the nature and extent of Mr. Steinberg's work by

15   Rambus in an effort to conceal his breach of duty and Rambus's role in it.

16           243.    Rambus, by its concealment, falsely represented to Samsung that it was still

17   interested in faithfully remaining a business partner with Samsung in their profitable business

18   alliance at a time when, as a result of its knowledge that Mr. Steinberg was breaching his fiduciary

19   duties to Samsung at Rambus's request and on its behalf, and because Rambus sponsored false

20   testimony, and upon information and belief continues to sponsor false testimony, as well as

21   destruction of documents, to conceal this wrongdoing, Rambus had a duty to speak.

22           244.    SEC and SEA were harmed by Rambus's aiding and abetting Mr.

23   Steinberg's breach of his fiduciary duty to Samsung.

24           **Applicable Statute of Limitations Tolled by Discovery Rule**

25           245.    As a result of Mr. Steinberg's and/or Rambus's concealment of his dual

26   representation of Samsung and Rambus, Samsung did not discover and could not have discovered

27   the circumstances giving rise to a breach of Mr. Steinberg's fiduciary duties owed to Samsung

28   while working for them, nor of Rambus's role in Mr. Steinberg's breach of his fiduciary duties,

1   until it was revealed for the first time during the trial of *Rambus v. Infineon*, in the U.S. District

2   Court for the Eastern District of Virginia in 2005.  Specifically, heavily redacted legal invoices

3   from Mr. Steinberg to Rambus dated in June of 1998, two months before Mr. Steinberg resigned

4   from Samsung, were produced by Rambus for the very first time in connection with the *Infineon*

5   unclean-hands trial in early 2005.  Furthermore, Mr. Steinberg testified in a deposition introduced

6   by video at the unclean-hands trial that he performed legal services for Rambus beginning in June

7   1998.  These documents and facts were not discoverable by Samsung or anyone else outside of

8   Rambus before 2005, and would remain concealed today if Rambus had not included as entries on

9   its *Infineon* privilege log two documents prepared by Mr. Steinberg in June and July of 1998.

10  Indeed, Mr. Steinberg had previously falsely testified in 2001 and again in 2004 that he had *not*

11  performed any legal work for Rambus prior to August 17, 1998, the date he resigned from

12  Samsung.  Mr. Steinberg's perjury was a specific act of fraud that concealed Rambus's aiding and

13  abetting of Mr. Steinberg's breaches of his fiduciary duties to Samsung, its intentional interference

14  with Mr. Steinberg's employment contract with Samsung, and Rambus's unfair business practices.

15  Finally, even though Samsung knew by at least October 2000 that Mr. Steinberg was working as in-

16  house counsel for Rambus – a fact that by itself was not disturbing to Samsung for the reasons

17  described herein – Samsung could not have discovered Mr. Steinberg's use of Samsung

18  confidential information until documents showing the true nature of Mr. Steinberg's work at

19  Rambus, including actively working to help Rambus plan patent prosecution and enforcement

20  strategies against DRAM manufacturers including Samsung as outlined in paragraphs 131-138

21  above, were introduced for the first time during the *Infineon* unclean-hands trial in 2005.  Once

22  Rambus's employment of Neil Steinberg while an employee of Samsung was revealed to Samsung

23  in 2005, however, Samsung was able to diligently investigate and pursue its claims against Rambus

24  based on such conduct.  Upon information and belief, Rambus and Mr. Steinberg continue to

25  conceal the true nature and extent of their wrongdoing in testimony, interrogatory answers, and by

26  documents previously destroyed.

27

28

**Applicable Statute of Limitations Tolled by Doctrine of Equitable Tolling**

246.    Furthermore, Mr. Steinberg's misrepresentations to Samsung while working for Samsung, coupled with Rambus's continued assurances that Samsung was a valued business partner, helped conceal material facts that prevented Samsung from knowing or discovering the nature and extent of the injury suffered due to Mr. Steinberg's dual representation.  Mr. Steinberg's concealment of his dual representation when he was under a duty to disclose those facts prevented Samsung from discovering that a breach of Mr. Steinberg's fiduciary duty had occurred, as Samsung was not otherwise on notice that Mr. Steinberg had breached his fiduciary duty by his dual representation of Samsung and Rambus.

247.    Although Samsung knew at least by the time the SDR/DDR License was negotiated in October 2000 that Mr. Steinberg had gone to work for Rambus, Samsung was not thereby put on inquiry notice of its claims against Mr. Steinberg and Rambus relating to Mr. Steinberg's secret dual employment because, in light of the extensive, cooperative, and profitable business alliance that Samsung and Rambus had enjoyed since executing their first RDRAM license in 1994, Samsung knew of no reason to be alarmed at that time by Mr. Steinberg's employment at Rambus.  Samsung also was not put on inquiry notice of its claims as a result of Rambus's institution of litigation against other DRAM manufacturers beginning in 2000 because Samsung was still licensed by Rambus at that time and continued to enjoy a friendly and profitable business alliance with Rambus, leaving Samsung no reason to suspect that Mr. Steinberg had any improper involvement with Rambus's preparations for those litigations.  Rather, it was not until documents and testimony revealing Mr. Steinberg's secret retention by Rambus at a time when he was still under an employment agreement as in-house counsel for Samsung, as well as his improper use of Samsung confidential information, were introduced for the very first time in connection with the *Infineon* unclean-hands trial in early 2005 that Samsung was put on inquiry notice of this claim.

248.    Rambus's concealment of its hiring of Mr. Steinberg while he was still an employee of Samsung and its affirmative misrepresentations to Samsung that it was still a faithful business partner to Samsung also helped conceal material facts that prevented Samsung from knowing or discovering the nature and extent of the injury suffered due to Mr. Steinberg's dual

representation. Rambus's concealment of his dual representation prevented Samsung from discovering that a breach of Mr. Steinberg's fiduciary duty had occurred, as Samsung was not otherwise on notice that Mr. Steinberg had breached his fiduciary duty by his dual representation of Samsung and Rambus.[5]

249.    As a result, the misrepresentation and nondisclosure practiced by Mr. Steinberg and Rambus on Samsung, and the role Rambus played in Mr. Steinberg's misrepresentation and nondisclosure, was not discovered until Mr. Steinberg's dual employment was revealed for the first time during the trial of *Rambus v. Infineon*, in the U.S. District Court for the Eastern District of Virginia in 2005. Once Rambus's employment of Neil Steinberg was discovered by Samsung in 2005, Samsung was able to diligently investigate and pursue its claims against Rambus based on such conduct. Upon information and belief, Rambus and Mr. Steinberg continue to conceal the true nature and extent of their wrongdoing in testimony, interrogatory answers, and by documents previously destroyed.

## COUNT V (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY TO A FORMER CLIENT)

250.    SEC and SEA reallege and incorporate by reference Paragraphs 1-249 above as though fully set forth herein.

251.    As a former in-house attorney for Samsung, Mr. Steinberg owed Samsung those duties due to a former client, including the duty to not disclose information about Samsung's business or to use it contrary to Samsung's interests, regardless of whether such information was trade secret, and the duty to obtain informed consent before representing parties adverse to Samsung in matters substantially related to those Mr. Steinberg worked on for Samsung.

---

[5] Tellingly, Vice Chancellor Strine denied Rambus's motion for summary judgment with respect to Samsung's claims based on Neil Steinberg's dual employment, including aiding and abetting breach of fiduciary duty to a current client, in related litigation in Delaware on December 4, 2006. Based solely on the pleadings, the Delaware court found that Samsung raised a fact issue as to whether it was fraudulently induced to release its claims against Rambus upon execution of the SDR/DDR License. The relevant portions of the hearing transcript are attached as Exhibit C.

252.     Despite these obligations to Samsung, Mr. Steinberg, upon information and belief, actively worked to help Rambus plan patent prosecution strategies, including actually working on patent applications, patent enforcement strategies, document handling and retention strategies for use in litigation, and to take other measures to extract royalties from manufacturers of DRAMs, including Samsung, as outlined in paragraphs 131-138 above.  Mr. Steinberg did this without first obtaining informed consent from Samsung.  Upon information and belief, Mr. Steinberg also used information about Samsung's business and DRAM products, as outlined in paragraphs 131-138 above, including but not limited to facts developed for the prosecution of the '956 patent and strategies for protection of Samsung's JEDEC-compliant products as partially implemented in the '956 patent, product roadmaps (plans for development of future products and plans for their release), and Samsung's own internal licensing discussions and internal litigation strategy discussions, while working for Rambus at a time he was under a duty not to disclose such information about Samsung's business or to use it contrary to Samsung's interests, regardless of whether such information was trade secret.

253.     Mr. Steinberg further violated his fiduciary duty to Samsung by failing to disclose to Samsung his work for Rambus that was contrary to Samsung's interests or his use of information obtained while an attorney for Samsung.

254.     Mr. Steinberg concealed from Samsung his work for Rambus that was adverse to Samsung and made use of Samsung information.  Samsung, therefore, had no notice of any deception on Mr. Steinberg's part and therefore had no reason to investigate whether Mr. Steinberg's work for Rambus was adverse to Samsung or made use of Samsung information.

255.     Samsung was entitled to reasonably rely on Mr. Steinberg's silence because of its expectation that Mr. Steinberg would obtain informed consent before working on matters adverse to Samsung and would faithfully safeguard Samsung's information.

256.     Because  Samsung  was  justifiably  misled  by  Mr.  Steinberg's misrepresentation and concealment of facts regarding the full nature of the work he performed for Rambus, it did not discover, nor was it put on notice to investigate, Mr. Steinberg's breach of fiduciary duties he owed to Samsung as a former client.

257.   Rambus knew that Mr. Steinberg was employed as an attorney by Samsung. It further knew that Samsung had not given permission for Mr. Steinberg to work on matters adverse to Samsung or to disclose Samsung information.   Rambus also knew of the fiduciary capacity in which Mr. Steinberg worked for Samsung and the duties that Mr. Steinberg continued to owe Samsung as a result of his former representation.

258.   By engaging Mr. Steinberg to represent Rambus knowing Mr. Steinberg owed fiduciary duties to Samsung as a former client, Rambus aided and abetted Mr. Steinberg in breaching those fiduciary duties.

259.   Rambus also knew that Mr. Steinberg had a duty to disclose to Samsung, a former client, of any breach of his fiduciary duty, and that Mr. Steinberg in fact failed to carry out this duty.   As a result, Rambus facilitated Mr. Steinberg's failure of his obligation to Samsung by secretly engaging Mr. Steinberg's services for matters adverse to Samsung and that made use of confidential Samsung information.

260.   Rambus knew that using Mr. Steinberg's services on matters adverse to Samsung or that made use of Samsung information would be considered contrary to the purpose of maintaining a profitable business alliance between Rambus and Samsung.   Nevertheless, Rambus concealed from Samsung that it had secretly engaged Mr. Steinberg's services on matters adverse to Samsung or that, on information and belief, made use of Samsung information and facilitated Mr. Steinberg's silence on his work for Rambus on matters adverse to Samsung and, upon information and belief, his use of information about Samsung's business and DRAM products in working for Rambus.

261.   Rambus, by its concealment, falsely represented to Samsung that it was still interested in faithfully remaining a business partner with Samsung in their profitable business alliance at a time when, as a result of its knowledge that Mr. Steinberg was breaching his fiduciary duties to Samsung at Rambus's request and on its behalf, and because Rambus sponsored false testimony, and upon information and belief continues to sponsor false testimony, as well as destruction of documents, to conceal this wrongdoing, Rambus had a duty to speak.

1    262.    SEC and SEA were harmed by Rambus's aiding and abetting Mr.

2    Steinberg's breach of his fiduciary duty to Samsung.

3                    **Applicable Statute of Limitations Tolled by Discovery Rule**

4    263.    As a result of Mr. Steinberg's and/or Rambus's failure to disclose the full

5    nature of his work for Rambus in violation of his continuing obligations to Samsung, Samsung did

6    not discover and could not have discovered the circumstances giving rise to a breach of Mr.

7    Steinberg's fiduciary duties owed to Samsung as a former client, nor of Rambus's role in Mr.

8    Steinberg's breach of his fiduciary duties, until it was revealed for the first time during the trial of

9    *Rambus v. Infineon*, in the U.S. District Court for the Eastern District of Virginia in 2005.

10   Specifically, heavily redacted legal invoices from Mr. Steinberg to Rambus dated in June and July

11   of 1998, two months before Mr. Steinberg resigned from Samsung, were produced by Rambus for

12   the very first time in connection with the *Infineon* unclean-hands trial in early 2005.  Furthermore,

13   Mr. Steinberg testified in a deposition introduced by video at the unclean-hands trial that he

14   performed legal services for Rambus beginning in June 1998.  These documents and facts were not

15   discoverable by Samsung or anyone else outside of Rambus before 2005, and would remain

16   concealed today if Rambus had not included as entries on its *Infineon* privilege log two documents

17   prepared by Mr. Steinberg in June and July of 1998.  Indeed, Mr. Steinberg had previously falsely

18   testified in 2001 and again in 2004 that he had *not* performed any legal work for Rambus prior to

19   August 17, 1998, the date he resigned from Samsung.  Mr. Steinberg's perjury was a specific act of

20   fraud that concealed Rambus's aiding and abetting of Mr. Steinberg's breaches of his fiduciary

21   duties to Samsung, its intentional interference with Mr. Steinberg's employment contract with

22   Samsung, and Rambus's unfair business practices.  Finally, even though Samsung knew by at least

23   October 2000 that Mr. Steinberg was working as in-house counsel for Rambus – a fact that by itself

24   was not disturbing to Samsung for the reasons described herein – Samsung could not have

25   discovered Mr. Steinberg's use of Samsung confidential information until documents showing the

26   true nature of Mr. Steinberg's work at Rambus, including actively working to help Rambus plan

27   patent prosecution and enforcement strategies against DRAM manufacturers including Samsung as

28   outlined in paragraphs 131-138 above, were introduced for the first time during the *Infineon*

1   unclean-hands trial in 2005.  Once the full scope of Rambus's employment of Mr. Steinberg was

2   revealed to Samsung in 2005, however, Samsung was able to diligently investigate and pursue its

3   claims against Rambus based on such conduct.  Upon information and belief, Rambus and Mr.

4   Steinberg continue to conceal the true nature and extent of their wrongdoing in testimony,

5   interrogatory answers, and by documents previously destroyed.

6   <u>**Applicable Statute of Limitations Tolled by Doctrine of Equitable Tolling**</u>

7           264.    Furthermore, Mr. Steinberg's misrepresentations to Samsung, coupled with

8   Rambus's continued assurances that Samsung was a valued business partner, helped conceal

9   material facts that prevented Samsung from knowing or discovering the nature and extent of the

10  injury suffered due to Mr. Steinberg's employment by Rambus.  Mr. Steinberg's failure to disclose

11  the nature of his employment by Rambus when he was under a duty to do so prevented Samsung

12  from discovering that a breach of Mr. Steinberg's fiduciary duty had occurred, as Samsung was not

13  otherwise under notice that Mr. Steinberg had breached his fiduciary duty by working for Rambus

14  on matters adverse to Samsung or that made use of Samsung information.

15          265.    Although Samsung knew at least by the time the SDR/DDR License was

16  negotiated in October 2000 that Mr. Steinberg had gone to work for Rambus, Samsung was not

17  thereby put on inquiry notice of its claims against Mr. Steinberg and Rambus relating to Mr.

18  Steinberg's secret dual employment because, in light of the extensive, cooperative, and profitable

19  business alliance that Samsung and Rambus had enjoyed since executing their first RDRAM

20  license in 1994, Samsung knew of no reason to be alarmed at that time by Mr. Steinberg's

21  employment at Rambus.  Samsung also was not put on inquiry notice of its claims as a result of

22  Rambus's institution of litigation against other DRAM manufacturers beginning in 2000 because

23  Samsung was still licensed by Rambus at that time and continued to enjoy a friendly and profitable

24  business alliance with Rambus, leaving Samsung no reason to suspect that Mr. Steinberg had any

25  improper involvement with Rambus's preparations for those litigations.  Rather, it was not until

26  documents and testimony revealing Mr. Steinberg's secret retention by Rambus at a time when he

27  was still under an employment agreement as in-house counsel for Samsung, as well as his improper

28

1    use of Samsung confidential information, were introduced for the very first time in connection with

2    the *Infineon* unclean-hands trial in early 2005 that Samsung was put on inquiry notice of this claim.

3            266.    Rambus's concealment of its use of Mr. Steinberg's services on matters

4    adverse to Samsung or that, upon information and belief, made use of Samsung information and its

5    affirmative misrepresentations to Samsung that it was still a faithful business partner to Samsung

6    also helped conceal material facts that prevented Samsung from knowing or discovering the nature

7    and extent of the injury suffered due to Mr. Steinberg's work for Rambus.  Rambus's concealment

8    of his work for it prevented Samsung from discovering that a breach of Mr. Steinberg's fiduciary

9    duty had occurred, as Samsung was not otherwise on notice that Mr. Steinberg had breached his

10   fiduciary duty by his work for Rambus.[6]

11           267.    As a result, the misrepresentation and nondisclosure practiced by Mr.

12   Steinberg and Rambus on Samsung, and the role Rambus played in Mr. Steinberg's

13   misrepresentation and nondisclosure, was not revealed until the full scope of Mr. Steinberg's

14   employment for Rambus was revealed for the first time during the trial of *Rambus v. Infineon*, in

15   the U.S. District Court for the Eastern District of Virginia in 2005.  Once the full scope of

16   Rambus's employment of Neil Steinberg was discovered in 2005, Samsung was able to diligently

17   investigate and pursue its claims against Rambus based on such conduct.  Upon information and

18   belief, Rambus and Mr. Steinberg continue to conceal the true nature and extent of their

19   wrongdoing in testimony, interrogatory answers, and by documents previously destroyed.

20           **COUNT VI (INTENTIONAL INTERFERENCE WITH CONTRACT)**

21           268.    SEC and SEA reallege and incorporate by reference Paragraphs 1-267 above

22   as though fully restated herein.

23

24

_____

25   [6] Tellingly, Vice Chancellor Strine denied Rambus's motion for summary judgment with respect to
     Samsung's claims related to Neil Steinberg's dual employment, including aiding and abetting
26   breach of fiduciary duty to a former client, in related litigation in Delaware on December 4, 2006.
     Based solely on the pleadings, the Delaware court found that Samsung raised a fact issue as to
27   whether it was fraudulently induced to release its claims against Rambus upon execution of the
     SDR/DDR License.  The relevant portions of the hearing transcript are attached as Exhibit C.
28

269.     Rambus was aware that Mr. Steinberg was employed as in-house counsel for Samsung and under a written employment contract for a specific term.  Rambus was further aware that at the time Mr. Steinberg's employment began with Rambus, his written employment contract had not been terminated and was still in effect.  Also during this time, Rambus knew that Mr. Steinberg's contract included nondisclosure clauses and restrictions on additional employment.

270.     Despite these contractual duties, Mr. Steinberg, upon information and belief, actively worked to help Rambus plan patent prosecution strategies, including actually working on patent applications, patent enforcement strategies, document handling and retention strategies for use in litigation, and to take other measures to extract royalties from manufacturers of DRAMs, including Samsung, as outlined in paragraphs 131-138 above.  Upon information and belief, while employed at Samsung, Mr. Steinberg also used information about Samsung's business and DRAM products in connection with his work for Rambus, as outlined in paragraphs 131-138 above, including but not limited to facts developed for the prosecution of the '956 patent and strategies for protection of Samsung's JEDEC-compliant products as partially implemented in the '956 patent, product roadmaps (plans for development of future products and plans for their release), and Samsung's own internal licensing discussions and internal litigation strategy discussions, despite the fact that he was under contractual and fiduciary duties not to disclose such information about Samsung's business or use it contrary to Samsung's interests, regardless of whether such information was trade secret.  Mr. Steinberg's work for Rambus, therefore, was in breach of his employment contract with Rambus.

271.     Because Rambus knew of Mr. Steinberg's employment contract and his subsequent breach of that contract by performing services on behalf of Rambus, Rambus intentionally interfered with the Steinberg-Samsung employment contract when it hired Mr. Steinberg in February of 1998.

272.     Mr. Steinberg further violated his contractual duty to Samsung by failing to disclose the full nature and duration of his work for Rambus.

273.     Mr. Steinberg and Rambus concealed from Samsung Mr. Steinberg's work for Rambus that was contrary to Samsung's interests and that made use of Samsung information.

1  Samsung had no notice of any breach of the employment contract by Mr. Steinberg's and therefore

2  did not discover and had no reason to investigate whether Mr. Steinberg worked for Rambus while

3  employed as an attorney by Samsung or was working for Rambus contrary to Samsung's interests

4  and with Samsung information.

5        274.    Samsung was entitled to reasonably rely on Mr. Steinberg's silence regarding

6  Rambus's interference with his employment contract with Samsung because of its expectation that

7  Mr. Steinberg would faithfully fulfill both his fiduciary and contractual obligations.

8        275.    Because   Samsung   was   justifiably   misled   by   Mr.   Steinberg's

9  misrepresentation and concealment of facts regarding the full nature of the work he performed for

10  Rambus as well as the time period during which he worked for Rambus, it did not discover, nor

11  was it put on notice to investigate, Mr. Steinberg's breach of contractual and fiduciary duties he

12  owed to Samsung.

13        276.    Rambus knew of Mr. Steinberg's contractual obligations to Samsung,

14  including his obligations to disclose the full nature and duration of his employment by Rambus.  By

15  secretly engaging Mr. Steinberg's services in contravention of these duties, therefore, Rambus

16  intentionally interfered with Mr. Steinberg's employment contract with Samsung and facilitated

17  Mr. Steinberg's violation of those duties.

18        277.    Rambus knew or should have known that the nature and duration of Mr.

19  Steinberg's employment by Rambus would be considered contrary to the purpose of maintaining a

20  profitable business alliance between Rambus and Samsung.  Nevertheless, Rambus concealed from

21  Samsung that it had secretly engaged Mr. Steinberg's services and facilitated Mr. Steinberg's

22  silence on the full nature and duration of his work for Rambus.

23        278.    Rambus, by its concealment, falsely represented to Samsung that it was still

24  interested in faithfully remaining a business partner with Samsung in their profitable business

25  alliance at a time when, as a result of its knowledge that Mr. Steinberg was breaching his fiduciary

26  duties to Samsung at Rambus's request and on its behalf, and because Rambus sponsored false

27  testimony, and upon information and belief continues to sponsor false testimony, as well as

28  destruction of documents, to conceal this wrongdoing, Rambus had a duty to speak.

1             279.     SEC and SEA were harmed by Rambus's intentional interference with Mr.

2 Steinberg's employment contract.

3                    **Applicable Statute of Limitations Tolled by Discovery Rule**

4             280.     As a result of the concealment of Mr. Steinberg's dual representation and of

5 the full nature of the work he performed for Rambus, coupled with Rambus's continued assurances

6 that Samsung was a valued business partner, Samsung did not discover and could not have

7 discovered the circumstances giving rise to Rambus's interference of Mr. Steinberg's employment

8 contract with Samsung until it was revealed for the first time during the trial of *Rambus v. Infineon*,

9 in the U.S. District Court for the Eastern District of Virginia in 2005.  Specifically, heavily redacted

10 legal invoices from Mr. Steinberg to Rambus dated in June and July of 1998, two months before

11 Mr. Steinberg resigned from Samsung, were produced by Rambus for the very first time in

12 connection with the *Infineon* unclean-hands trial in early 2005.  Furthermore, Mr. Steinberg

13 testified in a deposition introduced by video at the unclean-hands trial that he performed legal

14 services for Rambus beginning in June 1998.  These documents and facts were not discoverable by

15 Samsung or anyone else outside of Rambus before 2005, and would remain concealed today if

16 Rambus had not included as entries on its *Infineon* privilege log two documents prepared by Mr.

17 Steinberg in June and July of 1998.  Indeed, Mr. Steinberg had previously falsely testified in 2001

18 and again in 2004 that he had *not* performed any legal work for Rambus prior to August 17, 1998,

19 the date he resigned from Samsung.  Mr. Steinberg's perjury was a specific act of fraud that

20 concealed Rambus's aiding and abetting of Mr. Steinberg's breaches of his fiduciary duties to

21 Samsung, its intentional interference with Mr. Steinberg's employment contract with Samsung, and

22 Rambus's unfair business practices.  Finally, even though Samsung knew by at least October 2000

23 that Mr. Steinberg was working as in-house counsel for Rambus – a fact that by itself was not

24 disturbing to Samsung for the reasons described herein – Samsung could not have discovered Mr.

25 Steinberg's use of Samsung confidential information until documents showing the true nature of

26 Mr. Steinberg's work at Rambus, including actively working to help Rambus plan patent

27 prosecution and enforcement strategies against DRAM manufacturers including Samsung as

28 outlined in paragraphs 131-138 above, were introduced for the first time during the *Infineon*

1   unclean-hands trial in 2005.  Once the full nature and duration of Rambus's employment of Mr.

2   Steinberg was revealed to Samsung in 2005, however, Samsung was able to diligently investigate

3   and pursue its claims against Rambus based on such conduct.  Upon information and belief,

4   Rambus and Mr. Steinberg continue to conceal the true nature and extent of their wrongdoing in

5   testimony, interrogatory answers, and by documents previously destroyed.

6   **Applicable Statute of Limitations Tolled by Doctrine of Equitable Tolling**

7           281.    Furthermore, Mr. Steinberg's false representations to Samsung helped

8   conceal material facts that prevented Samsung from knowing or discovering the nature and extent

9   of the injury suffered due to Mr. Steinberg's employment by Rambus.  Mr. Steinberg's

10  concealment of the nature and duration of his employment by Rambus when he was under a duty to

11  do so prevented Samsung from determining that Rambus had intentionally interfered with Mr.

12  Steinberg's employment contract with Samsung, as Samsung was not otherwise under notice that

13  Mr. Steinberg had breached his employment contract by working for Rambus while employed by

14  Samsung and also by working for Rambus on matters adverse to Samsung or that made use of

15  Samsung information.

16          282.    Although Samsung knew at least by the time the SDR/DDR License was

17  negotiated in October 2000 that Mr. Steinberg had gone to work for Rambus, Samsung was not

18  thereby put on inquiry notice of its claims against Mr. Steinberg and Rambus relating to Mr.

19  Steinberg's secret dual employment because, in light of the extensive, cooperative, and profitable

20  business alliance that Samsung and Rambus had enjoyed since executing their first RDRAM

21  license in 1994, Samsung knew of no reason to be alarmed at that time by Mr. Steinberg's

22  employment at Rambus.  Samsung also was not put on inquiry notice of its claims as a result of

23  Rambus's institution of litigation against other DRAM manufacturers beginning in 2000 because

24  Samsung was still licensed by Rambus at that time and continued to enjoy a friendly and profitable

25  business alliance with Rambus, leaving Samsung no reason to suspect that Mr. Steinberg had any

26  improper involvement with Rambus's preparations for those litigations.  Rather, it was not until

27  documents and testimony revealing Mr. Steinberg's secret retention by Rambus at a time when he

28  was still under an employment agreement as in-house counsel for Samsung, as well as his improper

1    use of Samsung confidential information, were introduced for the very first time in connection with

2    the *Infineon* unclean-hands trial in early 2005 that Samsung was put on inquiry notice of this claim.

3          283.    Rambus's concealment of the full nature and duration of Mr. Steinberg's

4    employment by Rambus and its affirmative misrepresentations to Samsung that it was still a

5    faithful business partner to Samsung also helped conceal material facts that prevented Samsung

6    from knowing or discovering the nature and extent of the injury suffered due to Mr. Steinberg's

7    work for Rambus.  Rambus's concealment of his work for it prevented Samsung from discovering

8    that a breach of Mr. Steinberg's fiduciary duty had occurred, as Samsung was not otherwise on

9    notice that Mr. Steinberg had breached his fiduciary duty by his work for Rambus. [7]

10         284.    As a result, the misrepresentation and nondisclosure practiced by Mr.

11   Steinberg and Rambus on Samsung was not disclosed until the full scope and duration of Mr.

12   Steinberg's employment for Rambus was revealed for the first time during the trial of *Rambus v.*

13   *Infineon*, in the U.S. District Court for the Eastern District of Virginia in 2005.  Once the full scope

14   and duration of Rambus's employment of Neil Steinberg was disclosed to Samsung in 2005,

15   Samsung was able to diligently investigate and pursue its claims against Rambus based on such

16   conduct.  Upon information and belief, Rambus and Mr. Steinberg continue to conceal the true

17   nature and extent of their wrongdoing in testimony, interrogatory answers, and by documents

18   previously destroyed.

19   **COUNT VII (VIOLATION OF CALIFORNIA BUS. & PROF. CODE SECTION 17,200)**

20         285.    SEC and SEA reallege and incorporate by reference Paragraphs 1-284 above

21   as though fully restated herein.

22         286.    The herein-described conduct of Rambus, including its hiring of Mr.

23   Steinberg while still employed at Samsung, the "shred parties," and the persistent pursuit of patent

24

25   [7] Tellingly, Vice Chancellor Strine denied Rambus's motion for summary judgment with respect to
     Samsung's claims related to Neil Steinberg's dual employment, including intentional interference
26   with contract, in related litigation in Delaware on December 4, 2006.  Based solely on the
     pleadings, the Delaware court found that Samsung raised a fact issue as to whether it was
27   fraudulently induced to release its claims against Rambus upon execution of the SDR/DDR
     License.  The relevant portions of the hearing transcript are attached as Exhibit C.
28

1 claims beyond its original disclosures is an unlawful business practice and constitutes unfair and

2 anticompetitive conduct toward Samsung, the DRAM industry, and the consuming public, in

3 violation of California Business and Professions Code § 17200 *et. seq.*

4        287.    Rambus has engaged in at least the following unlawful, unfair, and

5 anticompetitive business practices, and deceptive conduct:

6        a.    Misdemeanor spoliation of evidence in violation of California Penal

7 Code § 135 as evident by the following facts:  Rambus willfully destroyed or concealed

8 documentary evidence to be produced in litigation against DRAM manufacturers with the intent to

9 prevent it from being produced, as fully described herein;

10        b.    Aiding and abetting the breach of fiduciary duty to a current client as

11 evidenced by the following facts:  Rambus knew that Mr. Steinberg was still employed as an

12 attorney by Samsung when it engaged his services.  It further knew that Samsung had not given

13 permission for Mr. Steinberg to dually represent Samsung and Rambus.  Rambus also knew of the

14 fiduciary capacity in which Mr. Steinberg worked for Samsung and the duties that Mr. Steinberg

15 owed to Samsung as a result.  By engaging Mr. Steinberg to represent Rambus knowing Mr.

16 Steinberg owed fiduciary duties to Samsung as a current client, therefore, Rambus aided and

17 abetted Mr. Steinberg in breaching those fiduciary duties, as fully described herein.

18        c.    Aiding and abetting the breach of fiduciary duty to a former client as

19 evidenced by the following facts:  Rambus knew that Mr. Steinberg was employed as an attorney

20 by Samsung.  It further knew that Samsung had not given permission for Mr. Steinberg to work on

21 matters adverse to Samsung or to disclose Samsung information.  Rambus also knew of the

22 fiduciary capacity in which Mr. Steinberg worked for Samsung and the duties that Mr. Steinberg

23 continued to owe Samsung as a result of his former representation.  By engaging Mr. Steinberg to

24 represent Rambus knowing Mr. Steinberg owed fiduciary duties to Samsung as a former client,

25 therefore, Rambus aided and abetted Mr. Steinberg in breaching those fiduciary duties as fully

26 described herein.

27        d.    Intentional interference with contract as evidenced by the following

28 facts:  Rambus knew of Mr. Steinberg's contractual obligations to Samsung, including his

1    obligations to disclose the full nature and duration of his employment by Rambus.  By secretly

2    engaging Mr. Steinberg's services in contravention of these duties, therefore, Rambus intentionally

3    interfered with Mr. Steinberg's employment contract with Samsung and  facilitated Mr. Steinberg's

4    violation of those duties as fully described in herein.

5                        e.        Unfair and anticompetitive business practices against DRAM

6    manufacturers as a member of JEDEC as evidenced by the following facts: During the 1990's,

7    Rambus participated actively in industry meetings on standards for SDRAMs and DDR SDRAMs

8    at the Joint Electron Device Engineering Council ("JEDEC").   Rambus improperly used

9    information it obtained as a result of its membership in JEDEC to secure additional patents and

10   claims.  Rambus's use of this information was in violation of policies applicable to all JEDEC

11   members.  Rambus  failure to disclose to other members of JEDEC that it had taken information

12   from JEDEC to craft its patent claims, only to seek to enforce its claims against JEDEC-compliant

13   products many years after JEDEC members had invested heavily in the technology without notice

14   of Rambus's conduct.  This conduct was unfair and anticompetitive to all DRAM manufacturers

15   that were members of JEDEC, including Samsung.

16           288.    As a result of Rambus's unfair, unlawful, and anticompetitive conduct, SEC

17   and SEA, as well as the consuming public, have been damaged.  Such injuries to SEC and SEA

18   include, but are not limited to, the loss of money and property in the form of attorneys' fees paid to

19   protect and assert SEC's and SEA's right against such unfair conduct, and lost revenues, profits,

20   and market share.

21           289.    Samsung and the public at large, including manufacturers and end-users of

22   DRAM and DDR technology, will continue to sustain injury and damages from this unfair conduct

23   by Rambus unless Rambus is enjoined from continuing its unlawful conduct.  Samsung is entitled

24   to recover reasonable attorneys' fees and costs in connection with this Count, as well as all

25   appropriate restitution and other equitable relief.

26           290.    Rambus knew or should have known that its actions in engaging in unlawful

27   and unfair business practices, and deceptive conduct would be considered contrary to the purpose

28   of maintaining a profitable business alliance between Rambus and Samsung.  Nevertheless,

1   Rambus concealed from Samsung that it had secretly engaged in unlawful and unfair business

2   practices, and deceptive conduct.

3           291.    Rambus, by its concealment, falsely represented to Samsung that it was still

4   interested in faithfully remaining a business partner with Samsung in their profitable business

5   alliance at a time when, as a result of its knowledge that Mr. Steinberg was breaching his fiduciary

6   duties to Samsung at Rambus's request and on its behalf, and because Rambus sponsored false

7   testimony, and upon information and belief continues to sponsor false testimony, as well as

8   destruction of documents, to conceal this wrongdoing, Rambus had a duty to speak.

9           **Applicable Statute of Limitations Tolled by Discovery Rule**

10          292.    Samsung did not discover and could not have discovered Rambus's

11  destruction of documents in anticipation of litigation with Samsung, its unfair employment of Neil

12  Steinberg, or the full nature and extent of the unfair and anticompetitive conduct by Rambus until

13  the actions of Rambus and Mr. Steinberg were revealed publicly in a trial in *Rambus v. Infineon*, in

14  the U.S. District Court for the Eastern District of Virginia in 2005. Specifically, voluminous

15  Rambus documents produced for the very first time in connection with the *Infineon* unclean-hands

16  trial in early 2005 catalogued Rambus's adoption of a document retention policy in early 1998, its

17  massive destruction of documents during at least three separate company-wide "Shred Days," and

18  its instructions to outside patent counsel to destroy numerous documents from his Rambus patent

19  files – documents that a patent-infringement defendant might use to defend against Rambus's

20  infringement claims. These documents and facts were not discoverable by Samsung or anyone else

21  outside of Rambus before 2005, and would remain concealed today if the *Infineon* court had not

22  broadly pierced Rambus's attorney-client privilege under the crime-fraud exception during

23  preparations for the unclean-hands trial. In addition, heavily redacted legal invoices from Mr.

24  Steinberg to Rambus dated in June and July of 1998, two months before Mr. Steinberg resigned

25  from Samsung, were produced by Rambus for the very first time in connection with the *Infineon*

26  unclean-hands trial in early 2005. Furthermore, Mr. Steinberg testified in a deposition introduced

27  by video at the unclean-hands trial that he performed legal services for Rambus beginning in June

28  1998. These documents and facts were not discoverable by Samsung or anyone else outside of

1    Rambus before 2005, and would remain concealed today if Rambus had not included as entries on

2    its *Infineon* privilege log two documents prepared by Mr. Steinberg in June and July of 1998.

3    Indeed, Mr. Steinberg had previously falsely testified in 2001 and again in 2004 that he had *not*

4    performed any legal work for Rambus prior to August 17, 1998, the date he resigned from

5    Samsung.  Mr. Steinberg's perjury was a specific act of fraud that concealed Rambus's aiding and

6    abetting of Mr. Steinberg's breaches of his fiduciary duties to Samsung, its intentional interference

7    with Mr. Steinberg's employment contract with Samsung, and Rambus's unfair business practices.

8    Finally, even though Samsung knew by at least October 2000 that Mr. Steinberg was working as in-

9    house counsel for Rambus – a fact that by itself was not disturbing to Samsung for the reasons

10   described herein – Samsung could not have discovered Mr. Steinberg's use of Samsung

11   confidential information until documents showing the true nature of Mr. Steinberg's work at

12   Rambus, including actively working to help Rambus plan patent prosecution and enforcement

13   strategies against DRAM manufacturers including Samsung as outlined in paragraphs 131-138

14   above, were introduced for the first time during the *Infineon* unclean-hands trial in 2005.  Once

15   Rambus's unfair conduct was revealed to Samsung in 2005, however, Samsung was able to

16   diligently investigate and pursue any potential claims against Rambus.  Upon information and

17   belief, Rambus and Mr. Steinberg continue to conceal the true nature and extent of their

18   wrongdoing in testimony, interrogatory answers, and by documents previously destroyed.

19              **Applicable Statute of Limitations Tolled by Doctrine of Equitable Tolling**

20              293.    Furthermore, the concealment of their actions by Mr. Steinberg and Rambus

21   prevented Samsung from knowing the full nature and extent of the injury suffered by Samsung due

22   to Rambus's unfair and anticompetitive conduct.  Although Samsung knew at least by the time the

23   SDR/DDR License was negotiated in October 2000 that Mr. Steinberg had gone to work for

24   Rambus, Samsung was not thereby put on inquiry notice of its claims against Mr. Steinberg and

25   Rambus relating to Mr. Steinberg's secret dual employment because, in light of the extensive,

26   cooperative, and profitable business alliance that Samsung and Rambus had enjoyed since

27   executing their first RDRAM license in 1994, Samsung knew of no reason to be alarmed at that

28   time by Mr. Steinberg's employment at Rambus.  Samsung also was not put on inquiry notice of its

1    claims as a result of Rambus's institution of litigation against other DRAM manufacturers

2    beginning in 2000 because Samsung was still licensed by Rambus at that time and continued to

3    enjoy a friendly and profitable business alliance with Rambus, leaving Samsung no reason to

4    suspect that Mr. Steinberg had any improper involvement with Rambus's preparations for those

5    litigations.  Rather, it was not until documents and testimony revealing Mr. Steinberg's secret

6    retention by Rambus at a time when he was still under an employment agreement as in-house

7    counsel for Samsung, as well as his improper use of Samsung confidential information, were

8    introduced for the very first time in connection with the *Infineon* unclean-hands trial in early 2005

9    that Samsung was put on inquiry notice of this claim

10           294.    Rambus's concealment of its hiring of Mr. Steinberg while he was still an

11   employee of Samsung and its affirmative misrepresentations to Samsung that it was still a faithful

12   business partner to Samsung also helped conceal material facts that prevented Samsung from

13   knowing or discovering the nature and extent of the injury suffered due to Rambus's unlawful,

14   unfair, and anticompetitive conduct. [8]

15           295.    As a result, Samsung was not aware of the full nature and extent of the unfair

16   and anticompetitive conduct by Rambus until the actions of Rambus and Mr. Steinberg were

17   revealed during the trial of *Rambus v. Infineon*, in the U.S. District Court for the Eastern District of

18   Virginia in 2005.  Once Rambus's unfair conduct was disclosed, Samsung was able to diligently

19   investigate and pursue any potential claims against Rambus.  Upon information and belief, Rambus

20   and Mr. Steinberg continue to conceal the true nature and extent of their wrongdoing in testimony,

21   interrogatory answers, and by documents previously destroyed.

22

23

24

25   [8] Tellingly, Vice Chancellor Strine denied Rambus's motion for summary judgment with respect to
     Samsung's claims related to Neil Steinberg's dual employment, including violation of Cal. Bus. &
26   Prof. Code § 17200, in related litigation in Delaware on December 4, 2006.  Based solely on the
     pleadings, the Delaware court found that Samsung raised a fact issue as to whether it was
27   fraudulently induced to release its claims against Rambus upon execution of the SDR/DDR
     License.  The relevant portions of the hearing transcript are attached as Exhibit C.
28

1

## COUNT VIII (DECLARATORY JUDGMENT OF NONINFRINGEMENT)

2    296.    SEC and SEA reallege and incorporate by reference Paragraphs 1-295 above

3    as though fully set forth herein.

4    297.    An actual and justiciable controversy exists between SEC, SEA and Rambus

5    with respect to the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696,

6    and '598 Patents because Rambus has brought this action against Samsung alleging that Samsung

7    infringes the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and

8    '598 Patents.  Absent a declaration of noninfringement, invalidity, and unenforceability, Rambus

9    will continue to wrongfully assert the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295,

10   '1,446, '5,020, '696, and '598 Patents against Samsung, and thereby cause SEC and SEA

11   irreparable injury and damage.

12   298.    SEC and SEA have not infringed the '184, '097, '285, '051, '789, '897,

13   '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents, either directly or indirectly,

14   literally or under the doctrine of equivalents, willfully, or otherwise, and SEC and SEA are entitled

15   to a declaration to that effect.

16

## COUNT IX (DECLARATORY JUDGMENT OF INVALIDITY)

17   299.    SEC and SEA reallege and incorporate by reference Paragraphs 1-298 above

18   as though fully set forth herein.

19   300.    An actual and justiciable controversy exists between SEC, SEA and Rambus

20   with respect to the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696,

21   and '598 Patents because Rambus has brought this action against Samsung alleging that Samsung

22   infringes the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and

23   '598 Patents.  Absent a declaration of noninfringement, invalidity, and unenforceability, Rambus

24   will continue to wrongfully assert the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295,

25   '1,446, '5,020, '696, and '598 Patents against Samsung, and thereby cause SEC and SEA

26   irreparable injury and damage.

27   301.    The '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446,

28   '5,020, '696, and '598 Patents are invalid for failure to meet the "Conditions for Patentability" of

1    35 U.S.C. §§ 102 and 103 because the alleged inventions thereof are taught by, suggested by,

2    and/or are obvious in view of, the prior art, and no claim of the '184, '097, '285, '051, '789, '897,

3    '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents can be validly construed to cover

4    any Samsung device, system or operating method related to DRAM memory.  Samsung is entitled

5    to a declaration to that effect.

6           302.    The '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446,

7    '5,020, '696, and '598 Patents are invalid for failure to meet the "Specification" requirements of 35

8    U.S.C. § 112 because the written specifications thereof do not describe the alleged inventions and

9    the manner and process of making and using them in the form required by § 112, and no claim of

10   the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598

11   Patents can be validly construed to cover any Samsung device, system or operating method related

12   to DRAM memory. Samsung is entitled to a declaration to that effect.

13   **COUNT X (DECLARATORY JUDGMENT OF UNENFORCEABILITY)**

14          303.    SEC and SEA reallege and incorporate by reference Paragraphs 1-302 above

15   as though fully set forth herein.

16          304.    An actual and justiciable controversy exists between SEC, SEA and Rambus

17   with respect to the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696,

18   and '598 Patents because Rambus has brought this action against Samsung alleging that Samsung

19   infringes the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and

20   '598 Patents.  Absent a declaration of noninfringement, invalidity, and unenforceability, Rambus

21   will continue to wrongfully assert the '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295,

22   '1,446, '5,020, '696, and '598 Patents against Samsung, and thereby cause SEC and SEA

23   irreparable injury and damage.

24          305.    The '184, '097, '285, '051, '789, '897, '6,446, '281, '037, '295, '1,446,

25   '5,020, '696, and '598 Patents are unenforceable under the provisions of Title 35, United States

26   Code and the equitable doctrines of prosecution laches, unclean hands, and estoppel, and SEC and

27   SEA are entitled to a declaration to that effect.

28

1      306.    Rambus unfairly and inequitably filed multiple continuation applications

2    over a long period of time.  Because Rambus failed to timely prosecute the '184, '097, '285, '051,

3    '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents, the '184, '097, '285,

4    '051, '789, '897, '6,446, '281, '037, '295, '1,446, '5,020, '696, and '598 Patents are unenforceable

5    due to prosecution laches, and SEC and SEA are entitled to a declaration to that effect.

6                                    **PRAYER FOR RELIEF**

7            WHEREFORE, Samsung asks this Court to enter judgment in its favor against

8    Rambus and grant the following relief:

9            A.    A declaration that Rambus breached Section 3.8 of the SDR/DDR IC and

10   SDR/DDR Memory Module Patent License Agreement Between Rambus Inc. and Samsung

11   Electronics Co., Ltd., and an award of all damages Samsung Electronics Co., Ltd. suffered as a

12   result of the breach;

13           B.    A declaration that Rambus breached Section 8.5 of the SDR/DDR IC and

14   SDR/DDR Memory Module Patent License Agreement Between Rambus Inc. and Samsung

15   Electronics Co., Ltd., and an award of all damages Samsung Electronics Co., Ltd. suffered as a

16   result of the breach;

17           C.    A declaration that Rambus aided and abetted the breach of fiduciary duty

18   owed to Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. by Neil Steinberg,

19   and an award of all damages Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

20   suffered as a result of the breach;

21           D.    A declaration that Rambus intentionally interfered with a contract involving

22   Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc., and an award of all

23   damages Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. suffered as a result

24   of that intentional interference;

25           E.    A declaration that Rambus violated California Bus. & Prof. Code Section

26   17,200, and an award of restitution for Samsung Electronics Co., Ltd. and Samsung Electronics

27   America, Inc. for loss suffered as a result of Rambus's unfair conduct;

28

1             F.      A declaration that the claims of U.S. Patent No. 6,182,184 are not infringed

2  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

3             G.     A declaration that the claims of U.S. Patent No. 6,260,097 are not infringed

4  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

5             H.     A declaration that the claims of U.S. Patent No. 6,266,285 are not infringed

6  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

7             I.      A declaration that the claims of U.S. Patent No. 6,314,051 are not infringed

8  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

9             J.      A declaration that the claims of U.S. Patent No. 6,493,789 are not infringed

10  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

11            K.     A declaration that the claims of U.S. Patent No. 6,496,897 are not infringed

12  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

13            L.      A declaration that the claims of U.S. Patent No. 6,546,446 are not infringed

14  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

15            M.     A declaration that the claims of U.S. Patent No. 6,564,281 are not infringed

16  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

17            N.     A declaration that the claims of U.S. Patent No. 6,584,037 are not infringed

18  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

19            O.     A declaration that the claims of U.S. Patent No. 6,697,295 are not infringed

20  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

21            P.      A declaration that the claims of U.S. Patent No. 6,701,446 are not infringed

22  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

23            Q.     A declaration that the claims of U.S. Patent No. 6,715,020 are not infringed

24  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

25            R.      A declaration that the claims of U.S. Patent No. 6,751,696 are not infringed

26  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

27            S.      A declaration that the claims of U.S. Patent No. 6,807,598 are not infringed

28  by Samsung Electronics Co., Ltd. or Samsung Electronics America, Inc.;

1          T.      A declaration that the claims of U.S. Patent No. 6,182,184 are invalid and

2   unenforceable;

3          U.      A declaration that the claims of U.S. Patent No. 6,260,097 are invalid and

4   unenforceable;

5          V.      A declaration that the claims of U.S. Patent No. 6,266,285 are invalid and

6   unenforceable;

7          W.      A declaration that the claims of U.S. Patent No. 6,314,051 are invalid and

8   unenforceable;

9          X.      A declaration that the claims of U.S. Patent No. 6,493,789 are invalid and

10   unenforceable;

11          Y.      A declaration that the claims of U.S. Patent No. 6,496,897 are invalid and

12   unenforceable;

13          Z.      A declaration that the claims of U.S. Patent No. 6,546,446 are invalid and

14   unenforceable;

15          AA.     A declaration that the claims of U.S. Patent No. 6,564,281 are invalid and

16   unenforceable;

17          BB.     A declaration that the claims of U.S. Patent No. 6,584,037 are invalid and

18   unenforceable;

19          CC.     A declaration that the claims of U.S. Patent No. 6,697,295 are invalid and

20   unenforceable;

21          DD.     A declaration that the claims of U.S. Patent No. 6,701,446 are invalid and

22   unenforceable;

23          EE.     A declaration that the claims of U.S. Patent No. 6,715,020 are invalid and

24   unenforceable;

25          FF.     A declaration that the claims of U.S. Patent No. 6,751,696 are invalid and

26   unenforceable;

27          GG.     A declaration that the claims of U.S. Patent No. 6,807,598 are invalid and

28   unenforceable;

1    HH.    An award to Samsung for Rambus's unjust enrichment, of all royalties

2    collected by Rambus on all patents and licenses that benefited in any way from Mr. Steinberg's

3    work for Rambus prior to termination of his employment by Samsung;

4    II.    A declaration that any patents or patent applications that claim priority to any

5    patent or patent application that pre-dates the termination of Mr. Steinberg's employment by

6    Samsung may not be enforced against SEC, SEA, or any of their subsidiary or affiliate companies;

7    JJ.    An injunction barring Rambus from enforcing its patents;

8    KK.    A finding that this case is an exceptional case and an award of attorneys' fees

9    and costs to Samsung pursuant to 35 U.S.C. § 285; and

10    LL.    Any and all other relief to which it may be justly entitled.

11    Dated: January 24, 2007.

12    Respectfully submitted,

13

14    By:   /s/ Edward R. Reines
         Edward R. Reines
15    Attorney for Defendants
     SAMSUNG ELECTRONICS CO., LTD.,
16    SAMSUNG ELECTRONICS AMERICA, INC.,
     SAMSUNG SEMICONDUCTOR, INC., and
17    SAMSUNG AUSTIN SEMICONDUCTOR, L.P.

18

19

20

21

22

23

24

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2          Defendants SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS

3    AMERICA, INC., SAMSUNG SEMICONDUCTOR, INC., and SAMSUNG AUSTIN

4    SEMICONDUCTOR, L.P, hereby demand a trial by jury on all issues triable of right by a jury that

5    are raised for determination by this Second Amended Answer and Counterclaims or that may be

6    raised by any counterclaim to be filed herein.

7    Dated: January 24, 2007                    WEIL, GOTSHAL & MANGES LLP

8

9                                    By:   /s/ Edward R. Reines
                                              Edward R. Reines
10                                   Attorney for Defendants
                                     SAMSUNG ELECTRONICS CO., LTD.,
11                                   SAMSUNG ELECTRONICS AMERICA, INC.,
                                     SAMSUNG SEMICONDUCTOR, INC., and
12                                   SAMSUNG AUSTIN SEMICONDUCTOR, L.P.

13

14

15              **CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

16          Pursuant to Civil Local 3-16, the undersigned certifies that as of this date, other than

17   the named parties, there is no such interest to report.

18   Dated: January 24, 2007                    WEIL, GOTSHAL & MANGES LLP

19

20                                   By:   /s/ Edward R. Reines
                                              Edward R. Reines
21                                   Attorney for Defendants
                                     SAMSUNG ELECTRONICS CO., LTD.,
22                                   SAMSUNG ELECTRONICS AMERICA, INC.,
                                     SAMSUNG SEMICONDUCTOR, INC., and
23                                   SAMSUNG AUSTIN SEMICONDUCTOR, L.P.

24

25

26

27

28