1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

E-filed:_____11/4/2007_____

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HYNIX SEMICONDUCTOR INC., HYNIX SEMICONDUCTOR AMERICA INC., HYNIX SEMICONDUCTOR U.K. LTD., and HYNIX SEMICONDUCTOR DEUTSCHLAND GmbH,<br><br>Plaintiffs,<br><br>v.<br><br>RAMBUS INC.,<br><br>Defendant. | No. CV-00-20905 RMW<br><br>ORDER GRANTING IN PART AND DENYING IN PART RAMBUS' MOTION TO STRIKE JURY DEMANDS<br><br>**[Re Docket No. 2175, 2484, 2602]** |
| RAMBUS INC.,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SEMICONDUCTOR, INC., SAMSUNG AUSTIN SEMICONDUCTOR, L.P.,<br><br>Defendants. | No. C-05-02298 RMW<br><br><br>**[Re Docket No. 180]** |

ORDER GRANTING IN PART AND DENYING IN PART RAMBUS' MOTION TO STRIKE JURY DEMANDS—C-00-20905; C-05-00334; C-05-02298; C-06-00244 RMW
TSF

**United States District Court**
For the Northern District of California

| | | |
|---|---|---|
| 1 | RAMBUS INC., | No. C-05-00334 RMW |
| 2 | Plaintiff, | |
| 3 | v. | **[Re Docket No. 424]** |
| 4 | HYNIX SEMICONDUCTOR INC., HYNIX | |
| 5 | SEMICONDUCTOR AMERICA INC., HYNIX SEMICONDUCTOR | |
| 6 | MANUFACTURING AMERICA INC., | |
| 7 | SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, | |
| 8 | INC., SAMSUNG SEMICONDUCTOR, INC., SAMSUNG AUSTIN SEMICONDUCTOR, L.P., | |
| 9 | NANYA TECHNOLOGY CORPORATION, | |
| 10 | NANYA TECHNOLOGY CORPORATION U.S.A., | |
| 11 | Defendants. | |
| 12 | RAMBUS INC., | No. C-06-00244 RMW |
| 13 | Plaintiff, | |
| 14 | v. | **[Re Docket No. 179]** |
| 15 | MICRON TECHNOLOGY, INC., and MICRON SEMICONDUCTOR PRODUCTS, | |
| 16 | INC. | |
| 17 | Defendants. | |

This order addresses two motions. First, Rambus moved on January 5, 2007 to confirm withdrawal of its jury demand with respect to Hynix's fraud claim in case 00-20905, pursuant to Fed. R. Civ. P. 39(a)(2). Hynix opposed the motion. The court has reviewed the papers and considered the arguments of counsel heard on February 16, 2007. For the reasons set forth below, the court denies without prejudice Rambus's motion to withdraw its jury demand for Hynix's fraud claim.

Second, Rambus moved on September 24, 2007 to strike all jury demands of Hynix Micron, and Nanya ("Manufacturers") with regard tot he trial set to commence on January 22, 2008. While Rambus' motion to withdraw its jury demand with respect to Hynix's fraud claim was under submission, the court consolidated the following cases: 00-20905, 05-00334, 05-02298, and 06-00244. *See* April 24, 2007 Order at 1. In a joint case management conference statement filed on

**United States District Court**
For the Northern District of California

1   July 31, 2007, the parties in all four cases identified which claims are to be tried in the consolidated

2   action set for trial commencing on January 22, 2008 and stated whether they claimed entitlement to

3   a jury on those claims.  *See* Joint Case Management Conference Statement of July 31, 2007

4   ("JCMCS"), at Attachments 1-3.  On September 7, Rambus filed its motion to strike the jury

5   demands with respect to all of the claims to be tried in the January 22, 2008 Trial.  The

6   Manufacturers jointly opposed the motion.  The court has reviewed these further papers and

7   considered the arguments of counsel heard on October 26, 2007.  For the reasons set forth below, the

8   court denies Rambus's motion to strike/withdraw jury demands as to the antitrust claims and denies

9   Rambus' motion without prejudice as to the fraud claims.  The court grants Rambus's motion to

10  strike/withdraw jury demands with respect to the contract and declaratory judgment claims and

11  affirmative defenses.

## I.  BACKGROUND

13          On June 16, 2006, Rambus moved to withdraw its jury demand for the third phase of trial in

14  00-20905 pursuant to Fed. R. Civ. P. 39(a)(2).  Rambus argued that Hynix had disclaimed all

15  damages other than the litigation costs incurred in defending Rambus's infringement claims.  As to

16  litigation costs, Rambus submitted that because its use of the courts to enforce its patents is

17  protected petitioning activity pursuant to the *Noerr-Pennington* doctrine and the privilege under Cal.

18  Civ. Code § 47(B), Hynix could not claim its litigation expenses as damages.  The court denied the

19  motion, holding that *Noerr-Pennington* immunity does not immunize an alleged fraudulent scheme

20  to obtain an improper patent monopoly in violation of the antitrust laws.  *See* August 2, 2006 Order

21  at 5:3-11, 6 n.2, 10:3-7.  Accordingly, Hynix could still claim its attorneys' fees as damages for its

22  antitrust claims, and therefore was still entitled to legal relief, and to a jury that can provide it at

23  trial.  *Id.* at 9-10.

24          On January 5, 2007, Rambus moved to confirm withdrawal of its jury demand with respect to

25  Hynix's fraud claim (Hynix's eighth claim for relief in its Second Amended Complaint ("SAC") in

26  00-20905 asserts a claim for actual fraud).  In support of its claim, Hynix alleges, *inter alia*, that

27  Rambus misrepresented its patents and patent applications to JEDEC members, including Hynix,

28

1   and failed to disclose its intent to file applications that would "capture" the JEDEC standards as they

2   were established.  *See* SAC ¶¶ 148-49.  Hynix's SAC seeks damages of, *inter alia*, "actual damages

3   sustained as a consequence of Rambus's unlawful conduct, trebled as provided by law," SAC, Prayer

4   for Relief, ¶ 5, "Hynix's full costs of this action, including reasonable attorney's fees," *id.* ¶ 6,

5   "punitive damages as a result of Rambus's fraudulent conduct," *id.* ¶ 8, and "any such other relief

6   deemed just and proper," *id.* ¶ 32.

7        Meanwhile, Rambus sued both Hynix and Nanya in the 05-00334 case and Micron in the 06-

8   00244 case.  These cases have been consolidated with 00-20905 for a joint trial on common claims

9   on January 22, 2008.  In a Joint Case Management Conference Statement filed July 31, 2007, the

10  parties listed on which claims they assert entitlement to a jury.  Hynix submitted that the following

11  claims should be heard by the jury: monopolization, attempted monopolization and fraud.  *See*

12  JCMCS at Attachment 1.  Micron also submitted that the monopolization, attempted

13  monopolization, and fraud claims should be heard by the jury, as well as its unenforceability,

14  declaratory judgment of unenforceability, breach of contract, negligent misrepresentation, and

15  damages offset claims and waiver defense.  *See id.* at Attachment 2.  Nanya too wants a jury to hear

16  the monopolization, attempted monopolization, and fraud claims.  *See id.* at Attachment 3.

17       Rambus now moves to strike the jury demands with respect to all of these claims.  Rambus

18  argues that none of the Manufacturers has a valid damages claim, leaving only requests for equitable

19  relief which do not entitle the Manufacturers to a jury.  This is the same argument Rambus made

20  with respect to Hynix's antitrust claims and Hynix's fraud claim.

21                              **II.  ANALYSIS**

22       **A.      The Right to Jury Trial**

23       The Seventh Amendment provides in relevant part: "in Suits at common law, where the value

24  in controversy shall exceed $20.00, the right of trial by jury shall be preserved."  U.S. Const.,

25  amend. VII.  This language "defines the kind of cases for which jury trial is preserved, namely suits

26  at common law." *Tull v. United States*, 481 U.S. 412, 426 (1987).  To ascertain such right, a court

27  first compares the action "to 18th-century actions brought in the courts of England prior to the

28

**United States District Court**

For the Northern District of California

1  merger of the courts of law and equity." *Id.* at 417 (citations omitted).  Second, the court

2  "examine[s] the remedy sought and determine[s] whether it is legal or equitable in nature." *Id.*

3  (citations omitted). This second inquiry is the more important of the two. *Granfinanciera, S.A. v.*

4  *Nordberg*, 492 U.S. 33, 42 (1989).  It is also the only relevant inquiry to these motions, as no one

5  disputes that the claims at issue can be tried to a jury if there are monetary damages.  Instead,

6  Rambus argues that the Manufacturers have forgone all legal relief, and with it, their right to a jury

7  as well.  Where the only requested relief is equitable, there is no right to a jury trial. *See, e.g., In re*

8  *Tech. Licensing Corp.*, 423 F.3d 1286, 1289-90 (Fed. Cir. 2005); 9 Wright & Miller, Fed. Practice &

9  Proc.: Civil 2d § 2308 (1995) ("[T]here is no constitutional right to a jury trial on a claim for an

10  injunction.").  In making these inquiries, the court keeps in mind that "[m]aintenance of the jury, as a

11  fact-finding body is of such importance and occupies so firm a place in our history and

12  jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the

13  utmost care." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501 (1959).

14  **B.      The Monopolization and Attempted Monopolization Claims**

15       On August 2, 2006, the court ruled in 00-20905 that Rambus could not withdraw its jury

16  demand because Hynix had alleged a claim for legal relief which entitled it to a jury.  Hynix's sole

17  basis for monetary damages on its antitrust claims was that it had incurred attorneys' fees defending

18  Rambus' patent claims.  The court held that these attorneys' fees from patent litigation could be

19  awarded as antitrust damages.  Upon reflection and the additional briefing provided regarding the

20  same issue in the 05-00334 and 06-00244 cases, the court believes its prior order is correct.  The

21  Manufacturers are entitled to a jury on their antitrust claim because their patent litigation attorneys'

22  fees are cognizable damages where the patent litigation itself was part of an unlawful scheme.

23       **1.      Choice of Law**

24       Whether a patentee's conduct in procuring or enforcing a patent is "sufficient to strip a

25  patentee of its immunity from the antitrust laws" is a question of Federal Circuit law. *Nobelpharma*

26  *AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (en banc).  This includes any

27  antitrust claim "premised on the bringing of a patent infringement suit." *Id.*  However, Ninth

28

1  Circuit law governs the other elements of the Manufacturers' antitrust claims, such as "relevant

2  market, market power, damages, etc." *Id.*

3       From one angle, the question posed by the pending set of motions is one of damages, and

4  would appear to be controlled by Ninth Circuit law.  However, the Manufacturers may only recover

5  their attorneys' fees as antitrust damages to the extent that the fees arise from litigation that itself

6  violates the antitrust laws, and whether a patentee's litigation activities can give rise to an antitrust

7  claim is an issue of Federal Circuit law.  Accordingly, Federal Circuit law controls the viability of

8  the Manufacturer's allegations of anticompetitive conduct to the extent they arise from Rambus'

9  patent litigation.  If Federal Circuit law permits an antitrust claim premised on Rambus' litigation

10  conduct, the question of whether the Manufacturers can recover their attorneys' fees as damages will

11  be decided as a matter of Ninth Circuit law.

12            **2.**      **Protected Litigation and Unlawful Schemes**

13       The Manufacturers' antitrust claims arise from "Rambus' scheme of anticompetitive conduct,

14  including its fraudulent activities at JEDEC."  Opp. at 6.  While the court assumes general

15  familiarity with the allegations, briefly recounting the details of the alleged scheme sheds light on

16  the court's narrow holding.  Rambus filed a patent application disclosing features of RAM

17  technology in 1990.  *See, e.g.,* Hynix's First Amended Answer ¶ 199.3, Docket No. 142 C-05-00334

18  (N.D. Cal. Feb. 22, 2007).[1]  In 1991, Rambus attended the Joint Electronic Devices Engineering

19  Council ("JEDEC") Solid State Technology Association, the semiconductor engineering

20  standardization body of the Electronic Industries Alliance.  *Id.* ¶ 199.10.  Rambus joined the

21  standards organization in 1992.  *Id.* ¶ 199.14.  While developing standards, JEDEC strived to

22  exclude patented technology unless the technology was essential and available on reasonable

23  licensing terms.  *Id.* ¶ 199.16.  To that end, JEDEC required its members to disclose their intellectual

24  property.  *Id.* ¶ 199.20.  As JEDEC began to develop a standard for SDRAM technology, Rambus

25  believed that its patents covered features of the technology.  *Id.* ¶ 199.24.  Rambus began using its

26  

27       [1]The allegations described here comes from Hynix's counterclaims.  Micron and Nanya make

28  similar monopolization and attempted monopolization allegations.

**United States District Court**
For the Northern District of California

membership in the organization to discover how the standard was developing, and to draft patent claims to cover the standard. *Id.* ¶ 199.25. While the SDRAM standard developed, Rambus failed to disclose that it was drafting patent claims to cover the standard. *Id.* ¶¶ 199.30-34. As the semiconductor industry migrated away from RDRAM technology (a standard known to be covered by Rambus' patents) to the SDRAM standard, Rambus began to formulate a litigation strategy based on its secret, undisclosed patent applications. *See, e.g., id.* ¶¶ 199.87-88, 199.99-100, 199.114. Once the industry became "locked-in" to the SDRAM standard, Rambus sprang the "patent trap" and demanded royalties. *See id.* ¶ 214.4. Rambus backed up its royalty demands with infringement litigation. *Id.* ¶ 214.5.

The Manufacturers allege that this "overall course of conduct" – including Rambus' patent litigation against the Manufacturers – violated the antitrust laws, as described in a line of cases beginning with *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir. 1952).[2] As discussed in more detail below, deceptive conduct before a standards setting organization can be anticompetitive conduct that violates section 2 of the Sherman Act. Whether the act of litigating a patent can also constitute anticompetitive conduct is more difficult because of the tension between the constitutional right to petition courts for redress and the Sherman Act's prohibition on anticompetitive conduct.

The Supreme Court's last treatment of the doctrine balancing these interests occurred in the context of a copyright infringement case. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ("*PREI*"). The Court explained the line of cases charting this balance as follows. First, "[t]hose who petition government for redress are generally immune from antitrust liability." *Id.* at 56 (explaining *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.* and *Mine Workers v. Pennington*). Second, this immunity extends to the litigation context. *Id.* at 57 (explaining *California Motor Transport Co. v. Trucking Unlimited*). This protection, however, does not extend to "sham" activities designed to hinder competition. *Id.* at

---

[2]Such claims are further described in Eugene Crew, *The Use of Patent Litigation to Violate the Antitrust Laws*, 11 Intell. Prop. L. Bull. 69 (Fall 2006). The court notes, however, the timing of the article and the relationship between the author and Hynix.

56.[3]  What constituted "sham" litigation had produced a circuit split, which the Court resolved by holding that "an objectively reasonable effort to litigate cannot be sham regardless of subjective intent." *Id.* at 57.

The Court's holding clarified the definition of "sham" litigation, but it did not pass on any broader basis for liability.  In a footnote, the Court explained that its review was limited to "whatever antitrust injury Columbia inflicted [stemming] from the attempted enforcement of copyrights." *Id.* at 54, n.2.  "[W]e do not consider whether Columbia could have made a valid claim of immunity for anticompetitive conduct independent of petitioning activity." *Id.*  The Court then referenced its prior discussion of antitrust liability in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707-08 (1962).  In *Continental Ore*, the Court held that antitrust liability could still attach to a sale of ore to a division of the Canadian government even though the purchase was legal under Canadian law.  370 U.S. at 707.  The Court explained that "it is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." *Id.*  The defendants invoked *Noerr*, arguing that their legal sale to the government could not form the basis of antitrust liability. *Id.*  The Court disagreed, explaining that *Noerr* had no bearing on the case because "[r]espondents were engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws." *Id.* Because no protected petitioning conduct was at issue in *Continental Ore*, the Court did not have the opportunity to address whether such conduct could form part of an "unlawful scheme" under the antitrust laws.  Because *PREI* did not involve any activities beyond protected petitioning conduct, the Court again had no opportunity to hold whether such conduct could be included within an "unlawful scheme."

While the Court has recognized the dilemma, it has not held whether petitioning activity protected by the First Amendment can be an element of an "unlawful scheme" or "overall course of conduct" which violates the antitrust laws.  Justice Stevens' concurrence in *PREI*, however, urges

---

[3]The *PREI* decision did not address how the *Noerr-Pennington* doctrine applies to fraudulent conduct.  508 U.S. at 62, n.6; *accord Nobelpharma*, 141 F.3d at 1068.

ORDER GRANTING IN PART AND DENYING IN PART RAMBUS' MOTION TO STRIKE JURY DEMANDS—C-00-20905; C-05-00334; C-05-02298; C-06-00244 RMW
TSF

8

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1  flexibility in applying the *Noerr-Pennington* doctrine to "more complicated cases." 508 U.S. at 72-

2  73 (Stevens, J., concurring). The concurrence notes that "a simple rule may be hard to apply when

3  there is evidence that the judicial process has been used as part of a larger program to control a

4  market[.]" *Id.* at 73. In reviewing cases entailing more complex anticompetitive conduct, Justice

5  Stevens noted that "the distinction between 'sham' litigation and genuine litigation is not always, or

6  only, the difference between lawful and unlawful conduct; objectively reasonable lawsuits may still

7  break the law." *Id.* at 75.

8         In the absence of Supreme Court authority, the Federal Circuit's law controls whether patent

9  litigation may be included as part of an anticompetitive scheme. The Federal Circuit has previously

10  suggested that "patent owners may incur antitrust liability for enforcement of a patent known to be

11  obtained through fraud or known to be invalid, where license of a patent compels the purchase of

12  unpatented goods, or where there is an overall scheme to use the patent to violate antitrust laws."

13  *Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 1576-77 (Fed. Cir. 1990) (citing

14  *Kobe v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir. 1952)) (footnotes omitted). As other courts

15  have noted, however, this remark is dictum as the Federal Circuit was not faced with allegations of

16  an "overall scheme" in *Atari Games*. *See Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*,

17  432 F. Supp. 2d 408, 428-29 (D. Del. 2006). A decade later, the Federal Circuit suggested that "a

18  patent owner who brings suit to enforce the statutory right to exclude others from making, using, or

19  selling the claimed invention is exempt from the antitrust laws, even though such a suit may have an

20  anticompetitive effect, unless the infringement defendant proves one of two conditions," the two

21  conditions being *Walker Process* fraud or sham litigation. *In re Independent Service Organizations

22  Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000) ("*ISO*"); *see also Q-Pharma, Inc. v. Andrew

23  Jergens Co.*, 360 F.3d 1295, 1304-05 (Fed. Cir. 2004) (reiterating that patent enforcement gives rise

24  to antitrust liability only under two conditions). While the *ISO* opinion cites the Federal Circuit's

25  earlier opinion in *Atari Games*, it does not mention or attempt to reconcile its two condition limit

26  with the more expansive list of ways in *Atari Games* that patent litigation can lead to antitrust

27  liability. *See* 203 F.3d at 1327. This absence of explanation may be due to the fact that *ISO*, like

28

ORDER GRANTING IN PART AND DENYING IN PART RAMBUS' MOTION TO STRIKE JURY DEMANDS—C-00-20905; C-05-00334; C-05-02298; C-06-00244 RMW
TSF                                     9

United States District Court

For the Northern District of California

1   *Atari Games*, also lacked any alleged "overall scheme" to monopolize.  *See id.* at 1324.  The

2   argument that *ISO* narrowed antitrust liability for patent enforcement to only two possible contexts

3   (*Walker Process* fraud or sham litigation) also cannot be reconciled with the *ISO* opinion's later list

4   of three contexts giving rise to liability.  *See id.* at 1327 ("In the absence of any indication of illegal

5   tying, fraud in the Patent and Trademark Office, or sham litigation, the patent holder may enforce

6   the statutory right to exclude others from making, using, or selling the claimed invention free from

7   liability under the antitrust laws.").  Finally, the court notes that the Federal Circuit lacked subject

8   matter jurisdiction to issue the *ISO* opinion because a patent issue did not appear on the face of the

9   complaint, and hence it is now only persuasive authority.  *Telecom Technical Services Inc. v. Rolm*

10  *Co.*, 388 F.3d 820, 826 (11th Cir. 2004).

11      The court has not found, and the parties have not shown, any case in which the Federal

12  Circuit has held whether patent litigation can be included as part of an anticompetitive scheme.

13  Statements in *ISO* and *Q-Pharma* suggest the Federal Circuit might limit liability for patent

14  enforcement to two situations, but dictum in *Atari Games* suggests otherwise.  Hence, to determine

15  whether the Federal Circuit would recognize a "scheme" claim premised on an infringement suit

16  brought as "an integral part of an agreement or plan to violate the antitrust laws," the court finds it

17  helpful to review the holdings of the various courts of appeals prior to the creation of the Federal

18  Circuit.

19          **3.      Three Approaches to Whether Patent Litigation Can Be Unlawful**

20      As Hynix suggested in opposition to Rambus' first motion to withdraw its jury demand, this

21  "fact pattern is relatively rare."  Nevertheless, various federal courts have examined the issue of

22  whether patent litigation can be an element of a broader scheme to violate the antitrust laws,

23  reaching back much earlier than the Supreme Court's *Noerr-Pennington* jurisprudence.  From these

24  cases, the court discerns three possible approaches to whether patent litigation can be an

25  anticompetitive act in violation of the antitrust laws.

26          **i.      The Second Circuit's Absolute Bar**

27      The first case to grapple with whether patent litigation can violate the antitrust laws is *Straus*

28

United States District Court

For the Northern District of California

*v. Victor Talking Machine Co.*, 297 F. 791 (2d Cir. 1924).  In *Straus*, the trial court instructed the jury to award the attorneys' fees incurred in patent litigation as antitrust damages if the suit "was a step taken in pursuance of the combination that then existed [. . .] and not the independent act of the Victor people in pursuance of their patent rights."  297 F. at 796.  The Second Circuit framed the issue as whether "resort to the courts, if unsuccessful, may be a step in violation of the statutes here concerned, and that a jury may so find, and award as part of the damages the fees of the attorneys of the successful party."  *Id.* at 797. The court then held that such fees could not be included as antitrust damages, reasoning that "[f]ree access to the courts must neither be denied nor penalized."  *Id.* at 798.  The court noted that when the patentee brought the patent litigation, "the most which can be said against Victor Company is that the questions litigated where debatable."  *Id.*  Further explaining the policy behind its decision, the court wrote,

> Never was it more necessary than now to preserve unimpaired this right so vital to the public welfare and so thoroughly a part of our theory of government. [. . .] it would be a negation of the principle and right of free access to the courts to hold that the submission of rights to judicial determination involved a dangerous gamble which might subject the loser to heavy damage.

*Id.* at 799. Accordingly, the court held that the Victor Company's unsuccessful patent litigation could not be a "step" in an unlawful scheme to violate the antitrust laws.

The Second Circuit revisited the issue of whether patent litigation can be part of a monopolistic scheme in 1971.  *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872 (2d Cir. 1971).  The trial court found that the lawsuits "together with Uniroyal's [resale price maintenance and territorial divisions] had the effect of perpetuating the price and market stabilization achieved through the earlier violations of § 1 of the Sherman Act."  *Id.* at 882.  Nevertheless, the trial court found that the suits were brought "in good faith and for the purpose of resolving the issues of validity and infringement rather than with the intent or purpose of restraining trade in violation of the Sherman Act."  *Id.*  Ansul appealed this ruling, arguing that "even if the intent of Uniroyal's suits was legitimate, the fact that their effect was to further the unlawful conspiracy makes them part of the conspiracy."  *Id.*  The Second Circuit rejected this contention, holding that "[w]hatever other anticompetitive activity the patentee may be guilty of, the patent laws would seem to authorize him

United States District Court

For the Northern District of California

1   to bring such a nonfrivolous suit."  *Id.*  In balancing the purposes of antitrust and patent law, the

2   court suggested that denying recovery in the infringement suit due to the patent misuse defense was

3   remedy enough to sufficiently vindicate antitrust policy, while keeping the courts open to legitimate

4   patent suits.  *Id.* at 882-83.

5          In short, the Second Circuit's jurisprudence creates a rule similar to the one suggested in *ISO*

6   and *Q-Pharma*, namely that only frivolous patent suits can be anticompetitive and part of an

7   unlawful scheme.

8                        **ii.      The *Kobe* Claim**

9          On the opposite end of the spectrum from *Straus* is the *Kobe* line of cases.  *See, e.g., Kobe,*

10  *Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir. 1952).  Kobe built up a large portfolio of patents

11  on hydraulic oil well pumps.  198 F.2d at 420.  It controlled the entire market for hydraulic oil well

12  pumps, though those pumps competed with electric and rod pumps.  *Id.* at 422-23.  When a

13  competitor (Dempsey Pump Company) began making hydraulic pumps, Kobe sued.  The trial court

14  found that one of the patents was valid and infringed, while the other four were invalid, but would

15  also have been infringed if they were valid.  *Id.* at 418.  At the time of filing, Kobe had no

16  information about the functioning of Dempsey's pumps, and appears to have declined the

17  opportunity to have gathered such information.  *Id.* at 421, 424.  Kobe later amended its complaint to

18  include a "groundless" trade secret misappropriation claim.  *Id.* at 424.  Nevertheless, the trial court

19  explicitly found that Kobe had not brought the infringement action in bad faith.  *Id.* at 425.

20         On these facts, the Tenth Circuit noted that "if there was nothing more than the bringing of

21  the infringement action, resulting damages could not be recovered."  *Id.*  The court stated that

22  "although Kobe believed some of its patents were infringed, the real purpose of the infringement

23  action and [notifying customers of the suit] was to further the existing monopoly and to eliminate

24  Dempsey as a competitor."  *Id.*  To be clear, the court believed that "the infringement action and the

25  related activities, of course, in themselves, were not unlawful, and standing alone would not be

26  sufficient to sustain a claim for damages."  *Id.*  In connection with the "entire monopolistic scheme,"

27  however, the court held that "they may be considered as having been done to give effect to an

28

unlawful scheme." *Id.* Summarizing the scheme, the court explained:

> The result of Kobe's infringement action, its verbal and written statements to the trade, was disastrous to the defendants. There was almost a complete boycott of their products. To hold that there was no liability for damages caused by this conduct, though lawful in itself, would permit a monopolizer to smother every potential competitor with litigation before it had an opportunity to be otherwise caught in its tentacles and leave the competitor without a remedy.

*Id.* The Tenth Circuit also considered the Second Circuit's ruling in *Straus*, and rejected it. The court opined that "the right of those who conduct their business in a lawful manner and who do not misuse their patent rights to bring infringement suits and to notify others of the consequences of infringement will in no way be impaired by this ruling." *Id.*

Seven years later, the Seventh Circuit held that "defendants [in a patent suit] are entitled to have their reasonable attorneys' fees and expenses included as an element of damages in the antitrust action." *Clapper v. Original Tractor Cab Co.*, 270 F.2d 616, 624 (7th Cir. 1959). The district court had held that the patent infringement suit was brought "as a part of the conspiracy in violation of the antitrust laws," but did not include the attorneys' fees as antitrust damages. *Id.* at 623-24. Instead, the district court found the case "exceptional" under the Patent Act and awarded untrebled attorneys' fees. *Id.* at 624. Referencing *Kobe*, the Seventh Circuit held that it was the antitrust violations that made the patent case "exceptional," and therefore the attorneys' fees should have been included as antitrust damages. *Id.* A brief dissent-in-part disagreed with the *Kobe* decision and recommended following the Second Circuit decision in *Straus*. *Id.* at 634 (Parkinson, J., concurring-in-part and dissenting-in-part). A few years later, the Seventh Circuit cited *Clapper* and *Kobe* to again hold that "[w]here an infringement suit is brought as part of and in furtherance of a combination and conspiracy which violates the antitrust laws and results in injury such as is here alleged the person injured may recover threefold the damages he sustains." *Dairy Foods Inc. v. Dairy Maid Products Co-op.*, 297 F.2d 805, 809 (7th Cir. 1961). One judge disagreed, believing that attorneys' fees in patent litigation could not be considered "damages" under the antitrust laws, but "d[id] not feel willing to dissent." *Id.* at 811 (Schnackenberg, J., concurring). Neither *Clapper* nor *Dairy Foods* contained any extensive discussion of the merits of the *Kobe* rule. Nevertheless, the debate was over in the Seventh Circuit in 1967 when the court held that there was "no merit" to an argument that

United States District Court
For the Northern District of California

1    litigation expenses should not be awarded as treble damages.  *Hazeltine Research, Inc. v. Zenith*

2    *Radio Corp.*, 388 F.2d 25, 35 (7th Cir. 1967).[4]

3          The Ninth Circuit considered this line of cases for the first time in *Rex Chainbelt, Inc. v.*

4    *Harco Products, Inc.*, 512 F.2d 993 (9th Cir. 1975).  The lower court had found that the patent

5    holder (Rex) was not "guilty of bad faith or inequitable or unconscionable conduct in the

6    prosecution of this action." *Id.* at 1003, n.5.  On appeal, Harco argued that "the bringing of the

7    infringement action by Rex is per se an action in furtherance of the tying situation and hence under

8    15 U.S.C. s [sic] 15 there would exists [sic] damages (i.e. the cost of defending against the patent

9    infringement suit) for which Harco should be allowed to recover threefold the amount." *Id.* at 1004.

10   Harco cited the favorable cases discussed above, and the Ninth Circuit "agree[d] with the holdings in

11   the above cases." *Id.*  Nonetheless, it rejected a "per se right to treble attorney's fees in all

12   combination patent-infringement-antitrust actions." *Id.*  The court considered the recommendations

13   of the Attorney General's National Committee to Study the Antitrust Laws, and divined "the

14   consistent thread of the patent infringement suit being used with ulterior motives as a predatory

15   means – an aggressive weapon to attain some other anticompetitive end–, as opposed to its being

16   used as a defensive shield with which to protect the patent interests." *Id.* at 1005.  The court

17   believed *Kobe* "instructive as to this distinction," and then concluded that a patent infringement suit

18   could not be part of an antitrust violation "absent some showing from which the trial court can find,

19   or infer, that the patent infringement suit was brought in furtherance and as an integral part of a plan

20   to violate the antitrust laws." *Id.* at 1005-06.  The court went on, however, to lament the problem of

21   patentees who are "unintentionally or negligently in violation of the antitrust laws," a common result

22   of the now-abrogated *per se* rule against tying, *see Illinois Tool Works, Inc. v. Independent Ink, Inc.*,

23   547 U.S. 28 (2006).  *Rex Chainbelt*, 512 F.2d at 1007.  Accordingly, the court held that a patent

24   infringement suit is not brought in furtherance of an antitrust violation if the suit was 1) brought in

---

[4]      The Supreme Court affirmed in part and reversed in part this decision.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969).  The Court did not, however, review the propriety of awarding treble damages for patent litigation expenses.  *See id.* at 133 ("HRI has not challenged that award in this Court.")

ORDER GRANTING IN PART AND DENYING IN PART RAMBUS' MOTION TO STRIKE JURY DEMANDS—C-00-20905; C-05-00334; C-05-02298; C-06-00244 RMW
TSF                                                                                14

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

good faith and 2) the patentee subjectively believed that it was not violating the antitrust or patent misuse laws. *Id.* at 1006-07.

While the Ninth Circuit went on to discuss the interface between the *Noerr-Pennington* doctrine and the patent and antitrust law at great length in *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979), it addressed "scheme" liability only in dictum. The court stated, "this is not a Kobe case." *Id.* at 994. "Only the bad faith theory of recovery exists in this case." *Id.* The court held that the only conduct bearing on antitrust liability was a single patent suit, which explains why "if the evidence, under the instructions our opinion requires, should fail to support the bad faith theory, it should not be sufficient to support the overall scheme theory." *Id.* The court "express[ed] no opinion on the type of additional evidence that would require an overall scheme charge," but held out *Kobe* as the archetype. *Id.* The opinion is not clear whether litigation must be in bad faith, as well as be in conjunction with additional antitrust misconduct, for a scheme claim, or if protected litigation conduct could give rise to a scheme claim if brought in conjunction with other antitrust misconduct. *Kobe*'s facts support the latter, while the Ninth Circuit's emphasis on protecting good faith infringement suits suggests the former.

Formulating a consistent rule from these cases is difficult. Nonetheless, the Ninth Circuit's synthesis in *Rex Chainbelt* held that patent litigation constituted anticompetitive conduct if "Rex merely had a good faith belief in the validity of its patent, but was intentionally using its patent in furtherance of a tying scheme (cf. Kobe, supra)." 512 F.2d at 1007. On the other hand, the patent litigation was protected if "Rex not only in good faith believed that its patent was valid, but also believed that it was not misusing its patent or violating the antitrust laws." *Id.* In short, even good faith patent litigation violates the antitrust laws if the patentee was aware of the anticompetitive effect of the litigation.

### iii.     The "Causal Connection" Middle Ground

The Eighth Circuit considered the viability of whether patent litigation costs could be awarded as treble damages resulting from an antitrust scheme to monopolize in 1966. *Am. Infra-Red Radiant Co. v. Lambert Indus., Inc.*, 360 F.2d 977, 996-97 (8th Cir. 1966). After considering the

*Kobe* and *Dairy Foods* cases, the court held that "whenever the patent litigations [sic] is initiated pursuant to a lawful purpose and there is no causal connection between the bringing of the action and the illegal conduct, the cost of the defense of the suit cannot become an element of the damage which is trebled under the Clayton Act." *Id.* at 997. The court then found that the patent litigation lacked any causal connection to the alleged antitrust violations (an exclusive dealing arrangement tied to a patent license) because "there is no indication that the initiation of this suit was inspired by any monopolistic conspiracy or was a veiled attempt to unjustly drive plaintiffs' competitors to the wall." *Id.* Put another way, "[t]he defense of this suit is, therefore, an expense attributable, not to the allegedly illegal contracts but solely to a dispute over the two patents." *Id.* Because the court could discern no causal connection between the parties' patent dispute and the alleged antitrust violation, the patent litigation could not be considered a step in an unlawful scheme.

The Sixth Circuit applied the Eighth Circuit's "causal connection" test to an alleged *Walker Process* fraud antitrust claim. *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.*, 562 F.2d 365, 374 (6th Cir. 1977). In that case, the court easily found a "causal connection" between the fraudulently obtained patent and the ensuring patent litigation, and accordingly included the litigation's attorneys' fees as part of the damages for the antitrust violation. *Id.* This test is broader than the Second Circuit's approach because it would allow good faith litigation to become unlawful if done as part of an anticompetitive scheme, yet narrower than the *Kobe* line of cases because it requires an explicit linkage between an antitrust violation and the litigation.

### iv.     If Presented With the Issue, the Federal Circuit Would Choose the "Causal Connection" Test

Summarizing these cases, the court draws the following conclusions. First, no court addressed the viability of a "scheme" claim based on patent litigation protected by the *Noerr-Pennington* doctrine. While many cases agonize over the patentee's freedom to bring suit, none address it in the context of constitutionally protected activity. Only *Handgards* acknowledged the existence of the Supreme Court's *Noerr-Pennington* jurisprudence. The Ninth Circuit again discussed the issue in *Clipper Exxpress v. Rocky Mountain Tariff Bureau, Inc.*, 690 F.2d 1240 (9th

**United States District Court**
For the Northern District of California

Cir. 1982), where the court considered the *Noerr-Pennington* doctrine's interaction with protected

agency petitioning.  The court held that such petitioning could be included as part of a broader

scheme to violate the antitrust laws, and did so based on the reasoning in *Kobe* and *Rex Chainbelt*.

The court summarized those cases by quoting *Handgards* to state that "a patentee may incur antitrust

liability for even the good faith prosecution of a valid patent where it is shown that the infringement

suit 'was brought in furtherance and as an integral part of a plan to violate the antitrust laws.'" *Id.* at

1264.  Because those cases (neither of which discussed the *Noerr-Pennington* protection afforded

good faith patent suits) allowed good faith enforcement efforts to be part of a scheme, the Ninth

Circuit concluded that, despite *Noerr-Pennington,* the petitioning activity at issue was analogous and

could also be part of a scheme.  *Id.*  Now, the Manufacturers cite *Clipper Exxpress* for the

proposition that *Noerr-Pennington* protected patent enforcement can be included in an antitrust

scheme allegation. Yet in no case did the Ninth Circuit actually consider how the *Noerr-Pennington*

doctrine should apply to scheme claims; instead, in *Clipper Exxpress* it merely analogized to pre-

*Noerr* decisions to justify not applying *Noerr-Pennington* to that case. Therefore, the court does not

find *Clipper Express*'s "reasoning" instructive on the question of whether otherwise protected

litigation conduct can be part of an unlawful anticompetitive scheme.

The jurisprudence contains a debate between the need to keep courts open for good faith

litigation and a desire to prevent "smothering" and "aggressive weapon" patent litigation.  At one

end is *Kobe* court's "smothering" reasoning, which appears unconcerned that its hypothetical

"potential competitor" was an infringer with no legal right to be competing in the product market.

*Kobe*, 198 F.2d at 425.  Nor is the meaning behind the Tenth Circuit's "tentacles" hyperbole clear.

Nonetheless, the Tenth Circuit's understanding of antitrust law seems premised on protecting the

greatest number of competitors, regardless of the legality of their competition.  This solicitude for

individual competitors does not square with modern antitrust law.  *See Brunswick Corp. v. Pueblo

Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws, however, were enacted for the

protection of *competition*, not *competitors*." (internal citations omitted)) (emphasis in original).  Nor

does it permit a patent holder to exercise any of its rights.  The *Kobe* court's reasoning that "the right

**United States District Court**

For the Northern District of California

of those who conduct their business in a lawful manner and who do not misuse their patent rights to bring infringement suits and to notify others of the consequences of infringement will in no way be impaired by this ruling" is subject to serious question. As a patent conveys only the right to exclude, s*ee* 35 U.S.C. § 154(a)(1), it is not clear what use of patent rights the Tenth Circuit would not have considered a misuse.  Taken as a whole, the *Kobe* decision represents hostility to patent rights inconsistent with a modern understanding of intellectual property and competition law.  *See*, *e.g.*, Fed. Trade Comm'n, To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy (2003) 1-7 ("Patent and antitrust law 'are actually complementary, as both are aimed at encouraging innovation, industry, and competition.'" (quoting *Atari Games*, 897 F.2d at 1576); *see also id.* at 1-18 ("Many now believe that antitrust's ascendency [from the 1930s to 1970s] lacked both a sound economic foundation and a sufficient appreciation of the incentives for innovation that patents and patent licensing can provide.").  On the other hand, the Second Circuit's position would allow litigation brought to further anticompetitive schemes to go unchecked.  On this point, Justice Stevens' concurrence in *PREI* usefully reminds that more complex cases exist and that even good faith litigation can further an anticompetitive scheme.

With these considerations in mind, the court believes that the Federal Circuit and the Supreme Court would recognize some "scheme" antitrust allegations that include constitutionally protected litigation within the "overall course of conduct," but only those in which the patent litigation is "causally connected" to anticompetitive harms.  This is the test described in *American Infra-Red* and applied in *Kearney & Trecker*.  The court recognizes, however, that some of the language is *American Infra-Red* is vague, and not adequately solicitous of a patent holder's constitutional right to petition for enforcement of its right to exclude.  Indeed, Justice Harlan cautioned that section 2 antitrust liability should not reach mere "patents that for one reason or another may turn out to be voidable under one or more of the numerous technicalities attending the issuance of a patent."  *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 180 (1965) (Harlan, J., concurring).  Therefore, the predicate harms in an "anticompetitive scheme" claim must be more precise than simply being "inspired by any monopolistic conspiracy or

[a] veiled attempt to unjustly drive plaintiffs' competitors to the wall."  The court concludes that before otherwise protected litigation can be a part of an "anticompetitive scheme" claim, the court must first find that the other aspects of the scheme independently produce anticompetitive harms.  Once this step has been established, the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms.  If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme.  *See PREI*, 508 U.S. at 74 (Stevens, J., concurring) (considering as unlawful actions that seek to enforce antitrust violations, e.g., restraints of trade).

In reaching this conclusion, the court acknowledges the apparently contrary opinions of respected commentators.  For example, Professors Hovenkamp, Janis, and Lemley suggest that:

> Some allegations of anticompetitive litigation are made as part of a broader pattern of alleged anticompetitive conduct, including more traditional antitrust theories.  In such a case, the logical approach is to consider the anticompetitive litigation allegations under the standards set forth [in *PREI* and *Walker Process*].  If the antitrust plaintiff can prove the existence of sham litigation, the litigation conduct can be included in the mix of things alleged to violate the antitrust laws.  If not, the antitrust claim can still be heard on the merits, but without the sham litigation allegations.  In this way, courts avoid the risk of such mixed allegations being used as a subterfuge to avoid the stringent requirements of *Walker Process* or *Noerr* immunity.

Herbert Hovenkamp, Mark D. Janis, & Mark A. Lemley, IP AND ANTITRUST § 11.4f (2007).  A district court opinion also endorsed this conclusion when considering an alleged scheme of antitrust misconduct including patent litigation.  *Abbott Laboratories*, 432 F. Supp. 2d at 428-29.  Nonetheless, where the patent litigation is used to further the harm caused under a "more traditional antitrust theory," a plaintiff should be allowed a full recovery.  In many antitrust cases, proposed damages calculations are too speculative to award.  In those situations, one of the few ways to adequately compensate an injured firm is by trebling its litigation expenses.  Herbert Hovenkamp, Mark D. Janis, & Mark A. Lemley, IP AND ANTITRUST § 6.3 (2005).  By including litigation that furthers other exclusionary practices amongst the monopolist's anticompetitive scheme, the law ensures that an injured plaintiff can recover a "workable minimum" of damages where the damages from other harms may be too difficult to calculate.  *Id.*

### 4.   "Patent Ambush" Section 2 Claims

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Having laid out a rule for when patent litigation may be included among a plaintiff's section

2  2 scheme allegations, the court turns to the present case.  The Manufacturers have alleged that

3  Rambus participated in a standards-setting organization, understood its intellectual property

4  disclosure policy, withheld information about its patent applications, waited until the industry was

5  irreversibly "locked in" to the standard, and then began a litigation campaign to extract royalties.

6  Rambus' alleged conduct before JEDEC can be considered anticompetitive conduct under the

7  Sherman Act.  *See Broadcom Corp. v. Qualcomm, Inc.*, __ F.3d __, 2007 WL 2475874, at *11 (3d

8  Cir. 2007); *see generally* U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and

9  Intellectual Property Rights: Promoting Innovation and Competition, at 37-40 (2007) ("Enforcement

10  Report").

11    Because Rambus' alleged conduct at JEDEC can independently qualify as an anticompetitive

12  harm under section 2, the court finds that Rambus' current patent litigation is "causally connected" to

13  that behavior and therefore properly included in an "anticompetitive scheme" allegation.  To be

14  clear, the causal connection is that a patent "ambush" or "hold-up" is ineffective without the threat of

15  litigation.

16    As clear as the causal connection is in this case, the court notes further policy considerations

17  that militate in favor of finding such a connection.  The recent FTC/DOJ report suggests that

18  "market participants often may have little incentive to complain about hold up because they can pass

19  on the hidden costs of hold up to consumers or because there is no venue for resolving complaints."

20  Enforcement Report, at 40.  Contributors to the report commented that "to the extent that the people

21  paying royalties are competing against each other and are all – or believe that they're all paying

22  roughly the same royalty, there's a lot of pass-through, so it's the final consumer rather than these

23  competitors who end up paying." *Id.*  They also explained that those in the best position to

24  challenge the anticompetitive holdup will not because "[it] may be a tax on the industry, and . . . it

25  doesn't hurt me worse than anybody else."  Essentially, the standard-setting patent hold-up presents

26  an example of the classic free rider problem.  A licensee who chooses to challenge the hold up risks

27  losing in court and incurring substantial legal expenses.  On the other hand, a licensee who does not

28

challenge the hold up is no worse off competitively because every licensee is paying the same royalty and passing costs onto consumers, while remaining in a position to free ride and reap all of the benefits if another licensee successfully challenges the hold up.  The market failure thus results in an under-supply of challenges to patent hold ups.  *See id.*  By allowing a successful challenger of a patent holdup to recover a "workable minimum" of damages, the antitrust laws can help alleviate this market failure.

As discussed, the Manufacturer's "anticompetitive scheme" allegations lay out an independent "traditional antitrust theory" of anticompetitive harm and demonstrate the causal connection between Rambus' patent litigation and that harm.  Accordingly, the patent litigation is properly included as an element of the alleged unlawful scheme.  If proven, this scheme would entitle the Manufacturers to at least their legal expenses incurred in defending the patent litigation. Because the Manufacturer's antitrust claims include a claim for legal relief, they are entitled to a jury trial.  Rambus' motions to withdraw/strike the jury demands as to the antitrust claims are therefore denied.

### C.    The Fraud Claims

Rambus argues that the Manufacturers cannot recover any monetary damages on their fraud claim, and hence have no right to a jury.  The Manufacturers claim they are entitled to three types of monetary damages – attorneys' fees as compensatory damages, nominal damages, and punitive damages.

The Manufacturers cannot claim their attorneys' fees as compensatory damages for a fraud claim.  The "American rule" requires each party to bear its own legal fees.  *See* Cal. Civ. Code § 1021.  The California Supreme Court closely guards this principle, and is loathe to expand the contexts in which a party can recover its attorneys' fees unless authorized by a statute.  *Gray v. Don Miller & Associates, Inc.*, 35 Cal. 3d 498, 507 (1984) (reversing attorneys' fees award in fraud case); *see also Prentice v. N. Am. Title Guar. Corp.*, 59 Cal. 3d 618, 620 (1963) ("This section undoubtedly prohibits the allowance of attorney fees against a defendant in an ordinary two-party lawsuit.").

The Manufacturers' argue that Rambus' alleged fraud has caused them to incur the costs of

United States District Court
For the Northern District of California

1   this litigation, and that they must be reimbursed these attorneys' fees to be made whole.  Generally,

2   the measure of tort damages in California is "the amount which will compensate for all the detriment

3   proximately caused."  Cal. Civ. Code § 3333.  The goal of section 3333 is "to make the successful

4   plaintiff whole." *Overgaard v. Johnson*, 68 Cal. App. 3d 821, 824 (1977).  The Manufacturers

5   reason that section 3333 therefore "expand[s] the American Rule" and allows for the recovery of

6   attorneys' fees whenever the tort proximately causes the attorneys' fees.  The Manufacturers would

7   have the general control the specific. On the contrary, section 3333 does not "expand" the American

8   Rule; the American Rule limits section 3333.  Under the Manufacturers' interpretation of section

9   3333, attorneys' fees would be recoverable as damages in every case, for every tort proximately

10  causes the litigation that follows it.  However, the California Supreme Court explicitly rejected this

11  interpretation of the law in *Gray*.  *See* 35 Cal. 3d at 506.

12      The Manufacturers support this interpretation by turning to a decision based on Virginia law.

13  *See Rambus, Inc. v. Infineon Tech. AG*, 164 F. Supp. 2d 743, 759-64 (E.D. Va. 2001).  After

14  analyzing the principles behind the "tort of another" doctrine (which allows a plaintiff to recover its

15  legal fees in an action with a third party where the action was caused by the defendant's tort against

16  the plaintiff), the court turned to "the rationale, which is followed in Virginia, for allowing attorneys'

17  fees to be an element of damage or injury in certain intentional torts." *Id.* at 762.  The

18  Manufacturers argue that "there are no distinctions between Virginia and California law applicable

19  here."  On the contrary, California law clearly prohibits attorneys' fees in two-party actions absent

20  special circumstances that do not apply here.  *See Gray*, 35 Cal. 3d at 505-507 (listing and

21  explaining exceptions to the American Rule).

22      Finally, the Manufacturers cite to California case law that attorneys' fees may be awarded

23  against an insurer who has forced the insured to pursue litigation in order to obtain benefits

24  wrongfully withheld.  *See Brandt v. Superior Court*, 37 Cal. 3d 813 (1985).  The Manufacturers also

25  cite case law which allows recovery of attorneys' fees in claims of malicious prosecution and false

26  imprisonment.  *See Cassim v. Allstate Ins. Co.*, 33 Cal. 4th 780, 806 (2004).  Both contexts are

27  readily distinguishable from this case.  In *Gray*, 35 Cal. 3d at 507 n.5, the court declined to extend

28

**United States District Court**
For the Northern District of California

the first line of cases to "a noninsurance context," namely, to the case of a defrauded plaintiff. The torts of malicious prosecution and false imprisonment allow attorneys' fees as compensatory damages "as sanctions against the abuse of process th[e] two torts represent." *Brandt*, 37 Cal. 3d at 822 (Davis, J., dissenting). The manufacturers' fraud claims in this case do not involve an analogous abuse of process. While the Manufacturers cite *Brandt* and *Cassim* to suggest the broad availability of attorneys' fees as compensatory damages, the cases amply demonstrate the opposite. *Cassim*, 33 Cal. 4th at 806 (listing bad faith insurance denial, malicious prosecution, and false imprisonment as exceptions to the American Rule). Accordingly, the Manufacturers cannot claim their attorneys' fees as compensatory damages.

The Manufacturers next premise their right to a jury on the availability of nominal damages. Rambus argues that the Manufacturers are not entitled to a jury because they cannot prove nominal damages.[5] Fraud requires proof of injury. *See* Cal. Civ. Code § 1709; *Furia v. Helm*, 111 Cal. App. 4th 945, 956 (2003). Because damages are essential to a claim for fraud, "nominal damages are not awarded in deceit." Prosser and Keeton on Torts § 110 (5th ed. 1984). However, they can be awarded where a plaintiff has proven actual damage has occurred (and therefore has satisfied fraud's damages element), but the plaintiff cannot prove the amount of the actual damage. *See, e.g., Oates v. Glover*, 154 So. 786, 787 (Ala. 1934); *McLaughlin v. National Union Fire Ins. Co.*, 23 Cal. App. 4th 1132, 1163 (1994); *Sterling Drug v. Benatar*, 99 Cal. App. 2d 393, 400 (1950).

Rambus maintains that the Manufacturers have not suffered any actual damage. Rambus points to the absence of any expert report quantifying damages other than attorneys' fees to support this proposition. Perry Decl. ¶¶ 2, 3. Rambus also submits that Hynix stated that it "will not claim damages for lost profits" and that Nanya seeks only attorneys' fees. Perry Decl. ¶¶ 4, 5, Ex. A. Rambus' declaration contains no purported disclaimer from Micron. Rambus conflates the

---

[5] Rambus also argues that Hynix and Nanya did not request nominal damages in their prayer for relief. Both Hynix and Nanya request "such other and further relief as the Court may deem appropriate." This general prayer suffices here to provide for nominal damages, if proven at trial. *See Basista v. Weir*, 340 F.2d 74, 87-88 (3d Cir. 1965) ("[I]t is not necessary to allege nominal damages and nominal damages are proved by proof of deprivation [sic] of a right to which the plaintiff was entitled"); *compare with* Cal. Code Civ. Proc. § 580(a) ("[T]he court may grant the plaintiff any relief consistent with the case made by the complaint and embraced within the issue.").

Manufacturers' failure to quantify damages with a  lack of actual damages.  The basis for nominal

damages in this instance is that the Manufacturers cannot prove the amount of the actual damage

they have suffered.  Given this, the Manufacturers' failure to submit damages calculations is both

logical and expected, not a basis for depriving the Manufacturers of their constitutional right to a

jury.

Nonetheless, to prove the actual damages required for a fraud claim, the Manufacturers must

submit something.  Recognizing this, the Manufacturers list two examples of the "specific

unquantifiable ways" in which they have been damaged.  The Manufacturers first point to paragraph

172 of "Micron's Answer."  The Manufacturers do not specify whether this is to Micron's Answer to

Amended Complaint (docket entry 45) or First Amended Answer (docket entry 87).  Neither one is

clearly on point.  The first paragraph 172 lists various publications that Rambus allegedly withheld

while prosecuting its patents.  The second paragraph 172 comes in the middle of a series of

allegations about Rambus' anticompetitive conduct and alleges that,

> Rambus's conduct threatens to thwart the development of any non-Rambus standard.
> Rambus's anticompetitive actions threaten to suppress industry acceptance of
> anything but Rambus's proprietary technology. The uncertainty created by Rambus
> over alternatives to its own technology poses the potential for raising the costs of
> rival standards and reducing the likelihood that those standards will be adopted.

The Manufacturers next point to an interrogatory responses dated September 4, 2001, in which

Hynix claimed that it suffered unquantifiable harm from lost sales, reduced prices, and delayed

chipsets "due to fear, uncertainty and doubt spawned by Rambus' patent threats."  The

Manufacturers submit nothing on Nanya's behalf.

The Manufacturers' inability to point to evidence substantiating their claims for damages

raises the question of what material the court should consider on a motion to strike a jury demand.

This is an issue the Supreme Court has expressly declined answering in the past.  *Curtis v. Loether*,

415 U.S. 189, 196, n.11 (1974).  Various courts have suggested that whether a party is entitled to a

jury should be decided on the basis of the pleadings.  *See, e.g., Rogers v. Loether*, 467 F.2d 1110,

1118-19 (7th Cir. 1972), *aff'd sub nom. Curtis v. Loether*, 415 U.S. 189 (1974); *Ring v. Spina*, 166

F.2d 546, 549 (2d Cir. 1948); *Laskaris v. Thornburgh*, 733 F.2d 260, 263-64 (3d Cir. 1984).  The

United States District Court

For the Northern District of California

1   Sixth Circuit considered the issue and disagreed, holding that,

2      If it becomes clear prior to trial that no genuine issue exists as to any material facts,
        a district court can grant summary judgment as to some or all issues. This standard
3      can operate to eliminate meritless damages requests and thus moot a jury demand.
        Under this standard, the district court is free to examine all of the record and not just
4      the pleadings. If a demand for damages is so insubstantial that it cannot meet the
        standard contained in Rule 56, then it should not be allowed to convert equitable
5      issues into legal ones.

6   *Hildebrand v. Board of Trustees of Mich. St. Univ.*, 607 F.2d 705, 710 (6th Cir. 1979); *see also*

7   *Mittelstadt v. Summit County Legal Aid Soc'y*, 1987 WL 37886, at **3 (6th Cir. 1987) (unpublished)

8   (affirming order striking jury demand when deposition revealed plaintiff sought only equitable

9   relief).

10          The court holds that if, after the close of discovery, the party requesting a jury cannot

11   produce evidence supporting its claim to monetary damages, then the party no longer has a right to a

12   jury.  On the basis of the Manufacturers' opposition, the Manufacturers have not demonstrated that

13   they are entitled to legal relief on their fraud claim.  The court is hesitant, however, to effectively

14   enter partial summary judgment that the Manufacturers are not entitled to monetary relief.  First,

15   summary judgment motions on these claims are currently pending.  Second, the law is unclear

16   regarding at what stage of the proceedings a party requesting a jury must produce evidence of actual

17   injury.  Third, Rambus' briefing did not call attention to the *Hildebrand* case until its reply,

18   foreclosing the Manufacturers' ability to respond with contrary authority or more concrete evidence

19   of actual damages.  Accordingly, the court denies without prejudice Rambus' motion to withdraw

20   and strike jury demands with respect to the fraud claim, but will entertain such a motion again if the

21   Manufacturers do not produce admissible evidence of their actual (but unquantifiable) fraud

22   damages.[6]

23          Finally, even if the Manufacturers may recover nominal damages, Rambus points out that the

24   Seventh Amendment only preserves the right to jury trial "where the value in controversy shall

25   _____

26      [6]      The court notes that many of the facts underlying the fraud claim will be decided by the
        jury in deciding the antitrust claims.  Even if the Manufacturers are not entitled to a jury, the court will
27   be required to decide the merits of the fraud claim in accord with the jury's factual findings. *See Beacon
        Theatres, Inc. v. Westover*, 359 U.S. 500 (1959); *Shum v. Intel Corp.*, __ F.3d __, 2007 2404718 (Fed.
28   Cir. 2007).

ORDER GRANTING IN PART AND DENYING IN PART RAMBUS' MOTION TO STRIKE JURY DEMANDS—C-00-20905; C-
05-00334; C-05-02298; C-06-00244 RMW
TSF                                                                25

exceed twenty dollars."  U.S. Const., amend. VII; *see also Van Wie v. Pataki*, 267 F.3d 109, 115 n.4

(2d Cir. 2001) (suggesting in dictum that suits requesting only nominal damages would not be

entitled to a jury trial). Nominal damages, being limited to $1.00, *see Wiggins v. Rushen*, 760 F.2d

1009, 1012 (9th Cir. 1985), would not alone satisfy the Seventh Amendment's amount in

controversy limitation.  The Manufacturers, however, also request punitive damages.  California

permits the award of punitive damages where a plaintiff receives only nominal damages, provided

the plaintiff has proven actual, but unquantifiable, damages.  *See Kizer v. County of San Mateo*, 53

Cal. 3d 139, 147 (1991); *see also Nominal Damages as a Basis for Awarding Punitive Damages in

California*, 3 Stan. L. Rev. 341, 343 (1951).  Given the possibility of punitive damages, the "value in

controversy" in this case would exceed twenty dollars, and the right to a jury trial would remain.

### D.      The Breach of Contract Claim

Rambus also moves to strike the jury demand with respect to Micron's breach of contract

claim, arguing that Micron cannot recover any damages, and hence is not entitled to a jury.  Micron

argues that its attorneys' fees are recoverable as damages under its contract claim.  As in tort cases,

California applies the American Rule to contract cases.  The only case law permitting the recovery

of attorneys' fees for breach of contract limits recovery to reasonably foreseeable attorneys' fees

incurred against third parties.  *See De La Hoya v. Slim's Gun Shop*, 80 Cal. App. 3d Supp. 6, 9-11

(1978) (collecting cases where breach of contract led to reasonably foreseeable litigation with third

parties).  Here again, Micron is trying to recover attorneys' fees for its litigation with Rambus, not

with a third party, a recovery the American Rule does not permit.  Absent a cognizable theory of

damages, Micron has no right to have its contract claim heard by a jury.  Accordingly, the court

grants Rambus' motion to strike the jury demand with respect to Micron's breach of contract claim.

### E.      Declaratory Judgment and Affirmative Defenses

Rambus also moves to strike jury demands with respect to various affirmative defenses and

requests for declaratory judgment asserted by Nanya and Micron.  The parties do not appear to

dispute that an affirmative defense does not entitle a party to a jury trial.  *See Burlington Northern R.

Co. v. Nebraska Public Power Dist.*, 931 F. Supp. 1470, 1486 (D. Neb. 1996).  Instead, the

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Manufacturers argue that a jury should hear their defenses because the same finder of fact must

2   resolve all intertwined factual issues.  *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509

3   (1959). The fact that *Beacon Theatres* requires the court to accept and apply any facts found by the

4   jury on the antitrust claims (and perhaps the fraud claims) means that the defenses as a whole must

5   be tried to the jury.

6        Whether a declaratory judgment actions entitles a party to a jury trial depends on the nature

7   of the claim from which it arises.  *See Pacific Indem. Co. v. McDonald*, 107 F.2d 446, 448 (9th Cir.

8   1939).  If the issue would have been tried to a jury had it arisen outside of the declaratory judgment

9   action, then a jury trial right exists.  Here, Rambus challenges Micron's request for a jury trial on its

10  declaratory judgment action for patent unenforceability due to antitrust violations and waiver. The

11  Federal Circuit has held that unenforceability is an equitable issue.  *See, e.g.,eSpeed, Inc. v.*

12  *BrokerTec USA, L.L.C.*, 480 F.3d 1129, 1135 (Fed. Cir. 2007) ("The ultimate conclusion that a

13  patent is unenforceable is an equitable decision committed to the discretion of the district court[.]");

14  *Agfa Corp. v. Creo Products, Inc.*, 451 F.3d 1366, 1375 (Fed. Cir. 2006).  Because Micron's claims

15  of unenforceability would be tried as equitable defenses in a standard lawsuit, a declaratory

16  judgment of unenforceability is also equitable in nature, and Micron is not entitled to a jury on its

17  declaratory judgment action.

18                                    **III.  ORDER**

19       For the foregoing reasons, the court DENIES Rambus's motion to strike/withdraw jury

20  demands as to the antitrust claims and as to its fraud claims without prejudice to renewal, but

21  GRANTS Rambus's motion to strike/withdraw its jury demands with respect to the Manufacturers'

22  contract and declaratory judgment claims and affirmative defenses.

23

24  DATED: _____11/4/2007_____            _____

25                                              RONALD M. WHYTE
                                                United States District Judge
26

27

28

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff(s):**

| | |
|---|---|
| Craig N. Tolliver | ctolliver@mckoolsmith.com |
| Pierre J. Hubert | phubert@mckoolsmith.com |
| Brian K. Erickson | berickson@dbllp.com, |
| David C. Vondle | dvondle@akingump.com |
| Gregory P. Stone | gregory.stone@mto.com |
| Carolyn Hoecker Luedtke | luedtkech@mto.com |
| Peter A. Detre | detrepa@mto.com |
| Burton Alexander Gross | burton.gross@mto.com, |
| Steven McCall Perry | steven.perry@mto.com |
| Jeannine Y. Sano | sanoj@howrey.com |

**Counsel for Defendant(s):**

| | |
|---|---|
| Matthew D. Powers | matthew.powers@weil.com |
| David J. Healey | david.healey@weil.com |
| Edward R. Reines | Edward.Reines@weil.com |
| John D Beynon | john.beynon@weil.com |
| Jared Bobrow | jared.bobrow@weil.com |
| Leeron Kalay | leeron.kalay@weil.com |
| Theodore G. Brown, III | tgbrown@townsend.com |
| Daniel J. Furniss | djfurniss@townsend.com |
| Jordan Trent Jones | jtjones@townsend.com |
| Kenneth L. Nissly | kennissly@thelenreid.com |
| Geoffrey H. Yost | gyost@thelenreid.com |
| Susan Gregory van Keulen | svankeulen@thelenreid.com |
| Patrick Lynch | plynch@omm.com |
| Jason Sheffield Angell | jangell@orrick.com |
| Vickie L. Feeman | vfeeman@orrick.com |
| Mark Shean | mshean@orrick.com |
| Kai Tseng | hlee@orrick.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**      11/4/07                                              TSF
                                                        **Chambers of Judge Whyte**

**United States District Court**
For the Northern District of California