FILED

MAR 2 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HYNIX SEMICONDUCTOR INC., HYNIX SEMICONDUCTOR AMERICA INC., HYNIX SEMICONDUCTOR U.K. LTD., and HYNIX SEMICONDUCTOR DEUTSCHLAND GmbH, | No. C-00-20905 RMW |
| Plaintiffs, | POST-EVIDENCE JURY INSTRUCTIONS |
| v. | |
| RAMBUS INC., | |
| Defendant. | |
| RAMBUS INC., | No. C-05-00334 RMW |
| Plaintiff, | |
| v. | |
| HYNIX SEMICONDUCTOR INC., HYNIX SEMICONDUCTOR AMERICA INC., HYNIX SEMICONDUCTOR MANUFACTURING AMERICA INC., NANYA TECHNOLOGY CORPORATION, NANYA TECHNOLOGY CORPORATION U.S.A., | |
| Def        endants. | |
| RAMBUS INC., | No. C-06-00244 RMW |
| Plaintiff, | |
| v. | |
| MICRON TECHNOLOGY, INC., and MICRON SEMICONDUCTOR PRODUCTS, INC. | |
| Defendants. | |

DATED: 3/25/08

_Ronald M. Whyte_

RONALD M. WHYTE
United States District Judge

**United States District Court**
For the Northern District of California

# JURY INSTRUCTION No. 1

## General — Duty of the Jury

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you as to the law of the case.

Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

You must not infer from these instructions or from anything I may have said or done as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

# JURY INSTRUCTION No. 2

## General — What Is Evidence

The evidence you are to consider in deciding what the facts are consists of:

1.    The sworn testimony of any witness;

2.    The exhibits which are received into evidence; and

3.    Any facts to which the lawyers have agreed.

3

# JURY INSTRUCTION No. 3

### General — What Is Not Evidence

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1.  Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.  Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

3.  Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition, sometimes testimony and exhibits are received only for a limited purpose; when I have given a limiting instruction, you must follow it.

4.  Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

United States District Court
For the Northern District of California

4

# JURY INSTRUCTION No. 4

### General — Direct and Circumstantial Evidence

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

United States District Court

For the Northern District of California

5

**United States District Court**
For the Northern District of California

# JURY INSTRUCTION No. 5

### General — Credibility of Witnesses

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

1. The opportunity and ability of the witness to see or hear or know the things testified to;

2. The witness's memory;

3. The witness's manner while testifying;

4. The witness's interest in the outcome of the case and any bias or prejudice;

5. Whether other evidence contradicted the witness's testimony;

6. The reasonableness of the witness's testimony in light of all the evidence; and

7. Any other factors that bear on believability.

**JURY INSTRUCTION No. 6**

**General — Expert Opinions**

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

# JURY INSTRUCTION No. 7

## General — Charts and Summaries Not Received In Evidence

Certain charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

United States District Court
For the Northern District of California

**JURY INSTRUCTION No. 8**

**General — Two or More Parties Have Distinct Legal Rights**

In this case, the court consolidated Hynix, Micron, and Nanya's claims against Rambus. While they have presented portions of their cases together, you must consider their claims against Rambus individually.

Unless otherwise stated, these jury instructions apply to all parties.

United States District Court

For the Northern District of California

9

# JURY INSTRUCTION No. 9

## General — Overview of Contentions

### Parties

The parties bringing the claims in this case are Hynix Semiconductor Inc., Hynix Semiconductor America Inc., Hynix Semiconductor U.K. Ltd., Hynix Semiconductor Deutschland GmbH (collectively "Hynix"), Micron Technology, Inc. and Micron Semiconductor Products, Inc. (collectively "Micron") and Nanya Technology Corp. and Nanya Technology Corp. USA (collectively "Nanya"). Hynix, Micron and Nanya may be referred to collectively in these instructions as "the Manufacturers." The party against whom the claims are brought is Rambus Inc. ("Rambus"). As you have learned, Hynix, Micron and Nanya are companies that manufacture a type of computer memory called dynamic random access memory or DRAM. Rambus is a company that develops technology for computer memory products and owns patents covering certain DRAM technologies.

### The Manufacturers' Contentions

The Manufacturers claim that Rambus has obtained, or attempted to obtain, an unlawful monopoly in certain memory interface technologies and has made misrepresentations, half-truths, and nondisclosures to the Manufacturers relating to the scope of its intellectual property rights. From January 1992 until June 1996 Rambus was a member of an organization called the Joint Electron Device Engineering Council ("JEDEC"). JEDEC is an organization which develops and publishes standards concerning the design and manufacture of electrical components, including DRAMs, that are used in computers and related products. The Manufacturers contend such standards enhance interoperability between different electrical components. Hynix and Micron were members of JEDEC during the same period that Rambus was and are still members today. Nanya was formed during Rambus's membership in JEDEC and thus was not a member of JEDEC during the period of time in which Rambus was a member. Nanya later became a member and is a member today.

The Manufacturers claim that members of JEDEC had a duty to disclose any patents, any pending patent applications and any intent they had to apply for patents that relate to standards being considered by JEDEC. The Manufacturers claim that this disclosure obligation existed so that standards could be developed that avoided infringing patents, if possible. The Manufacturers further claim that Rambus attended JEDEC meetings and learned what standards were being considered by JEDEC and then, without disclosing its intentions to JEDEC members, amended its patent applications to cover certain features that JEDEC was discussing for inclusion in the JEDEC DRAM standards. The Manufacturers also claim that JEDEC would have used different technologies in the standards had it known of Rambus's intentions and that Rambus deliberately failed to tell JEDEC

10

and the Manufacturers of its intentions until after JEDEC adopted the standards and the Manufacturers had invested substantial sums of money developing and manufacturing products that complied with the JEDEC standards. The Manufacturers claim they were at that point "locked in" to manufacturing products that infringe patents belonging to Rambus.

### Rambus's Contentions

Rambus contends that the Manufacturers used Rambus's inventions and put them in their products because the inventions were superior and that the Manufacturers refuse to pay what Rambus contends is a reasonable royalty for using those inventions. Rambus contends that it had no duty to disclose information about its patents, patent applications or intentions to file patent applications to JEDEC or to other JEDEC members. Rambus contends that it explicitly informed JEDEC that Rambus would not provide such information, and that no one suggested that it was required to provide it. Rambus also contends that it did not mislead JEDEC or the Manufacturers in any way, and that it had proper and legitimate reasons for not providing information to JEDEC that it considered confidential. Rambus also asserts that JEDEC members knew that Rambus was trying to get patents that would cover all of the inventions made by Mike Farmwald and Mark Horowitz. Rambus also asserts that JEDEC members knew about and reviewed a written description of all of those inventions before they began to use those inventions in their products. Rambus also asserts that amendments to patent claims to cover other companies' products are allowed as long as the claims are supported by the original description of the inventions.

### Relief Sought If Manufacturers Win on Any of Their Claims

The Manufacturers are seeking two types of relief. The only monetary award that the Manufacturers are seeking is the attorney's fees they claim they necessarily incurred as a result of the claimed antitrust violations by Rambus. If you decide that the Manufacturers have proven their antitrust claims, you will then be asked following your verdict of liability to determine the reasonable amount of such fees. None of the Manufacturers is seeking any compensatory damages on its fraud claim, but Hynix and Micron each claim they are entitled to nominal damages (such as $1.00).

If a Manufacturer wins on its antitrust or fraud claims, that Manufacturer will also ask the court to bar the enforcement of Rambus's patents. It will then be up to me as the judge to determine whether Rambus should be barred from enforcing its patents or whether some other form of relief should be imposed.

I will now give you instructions on the federal antitrust law on monopolization and attempted monopolization and the state law on fraud that apply to this case and what each Manufacturer must prove to win on each of its claims.

11

**JURY INSTRUCTION No. 10**

**General — Litigation Between the Parties**

I want to inform you of some background regarding the United States litigations between the parties:

1.  On August 28, 2000, Micron Technology, Inc. filed a lawsuit for declaratory judgment of non-infringement, unenforceability, and invalidity of certain Rambus patent claims, and asserted antitrust, fraud, and other claims in the United States District Court for the District of Delaware. A lawsuit for declaratory judgment may be brought by a party who has a reasonable apprehension that it will be sued for patent infringement to seek a declaration from the court as to whether it infringes the patent, whether the patent is valid and whether the patent is enforceable.

2.  On August 29, 2000, Hyundai Electronics Industries Co. Ltd. and Hyundai Electronics America (predecessors to Hynix Semiconductor Inc. and Hynix Semiconductor America, Inc., respectively) filed a lawsuit for declaratory judgment of non-infringement, unenforceability, and invalidity of certain Rambus patent claims, and asserted certain other claims, in the United States District Court for the Northern District of California.  The complaint was later amended to add Hyundai Electronics U.K. and Hyundai Electronics Deutschland GmbH (predecessors to Hynix Semiconductor U.K. Ltd. at Hynix Semiconductor Deutschland GmbH) as plaintiffs and to add claims for, among other things, antitrust and fraud.

3.  On September 11, 2000 Rambus Inc. filed a complaint with the United States International Trade Commission in Washington D.C. against Hyundai Electronics Industries Co., Ltd. and Hyundai Electronics America (predecessors to Hynix Semiconductor Inc. and Hynix Semiconductor America, Inc., respectively) alleging claims of unlawful importation into the U.S. of SDRAM devices and modules that infringe one or more claims of Rambus's U.S. patents.

4.  On February 5, 2001, Rambus filed its answer and counterclaims in the 2000 lawsuit with the Hyundai (now Hynix) entities, asserting claims of patent infringement against Hyundai Electronics Industries Co., Ltd., Hyundai Electronics America, Hyundai Electronics U.K., Ltd., and Hyundai Electronics Deutschland GmbH.  Rambus later amended its counterclaims to assert claims of infringement of certain additional Rambus U.S. patents.  A party who has been sued for a declaratory judgement of non-infringement must file a patent infringement

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

claim in response or the patent owner will be barred forever from claiming patent infringement and seeking royalties from the other party for use of the claimed patented invention.

5.    On February 15, 2001, Rambus filed its answer and counterclaims in the Delaware action with Micron, asserting claims of patent infringement against Micron Technology, Inc. Rambus later added Micron Semiconductor Products, Inc. as a counterclaim defendant.

6.    On January 25, 2005, Rambus filed a lawsuit for patent infringement against Hynix Semiconductor Inc., Hynix Semiconductor America Inc., and Hynix Semiconductor Manufacturing America Inc., Nanya Technology Corporation, and Nanya Technology Corporation U.S.A. in the United States District Court for the Northern District of California.

7.    On June 27, 2005, Hynix Semiconductor Inc., Hynix Semiconductor America Inc., Hynix Semiconductor Manufacturing America Inc., Hynix Semiconductor U.K. Ltd., Hynix Semiconductor Deutschland GmbH filed an answer and counterclaims to Rambus's complaint in the 2005 lawsuit, asserting claims for, among other things, declaratory judgment, antitrust, and fraud.  Rambus later  asserted additional claims for infringement of certain additional Rambus U.S. patents.

8.    On July 18, 2005, Nanya Technology Corporation, and Nanya Technology Corporation U.S.A. filed an answer and counterclaims to Rambus's complaint in the 2005 lawsuit, asserting claims for, among other things, declaratory judgment, antitrust, and fraud.

9.    On January 13, 2006, Rambus filed suit for patent infringement against Micron Technology, Inc. and Micron Semiconductor Products, Inc. in the United States District Court for the Northern District of California.

10.    On June 2, 2006, Micron Technology, Inc. and Micron Semiconductor Products, Inc. filed an answer and counterclaims to Rambus's complaint filed in the Northern District of California, asserting claims for, among other things, declaratory judgment, antitrust, and fraud.

Whether or not the Manufacturers developed a joint litigation strategy in opposing Rambus's claims of patent infringement is not relevant to the issues before you at this time.

**United States District Court**
For the Northern District of California

# JURY INSTRUCTION No. 11

## Patent Law — General

Although the Manufacturers' claims in this case are for alleged violations of the federal antitrust law and the state fraud law, the case does involve patents and conduct relating to those patents. Therefore, I will now give you some information about patents and how patents fit into this case. I will first explain what a patent is and how one is obtained.

Patents create property rights in inventions that are new, useful and nonobvious. Patents are granted by the United States Patent and Trademark Office (sometimes called the "PTO"). The process of obtaining a patent is called patent prosecution. A valid and enforceable United States patent gives the patent owner the right to prevent others from making, using, offering to sell, or selling the patented invention within the United States or from importing it into the United States without the patent holder's permission. A violation of the patent owner's right is called infringement. A patent exists for a limited time only. The patents at issue in this case will expire 20 years after the filing of the original application on which they are based.

To obtain a patent, one must file an application with the PTO. The PTO is an agency of the federal government and employs trained examiners who review applications for patents. The application includes what is called a specification, which must contain a written description of the claimed invention telling what the invention is, how it works, how to make it and how to use it so others skilled in the field will know how to make or use it. The specification concludes with one or more numbered sentences. These are called the patent claims. When the patent is eventually granted by the PTO, the claims define the boundaries of that patent's protection and give notice to the public of those boundaries.

After the applicant files the application, a PTO patent examiner reviews the patent application to determine whether the claims are patentable and whether the specification adequately describes the invention claimed. In examining a patent application, the patent examiner reviews records available to the PTO for what is referred to as prior art. The examiner also will review prior art if it is submitted to the PTO by the applicant. In general, prior art includes things that existed before the claimed invention, that were publicly known, or used in a publicly accessible way in this country, or that were patented or described in a publication in any country. The examiner considers, among other things, whether each claim defines an invention that is new, useful, and not obvious in view of the prior art.

After the prior art search and examination of the application, the patent examiner then

14

1    informs the applicant in writing what the examiner has found and whether any claim is patentable,

2    and thus will be allowed. If the examiner rejects the claims, the application then responds and

3    sometimes changes the claims or submits new claims. During this process, the patent applicant may

    amend its claims prior to issuance of the patent. This process, which is only between the examiner

4    and the patent applicant, may go back and forth for some time until the examiner is satisfied that the

5    application and claims meet the requirements for a patent. Until a patent is allowed by the PTO, a

6    patent applicant cannot know with certainty what scope of coverage the patent will have. All of the

    material pertaining to the application becomes available to the public after the date when the patent

7    issues.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# JURY INSTRUCTION No. 12

## Patent Law — Validity of Rambus's Patents

Rambus's patent claims identified at Tab 2 of the juror notebooks are assumed to be valid. Specifically, I instruct you that the claims identified at Tab 2 in the juror notebooks of U.S. Patent Nos. 5,915,105, 6,034,918, 6,038,195, 6,182,184, 6,266,285, 6,314,051, 6,324,120, 6,378,020, 6,426,916, 6,452,863, 6,546,446, 6,584,037, 6,697,295, 6,715,020, and 6,751,696, each of which was issued to Rambus inventors Drs. Farmwald and Horowitz, must be treated by you as valid. I further instruct you that the claims identified at Tab 2 in the juror notebooks of U.S. Patent Nos. 6,493,789 and 6,496,897, each of which was issued to Rambus inventors Fred Ware, Craig Hampel, Don Stark and Matt Griffin, are assumed to be valid.

Each of these patents was issued to the individual inventors and was assigned to Rambus.

United States District Court

For the Northern District of California

# JURY INSTRUCTION No. 13

### Patent Law — Validity Defined

I now want to instruct you in more detail on what it means for a patent claim to be valid.

The fact that a patent claim is valid means, among other things:

(1)    The named inventors, Dr. Farmwald and Dr. Horowitz for 15 of the patents and Mr. Ware and his co-inventors for the other two patents, made the inventions described in the patent claims that are asserted in this case as set forth in the claim chart at Tab 2 in your notebook.

(2)    Those claimed inventions were new and novel at the time the original Rambus patent application was filed.

(3)    Those inventions would not have been obvious to someone of ordinary skill in the field when the original applications were filed.

(4)    Those inventions were described in the "specification" section of the original patent applications that Drs. Farmwald and Horowitz filed in 1990, and that Mr. Ware and his co-inventors filed in 1995, such that a person of ordinary skill in the field looking back at the original application after the claims for the inventions issued would recognize that the inventors were in possession of the claimed inventions at the time they filed the original and that the original patent specification described those inventions.

(5)    The descriptions of the inventions are sufficiently full and clear to enable a person of ordinary skill in the field to make and use the inventions.

United States District Court

For the Northern District of California

**JURY INSTRUCTION No. 14**

**Patent Law — Testimony About Certain Technology Concepts**

You heard testimony about a memory engineer's knowledge concerning the concepts of programmable CAS latency, programmable burst length, programmable write latency, on-chip PLL/DLL, and dual edge clocking. Such testimony was offered by the Manufacturers to show what they contend a reasonably skilled memory engineer would have known about these concepts when he or she participated in JEDEC standard setting discussions for JEDEC SDRAM standards, and what could have been the sources of their knowledge of those concepts.

Rambus's inventions described in Rambus's patent claims are not those general concepts or features but rather are the specific implementations of those concepts or features in synchronous dynamic random access memory chips. You must assume those implementations were new, novel, and non-obvious inventions as of the date of Rambus's original patent application in April of 1990.

The headings and the columns and the charts in your juror notebooks use a shorthand expression to refer to the specific implementation of these features as claimed in particular Rambus patents and used in particular Manufacturers' products.

18

**JURY INSTRUCTION No. 15**

**Patent Law — Infringement of Patents Listed on Chart**

The chart in your juror notebook shows the patent claims and products involved in this case. As I have previously instructed you, you must assume those claims are infringed by the memory-related products made and sold by Hynix, Micron and Nanya identified in the chart. However, the fact that the Manufacturers are assumed to infringe those patent claims does not speak to whether the Manufacturers copied any of Rambus's patents in making their products; it only means that the requirements of the specified Rambus patent claims are found in the identified Manufacturers' products.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# JURY INSTRUCTION No. 16

## Patent Law — Amendments to Cover a Competitor's Products

You have heard some evidence that Rambus filed patent claims to obtain patent coverage of products that it learned others were introducing, or planning to introduce, into the marketplace. It is not illegal or improper to amend or add claims to cover a competitor's products that the applicant has learned about during the prosecution of a patent application, provided that any invention added in an amendment is disclosed in the original patent application. In other words, a person ordinarily skilled as a memory engineer must be able to read the specification in the originally filed application and recognize that it described the invention claimed in the amendment. However, such a claim may not be enforceable if the patent holder breached an obligation to its competitor to disclose its intent to seek such patent coverage. I will explain later the law regarding whether or not Rambus had such a disclosure obligation and whether Rambus breached it.

**JURY INSTRUCTION No. 17**

**Monopolization — Introductory Instruction**

The Manufacturers claim that Rambus has violated the federal antitrust laws, specifically the Sherman Act, by monopolizing certain technology markets related to DRAMs.

United States District Court

For the Northern District of California

# JURY INSTRUCTION No. 18

## Monopolization — General Purposes of the Antitrust and Patent Laws

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress. The patent laws complement the antitrust laws in promoting competition by encouraging innovation and the development of new technologies.

The basic purpose of both sets of laws is to promote innovation, industry, and competition. In general, the antitrust laws seek to promote competition by prohibiting the abuse of monopoly power and restraints on trade that unduly interfere with the competitive process. The patent laws seek to promote competition by encouraging people to invest in scientific research and product development. These investments can lead to new and better products, better ways of making things, new jobs, and entirely new industries. But a patent necessarily involves a restraint of trade – the right to exclude others from using the patented invention for the duration of the patent. This right to exclude is not by itself an antitrust violation. However, if the patent owner seeks to misuse, or improperly enforce or attempt to enforce its right to exclude, its conduct may constitute an antitrust violation.

United States District Court
For the Northern District of California

# JURY INSTRUCTION No. 19

### Monopolization — Elements

The Manufacturers allege that they were injured by Rambus's unlawful monopolization of six distinct markets for DRAM interface technologies.

To win on its monopolization claim in any such market, the Manufacturers must prove each of the following elements is more likely true than not true:

**First**, that the alleged technology market is a relevant antitrust market;

**Second**, that Rambus possessed monopoly power in that market;

**Third**, that Rambus willfully acquired or maintained its monopoly power in that relevant market by engaging in anticompetitive conduct;

**Fourth**, that Rambus's conduct occurred in or affected interstate commerce; and

**Fifth**, that Rambus's anticompetitive conduct was a substantial factor in causing injury to the Manufacturers in their business or property.

If you find that the Manufacturers have proved each of these elements, then you must find for the Manufacturers and against Rambus on the monopolization claim.  If you find that the Manufacturers have failed to prove any one or more of these elements, then you must find for Rambus and against that Manufacturers on this claim.

# JURY INSTRUCTION No. 20

## Monopolization — Monopoly Power Generally

Monopoly power is the power to control prices and exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time. To prove a monopolization claim, one of the elements the Manufacturers must prove is that Rambus has monopoly power in a relevant antitrust market. However, monopoly power, in and of itself, is not unlawful. A patent owner who does no more than take advantage of the right to exclude created by its patent does not violate the antitrust laws.

I will now provide further instructions about how you may determine whether the Manufacturers have met their burden of proving Rambus's alleged monopoly power in a relevant market.

# JURY INSTRUCTION No. 21

## Monopolization — Relevant Market Generally

The Manufacturers must prove that it is more likely true than not true that Rambus had monopoly power in one or more relevant markets. Defining the relevant market is essential to determining whether Rambus had monopoly power because whether a company has monopoly power depends on the contours of the market.

There are two aspects you must consider in determining whether the Manufacturers have met their burden of proving the relevant market or markets. The first is the existence of a relevant technology market. The second is the existence of a relevant geographic market.

If, after considering all the evidence, you find that the Manufacturers have proven both a relevant technology market and a relevant geographic market, then you must find that the Manufacturers have met the relevant market requirement and you must consider the remaining elements of their unlawful monopolization claims.

If you find that the Manufacturers have failed to prove either a relevant technology market or a relevant geographic market, then you must find for Rambus and against the Manufacturers on the Manufacturers' unlawful monopolization claim.

# JURY INSTRUCTION No. 22

## Monopolization — Relevant Technology Market

A "technology" refers to an invention or process for accomplishing something, and is sometimes covered by a patent.  The basic idea of a relevant technology market is that the technologies within it are reasonable substitutes for each other from the user's point of view; that is, the technologies compete with each other.  In other words, a relevant technology market includes the technologies that a user believes are reasonably interchangeable or reasonable substitutes for each other.  Technologies need not be identical or precisely interchangeable as long as they are reasonable substitutes.  This is a practical test, and you may consider the actual behavior of users and the marketing efforts of licensors.

To illustrate, if consumers seeking technologies to perform a specific function such as generating electricity considered five different technologies for doing so, the alternatives would have to be reasonable alternatives for them all to be in the same technology market. If, for example, one technology was burning coal and an environmental law significantly limited the burning of coal, then it might not be a reasonable alternative and the relevant market would consist of the four other technologies.  If solar panel technology was another of the five technologies but was more expensive and inconsistent in its ability to supply electricity, then the technology market for generating electricity might consist of only the other three technologies.  If one of the technologies was the most productive, comparable or less in price and created no environmental concerns, the technology market might then consist of it alone.  On the other hand, if all five technologies had some advantages and some drawbacks such that they were reasonable alternatives to each other, then the five technologies would comprise the relevant technology market.

In sum, in this case, what you are being asked to do is to decide which technologies, if any, competed with the relevant Rambus technologies at the time the JEDEC standards were being considered.

There are a number of factors you may consider in determining whether various technologies were reasonable substitutes for each other:

- whether potential users of the technologies would have considered alternatives to the Rambus technologies for the JEDEC standards during the time period before the relevant JEDEC standards were adopted;

- the relationship between the prices and performance of one technology and another;

26

- the perceptions of either the industry or the public as to whether the technologies were in separate markets;

- the views of the Manufacturers and Rambus regarding who their respective competitors were;

- the existence or absence of different end uses for the technologies.

In this case, the Manufacturers claim that the relevant technology markets are the markets for use of the following technologies in a DRAM interface: (1) the market for latency technology; (2) the market for burst length technology; (3) the market for data acceleration technology; (4) the market for clock synchronization technology; (5) the market for precharge technology; and (6) the market for write latency technology. The Manufacturers contend that each market includes a particular element of DRAM interface technology as to which Rambus has obtained patents and any technologies that are reasonable substitutes for that patented technology. Rambus contends that there are no reasonable substitutes for its patented technologies.

You must evaluate the existence of the six claimed technology markets independently. You may find that the Manufacturers have proven that all, some, or none of them exist. If you find that the Manufacturers have proven at least one relevant technology market comprised of technologies that are reasonably interchangeable, then you should continue to evaluate the remainder of the Manufacturers' claim as it relates to such market or markets. However, if you find that the Manufacturers have failed to prove such a market, then you must find in Rambus's favor on this claim.

# JURY INSTRUCTION No. 23

### Monopolization — Relevant Geographic Market

The second aspect of the relevant market that you must consider is the geographic market within which the technologies compete. A geographic market may be as large as global or nationwide, or as small as a single town or even smaller. In this case, the Manufacturers claim a relevant geographic market comprises the United States as a whole.

The Manufacturers have the burden of proving that it is more likely than not that the United States as a whole comprises a relevant geographic market for each of the six DRAM interface technologies. Rambus asserts that the Manufacturers have not shown that such a market exists. In determining whether the Manufacturers have met their burden of proof and demonstrated that their proposed geographic market is proper, you may consider several factors, including:

- the geographic area in which Rambus licenses its patents and where Rambus's customers are located;
- the geographic scope of the patents at issue in this case;
- the geographic area to which customers turn for supply of the technologies; and
- the geographic areas that suppliers view as potential sources of competition.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

# JURY INSTRUCTION No. 24

## Monopolization — Evidence of Monopoly Power

If you find that the Manufacturers have proven a relevant market, then you should determine whether Rambus has monopoly power in that market. As I said earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market. There are a number of factors you may consider as indirect evidence of monopoly power, including evidence of Rambus's market share, market share trend, and barriers to entry. If you find based on these factors or other evidence that Rambus more likely than not has the power to maintain royalties above a competitive level or to exclude alternative technologies in the relevant market or markets, then you may conclude that Rambus has monopoly power in the relevant market or markets.

### *Market Share*

The first factor you should consider is Rambus's market share in any relevant technology market or markets you have found.

A market share above 50 percent may be sufficient to support an inference that Rambus has monopoly power. However, in considering whether Rambus has monopoly power, it is also important to consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry into the market, actual entry and exit by other companies, and the number and size of competitors. Along with Rambus's market share, these factors should inform you as to whether Rambus has monopoly power. The likelihood that a company has monopoly power is stronger when the company's share is above 50 percent.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that a company has monopoly power. However, if you find that other evidence demonstrates that Rambus does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that it has monopoly power.

### *Market Share Trend*

A second factor you may consider is the trend in Rambus's market share. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

### *Barriers to Entry*

Another factor you may consider is whether there are barriers to entry into the relevant

market or markets. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. A potential barrier to entry may be the existence of a recognized standard which prevents alternative technologies from being adopted or introduced in the market. Similarly, if users of a technology cannot readily switch between technologies, entry into the technology market may be impossible.

Evidence of low or no entry barriers may be evidence that Rambus does not have monopoly power, regardless of Rambus's market share, because new competitors could enter a technology market easily if Rambus attempted to raise its royalties above a competitive level for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Rambus has monopoly power.

### Entry and Exit by Other Companies

The history of entry and exit in a relevant technology market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Rambus lacks monopoly power. On the other hand, departures from a technology markets, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Rambus has monopoly power.

### Number and Size of Competitors

You may consider whether Rambus's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares and number of competitors act as a check on Rambus's ability to charge royalties on its technologies. If Rambus's competitors are vigorous or have large or increasing market shares, this may be evidence that Rambus lacks monopoly power. On the other hand, if you determine that Rambus's competitors are weak or have small or declining market shares, this may support an inference that Rambus has monopoly power.

### Conclusion

If you find that Rambus has monopoly power in one or more relevant technology markets, then you must consider the remaining elements of the Manufacturers' monopolization claim. If you find that Rambus does not have monopoly power, then you must find for Rambus and against the Manufacturers on this claim.

# JURY INSTRUCTION No. 25

## Monopolization — Willful Acquisition or Maintenance of Monopoly Power Through Anticompetitive Acts

The next element the Manufacturers must prove is that Rambus willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition among technologies. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. In addition, you should distinguish the acquisition or maintenance of monopoly power through anticompetitive acts from the acquisition or maintenance of monopoly power by supplying better technology, possessing superior business skills, or because of luck, which is not unlawful.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. The reason is that all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals – or the achievement of these goals – unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Rambus's conduct was anticompetitive or whether it was legitimate business conduct, you should consider whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For example, suppose there are five firms that develop technologies for generating electricity and that these technologies comprised a relevant technology market. Suppose also that Firm A developed a process technology that generated electricity at a lower price than its competitors. If Firm A grew its market share and achieved monopoly power because its technology was cheaper, it would not be unlawful for Firm A to achieve monopoly power in this way. Developing more efficient processes and developing the ability to sell profitably at lower prices is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct even if it has a negative effect on competitors.

Similarly, in the same example, suppose Firm B developed and patented a new method for generating electricity and utilities so preferred Firm B's process that Firm B achieved monopoly power. It would not be unlawful for Firm B to achieve monopoly power in this way. Firm B "built a better mousetrap," which is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct.

By contrast, in the same example, suppose not only that Firm C develops electricity technologies, but also that Firm C operates the electricity grid and that there are barriers to entry such that no other firm will be able to create a competing electricity grid. Suppose also that Firm C altered its grid in such a way that only Firm C's electricity technologies could supply electricity to the electrical grid, and that the alteration does not improve the efficiency of Firm C's grid or provide any benefits to competition or consumers – the only effect of the alteration is to exclude competing electricity generation technologies from the marketplace. If Firm C thereby prevented its technology competitors from competing and achieved monopoly power, it would be unlawful for Firm C to achieve monopoly power in the electricity generation technology market in this way.

As these examples show, the acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and whose anticompetitive harm outweighs any legitimate business reason for the conduct. You may not find that a company willfully acquired or maintained monopoly power if it has acquired that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a valid and enforceable patent; or because changes in cost or taste have driven out all but one supplier.

If you find that the Manufacturers have proven that it is more likely than not that Rambus willfully acquired or maintained monopoly power through anticompetitive acts, then you must consider whether the Manufacturers have proven the remaining elements of their monopolization claim. If, however, you find that the Manufacturers did not prove this element, then you must find for Rambus and against the Manufacturers on this claim.

# JURY INSTRUCTION No. 26

## Monopolization — Anticompetitive Behavior in Standard-Setting

The Manufacturers allege that Rambus willfully acquired or maintained monopoly power based on anticompetitive behavior at JEDEC. JEDEC is a standard-setting organization. A standard can enhance consumer welfare by ensuring interoperability of products and devices and making multiple sources of supply available to consumers. The ideal standard-setting process can allow members of a standard-setting organization to make an objective comparison between competing technologies before a standard is adopted. Based on the available information, a rational standard-setting organization can select the best technology (considering its cost and its performance) and can include that technology in the standard. To the extent the marketplace recognizes only one standard, the process of standardization may eliminate alternative technologies. When a patented technology is incorporated into such a standard, adoption of the standard may eliminate alternatives to the patented technology. Nonetheless, "winning" the competition between technologies to be included in the standard may enhance consumer welfare and not be anticompetitive, even if the technology is covered by a patent.

Disruption of a standards-setting process, however, may be anticompetitive. If (1) JEDEC members shared a clearly defined expectation that members would disclose relevant knowledge they had about patent applications or the intent to file patent applications on technology being considered for adoption as a JEDEC standard; (2) Rambus knowingly failed to disclose such information; (3) JEDEC members relied on the requirement that Rambus would disclose such relevant patent applications or its intent to file such applications when JEDEC adopted its standards; and (4) Rambus later attempted to enforce such a patent against a standard-compliant product, then you may find that Rambus willfully acquired or maintained monopoly power through anticompetitive acts.

In determining whether JEDEC members shared a clearly defined expectation that patent applications or the intent to file patent applications on standards being considered by JEDEC must be disclosed, you may consider, among other factors: (1) the expectations of individual JEDEC members; (2) any behavior by JEDEC members with respect to disclosing or not disclosing such information; (3) oral information communicated or discussed at JEDEC meetings or in JEDEC minutes; (4) any written rules of JEDEC made available to members; (5) customs of the industry; and (6) the purpose of JEDEC. The written rules of JEDEC during the time that Rambus was a member were not in and of themselves definite enough to require mandatory disclosure of patent applications or the intent to file such applications. However, those rules may be considered as a factor in deciding whether the JEDEC members shared a clearly defined expectation that such applications or the intent to file such applications would be disclosed.

33

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY INSTRUCTION No. 27

### Monopolization — Rambus's Intent

In determining whether or not Rambus willfully acquired or maintained monopoly power in a relevant technology market, you may consider any evidence that Rambus intended to deceive the Manufacturers or JEDEC to the extent it helps to understand the likely effect of Rambus's conduct. Specific intent to monopolize, however, is not required for one to be liable for monopolization; only the intent to commit the acts that resulted in monopolization.

# JURY INSTRUCTION No. 28

## Monopolization — Business Justification

If you find that the Manufacturers have shown that more likely than not that Rambus's conduct was anticompetitive, then you must consider whether Rambus's conduct also had a legitimate, procompetitive business justification. To be legitimate, the justification must not be pretextual.

Any procompetitive justification must be a form of competition on the merits because it involves, for example, conduct that increased efficiency or benefitted competition. A procompetitive business purpose is one that benefits competition such as by promoting efficiency or quality or offering a better product or service. If you find that Rambus presented evidence of a procompetitive business justification, the Manufacturers may rebut that showing by demonstrating that the justification was not the reason for Rambus's conduct or that the justification does not on balance have procompetitive benefits.

If you determine that Rambus had a procompetitive justification for its conduct, you must determine whether the anticompetitive effect of Rambus's conduct outweighed the procompetitive benefits of that conduct. When you evaluate this balance, you may consider whether less restrictive means were available to Rambus to accomplish the alleged procompetitive benefit of its conduct, and whether those other means would have been less harmful to competition. If the anticompetitive effect of Rambus's conduct outweighs the procompetitive benefit, the proffered legitimate business justification for the conduct in question is not a defense to the Manufacturers' monopolization claims. If, on the other hand, the procompetitive benefit of Rambus's conduct outweighs the anticompetitive harm of that conduct, then you must find for Rambus on the monopolization claim.

# JURY INSTRUCTION No. 29

## Monopolization — Interstate Conduct

The Sherman Act applies only to conduct that affects interstate commerce.  In this case, there is no dispute that Rambus's conduct affected interstate commerce.

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY INSTRUCTION No. 30

### Monopolization — Injury and Causation

If you find that Rambus has violated the Sherman Act as alleged by the Manufacturers, you must then decide if each Manufacturer is entitled to recover damages from Rambus.

The Manufacturers are entitled to recover damages for an injury to their business or property if they can establish three elements of injury and causation:

First, that the Manufacturers were in fact injured as a result of Rambus's alleged violation of the antitrust laws;

Second, that Rambus's alleged illegal conduct was a material cause of the Manufacturers' injuries; and

Third, that the Manufacturers' injuries are the type that the Sherman Act was intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For the Manufacturers to establish that they are entitled to recover damages, they must prove that they were injured as a result of Rambus's alleged violation of the antitrust laws. Proving the "fact of damage" does not require the Manufacturers to prove the dollar value of their injuries. It requires only that the Manufacturers prove that they were in fact injured by Rambus's alleged antitrust violation. If the Manufacturers prevail on their monopolization claim, the amount of their damages will be determined by you in a relatively brief subsequent proceeding.

The Manufacturers must also offer evidence that establishes as a matter of fact and with a fair degree of certainty that Rambus's alleged illegal conduct was a material cause of the Manufacturers' injuries. This means that the Manufacturers must have proven that some damages occurred as a result of Rambus's alleged antitrust violation, and not some other cause. The Manufacturers are not required to prove that Rambus's alleged antitrust violation was the sole cause of their injury. They also does not need to eliminate all other possible causes of injury. It is enough if the Manufacturers have proven that Rambus's alleged antitrust violation was a material cause of their injury. However, if you find that the Manufacturers' injury was caused primarily by something other than the alleged antitrust violation, then you must find that the Manufacturers have failed to prove that they are entitled to recover damages from Rambus.

37

Finally, the Manufacturers must establish that their injuries are the type of injuries that the Sherman Act was intended to prevent. This is sometimes referred to as an "antitrust injury." If the Manufacturers' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the Manufacturers' injuries are "antitrust injuries." In this case, the Manufacturers' alleged injuries are the attorney's fees they have incurred in patent litigation with Rambus. Attorney's fees constitute injury for the purposes of the Manufacturers' claims of monopolization and attempt to monopolize if you find that Rambus engaged in litigation as part of an anticompetitive course of conduct.

If the Manufacturers can establish that they were in fact injured by Rambus's conduct, that Rambus's conduct was a material cause of their injuries, and that their injuries were "antitrust injuries" - the type that the Sherman Act was intended to prevent - then the Manufacturers are entitled to recover damages for the injuries to their business or property.

**JURY INSTRUCTION No. 31**

**Monopolization —  Causation Resulting From Adoption of a JEDEC Standard**

In order to prevail on their claims for monopolization or attempt to monopolize, the Manufacturers must prove that Rambus's alleged unlawful conduct caused the Manufacturers' injury. In other words, the Manufacturer must prove that, but for Rambus's alleged unlawful conduct, the Manufacturers would not have been injured in the manner they claim.

In this case, the Manufacturers assert that their injuries were caused by Rambus's deceptive conduct while Rambus was a member of JEDEC. To find that Rambus's conduct at JEDEC caused the Manufacturers' injury, you must find that Rambus's monopoly power in a technology market was caused in substantial part by JEDEC's adoption of Rambus's technology as the standard. One way that the Manufacturers can establish this is by proving that Rambus's alleged unlawful conduct caused JEDEC to include a Rambus technology in a standard that it otherwise would have rejected. Another way the Manufacturers can demonstrate that their injuries were caused in substantial part by JEDEC's adoption of a Rambus technology in a standard is if Rambus now charges a higher royalty for a technology covering a standard than it would have been able to charge absent its alleged unlawful conduct.

On the other hand, if you find that Rambus's monopoly power in a technology market is attributable to Rambus's ownership of patents on the technology, that there is no reasonable substitute for that technology, and that Rambus's monopoly power was not attributable in any substantial way to JEDEC's standardization, then you must find for Rambus on the monopolization claim.

39

# JURY INSTRUCTION No. 32

## Attempt to Monopolize — Elements

The Manufacturers also allege that Rambus engaged in an unlawful attempt to monopolize.

To prevail on its claim of attempted monopolization, the Manufacturers must prove each of the following elements is more likely true than not true:

First, that Rambus engaged in anticompetitive conduct;

Second, that Rambus had a specific intent to achieve monopoly power in a relevant market;

Third, that there was a dangerous probability that Rambus would achieve its goal of monopoly power in the relevant market;

Fourth, that Rambus's conduct occurred in or affected interstate commerce; and

Fifth, that the Manufacturers were injured in their business or property by Rambus's anticompetitive conduct.

If you find that the evidence is sufficient to prove all five elements as to the Manufacturers' claim against Rambus, then you must find for the Manufacturers and against Rambus on the Manufacturers' claim of attempted monopolization. If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Rambus and against the Manufacturers on the Manufacturers' claim of attempted monopolization.

# JURY INSTRUCTION No. 33

## Attempt to Monopolize — Relevant Market

To prevail on their attempted monopolization claim, the Manufacturers must also prove the existence of relevant technology and geographic market or markets. I have already provided you with the instructions on how to determine whether relevant technology market or markets and relevant geographic markets exist in Jury Instruction Nos. 21 through 23.

# JURY INSTRUCTION No. 34

### Attempt to Monopolize — Anticompetitive Conduct

It is not sufficient for the Manufacturers to prove that Rambus intended to monopolize a relevant market or markets. The Manufacturers must also show that Rambus engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that Rambus would succeed.

I have previously instructed you concerning what the Manufacturers must show to support their monopolization claim. The same anticompetitive conduct required to support a monopolization claim is also required to establish attempted monopolization. In other words, the Manufacturers must show as an element of their attempted monopolization claim that it is more likely than not that Rambus engaged in anticompetitive as defined in Jury Instruction Nos. 25 through 27.

United States District Court
For the Northern District of California

42

# JURY INSTRUCTION No. 35

## Attempt to Monopolize — Specific Intent

The second element that the Manufacturers must prove in order to prevail on their attempt to monopolize claims is that Rambus had a specific intent to monopolize a relevant market. To do so, the Manufacturers must first prove that the market or markets they propose constitute a relevant market or markets for antitrust purposes. The Manufacturers must then prove that Rambus had a specific intent to monopolize that market or those markets. The court has previously instructed you with respect to determining the relevant market or markets in Jury Instructions Nos. 21 through 23, and the court will now explain specific intent. If the Manufacturers prove both a relevant market or markets and that Rambus had a specific intent to monopolize that market or markets, you must find that the Manufacturers have proven this element of their attempted monopolization claim and you should consider the other elements of the claim. If you find that the Manufacturers failed to prove either of these points, then you must find for Rambus on the Manufacturers' attempted monopolization claim.

If you find that the Manufacturers have proven a relevant market or markets, you must then decide whether Rambus had the specific intent to monopolize that market or markets. In other words, you must decide if the evidence shows that Rambus more likely than not acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the relevant market or markets.

There are several ways in which the Manufacturers may prove that Rambus had the specific intent to monopolize. There may be evidence of direct statements of Rambus's intent to obtain a monopoly in a relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Rambus at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Rambus. You must be careful, however, to distinguish between Rambus's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Rambus actually intended to obtain a monopoly, specific intent may be inferred from what Rambus did. For example, if the evidence shows that the natural and probable consequence of Rambus's conduct in a relevant market was to give Rambus control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Rambus, then you may (but are not required to) infer that Rambus specifically intended to acquire monopoly power.

43

# JURY INSTRUCTION No. 36

### Attempt to Monopolize — Dangerous Probability of Success

If you find that Rambus had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Rambus would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

In determining whether there was more likely than not a dangerous probability that Rambus would acquire the ability to control price in the relevant market or markets, you should consider such factors as:

**First**, Rambus's market share in the market or markets;

**Second**, the trend in Rambus's market share in the relevant market or markets;

**Third**, whether the barriers to entry into the market or markets made it difficult for competitors to enter the market or markets; and

**Fourth**, the likely effect of any anticompetitive conduct on Rambus's share of the market or markets.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Rambus would ultimately acquire monopoly power.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Rambus would ultimately acquire monopoly power.

44

**JURY INSTRUCTION No. 37**

**Fraud and Deceit — Introductory Instruction**

Each Manufacturer claims that Rambus has committed fraud through its conduct inside and outside of JEDEC. There are two general types of fraud: intentional misrepresentation and concealment. A fraud claim based on misrepresentation depends on a false statement or representation, regardless whether the representation was made orally, in writing, or by nonverbal conduct. A fraud claim based on concealment depends on concealed facts, omissions, or half-truths. Intentional concealment exists where a party has a duty to disclose information but intentionally conceals it, or, while under no duty to speak, nevertheless does so, but does not speak honestly or makes misleading statements or suppresses important facts. Each Manufacturer makes a claim against Rambus based upon alleged intentional misrepresentations and concealment.

# JURY INSTRUCTION No. 38

### Fraud and Deceit — Intentional Misrepresentations

The Manufacturers claim that Rambus made intentional misrepresentations to JEDEC. To establish fraud based on intentional misrepresentations made in the JEDEC context, each Manufacturer must prove each of the following is more likely true than not true:

(1)    that Rambus made important representations that it did not have any intellectual property pertaining to the work of JEDEC and intended or reasonably expected that the representations would be heard by or repeated to others including each of the Manufacturers;

(2)    that Rambus's representations were false;

(3)    that Rambus knew that the representations were false when it made them, or that Rambus made the representations recklessly and without regard for their truth;

(4)    that Rambus intended for each Manufacturer to rely on the representations;

(5)    that each Manufacturer reasonably relied on Rambus's representations;

(6)    that each Manufacturer was harmed; and

(7)    that Rambus's misrepresentations were a substantial factor in causing each Manufacturer's harm.

United States District Court
For the Northern District of California

**JURY INSTRUCTION No. 39**

**Fraud and Deceit — Concealment**

The Manufacturers claim that Rambus concealed both at JEDEC and in its dealings with the Manufacturers its patent applications and intentions to obtain patent coverage of products utilizing JEDEC-standard synchronous DRAM features.  To establish intentional fraud based on concealment of its intentions inside and outside JEDEC, each Manufacturer must prove the following is more likely true than not true:

(1)(a)  that Rambus uttered half-truths about its intellectual property coverage or potential coverage of products compliant with synchronous DRAM standards then being considered by JEDEC by disclosing some facts but failing to disclose other important facts, making the disclosure deceptive; and/or

(1)(b)  that JEDEC members shared a clearly defined expectation that imposed a duty to disclose certain information, and that Rambus intentionally failed to disclose an important fact concerning its intellectual property coverage or potential coverage of products compliant with synchronous DRAM standards then being considered by JEDEC which was known only to Rambus and which the Manufacturer could not have reasonably discovered; and/or

(1)(c)  that JEDEC members shared a clearly defined expectation that imposed a duty to disclose certain information, and that Rambus actively concealed its intellectual property coverage or potential coverage of products compliant with synchronous DRAM standards then being considered by JEDEC or prevented the Manufacturer from discovering the fact;

(2)  that the Manufacturer did not know of the concealed or omitted fact;

(3)  that Rambus intended to deceive the Manufacturer by concealing or omitting the fact and intended or reasonably expected that the concealment would be relied on by the Manufacturer;

(4)  that the Manufacturer reasonably relied on Rambus's deception;

(5)  that the Manufacturer was harmed; and

(6)  that Rambus's concealment, omissions, or half-truths constituted a substantial factor in causing the Manufacturer's harm.

47

**JURY INSTRUCTION No. 40**

**Fraud and Deceit — Definition of "Important Fact"**

A fact is important if it would influence a reasonable person's judgment or conduct.  A fact is also important if the person who represents it knows that the person or entity to whom the representation is made is likely to be influenced by it even if a reasonable person would not.

United States District Court

For the Northern District of California

# JURY INSTRUCTION No. 41

### Fraud and Deceit — Alleged Duty to Disclose Among JEDEC Members

A person generally has no duty to disclose information to others, but certain relationships can create or impose a duty to disclose information. The Manufacturers allege that the relationship and understanding among JEDEC members imposed a duty to disclose potential patent coverage of products that would comply with a JEDEC standard being considered.

You have heard conflicting evidence about whether or not JEDEC members were required to disclose certain pending patent applications and whether JEDEC members were required to disclose their intentions to file certain patent applications. You have also heard conflicting evidence about when a JEDEC member was required to make any disclosure, if one was required.

You must determine what information, if any, JEDEC's members reasonably expected that each of them was required to disclose to JEDEC. In determining the scope of any disclosure expectation, you may consider, among other factors: (1) the expectations of individual JEDEC members; (2) any behavior by JEDEC members with respect to disclosing or not disclosing such information; (3) oral information communicated or discussed at JEDEC meetings or in JEDEC minutes; (4) any written rules of JEDEC made available to members; (5) any customs or practices in the industry with respect to maintaining confidentiality of, or disclosing of, patent applications; and (6) the purposes of JEDEC.

You are instructed that the written rules of JEDEC during the time that Rambus was a member were not in and of themselves clear and definite enough to require mandatory disclosure of patent applications or the intent to file such applications. However, you may consider the written rules as a factor in determining the expectations of JEDEC members.

You are instructed that any duty of disclosure imposed on JEDEC members ended as to a member on its formal withdrawal from JEDEC except for any duty to disclose that already existed at the time of withdrawal.

If you find that it is more likely than not that there was a clear and definite understanding among JEDEC members that certain disclosures were mandatory, you must find that Rambus had a legal duty to make any such disclosure during its membership in JEDEC. If there was not a clear and definite understanding among the JEDEC members requiring any disclosure or if there was a requirement but it did not apply to a member whose patent status was similar to that of Rambus's during Rambus's JEDEC membership, you must find that Rambus had no legal duty to disclose.

49

United States District Court

For the Northern District of California

**JURY INSTRUCTION No. 42**

**Fraud and Deceit — Reliance on Statements or Omissions Made to JEDEC**

Rambus is responsible for a misrepresentation or for concealment that was not made directly to a Manufacturer if Rambus made the representation to, or concealed a fact from, JEDEC with the intent or reasonable expectation that it would be repeated to the Manufacturer and that Manufacturer relied on it. One who makes a misrepresentation or conceals a material fact with the intent to defraud the public or a particular class of persons is deemed to have intended to defraud every individual in that category who is actually misled thereby.

# JURY INSTRUCTION No. 43

### Fraud and Deceit — Reasonable Reliance

A Manufacturer relied on Rambus's misrepresentations or concealment if those misrepresentations or concealment caused it to believe that it could manufacture JEDEC complaint products without incurring a royalty obligation to Rambus and it probably would have behaved differently had such misrepresentations or concealment not occurred.  It is not necessary for a misrepresentation or concealment to be the only reason for the Manufacturer's conduct or actions.  It is enough if a misrepresentation or concealment substantially influenced the Manufacturer's conduct or actions.

In order for a Manufacturer to show that it relied on a concealment, it must show that had the omitted information been disclosed, the Manufacturer would have been aware of it and behaved differently.

The Manufacturer's reliance must have been reasonable under the circumstances taking into account its knowledge and experience.  Mere negligence in failing to conduct an investigation or inquiry does not defeat a claim for fraud.

You may infer that a Manufacturer relied on a misrepresentation (or would have behaved differently if concealed information had been disclosed) if the misrepresented or concealed information consisted of  "important facts."

# JURY INSTRUCTION No. 44

## Fraud and Deceit — Damages

If you decide that a Manufacturer has proven its claim against Rambus, you also must determine whether the fraud was a substantial factor in causing any damage to the Manufacturer. A Manufacturer must prove that it has suffered damage or actual harm. However, the Manufacturers seek only "nominal damages," i.e., $1.00, for the harm caused by Rambus's alleged fraud. If you find that a Manufacturer has suffered actual harm even though that amount is unquantified, you must award it $1.00. When deciding whether a Manufacturer has proven that it suffered actual harm, you may consider whether it has shown that management time and effort have been spent responding to Rambus's fraudulent conduct. However, the cost of litigating the case or management time connected with litigating the case may not be considered as damages or actual harm with respect to a Manufacturer's fraud claim.

# JURY INSTRUCTION No. 45

## Fraud and Deceit — Punitive Damages

If you decide that Rambus's conduct caused a Manufacturer's harm, you must decide whether that conduct justifies an award of punitive damages. At this time, you must decide whether the Manufacturer has proved by clear and convincing evidence that Rambus engaged in that conduct with malice or fraud. The amount of punitive damages, if any, will be decided by you later.

"Clear and convincing evidence" is a higher burden of proof. This means the Manufacturer must persuade you that it is highly probable that Rambus engaged in the conduct that caused the Manufacturer's harm with malice or fraud.

"Malice" means that Rambus acted with intent to cause injury or that Rambus's conduct was despicable and was done with a willful and knowing disregard of the rights of another. A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his or her conduct and deliberately fails to avoid those consequences.

"Fraud" means that Rambus intentionally misrepresented or concealed an important fact and did so intending to harm the Manufacturer.

53

**JURY INSTRUCTION No. 46**

**General — Duty to Deliberate**

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

# JURY INSTRUCTION No. 47

## General — Communication with the Court

If it becomes necessary during your deliberations to communicate with me, you may send a note through the security guard, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the Court.

**United States District Court**
For the Northern District of California

# JURY INSTRUCTION No. 48

### General — Return of Verdict

A verdict form has been prepared for you. After you have reached unanimous agreement on the questions on the verdict form, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.

# TABLE OF CONTENTS

**JURY INSTRUCTION No. 1**
General — Duty of the Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
**JURY INSTRUCTION No. 2**
General — What Is Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
**JURY INSTRUCTION No. 3**
General — What Is Not Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
**JURY INSTRUCTION No. 4**
General — Direct and Circumstantial Evidence . . . . . . . . . . . . . . . . . . . 5
**JURY INSTRUCTION No. 5**
General — Credibility of Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . 6
**JURY INSTRUCTION No. 6**
General — Expert Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
**JURY INSTRUCTION No. 7**
General — Charts and Summaries Not Received In Evidence . . . . . . . . . . . 8
**JURY INSTRUCTION No. 8**
General — Two or More Parties Have Distinct Legal Rights . . . . . . . . . . . 9
**JURY INSTRUCTION No. 9**
General — Overview of Contentions . . . . . . . . . . . . . . . . . . . . . . . . . 10
**JURY INSTRUCTION No. 10**
General — Litigation Between the Parties . . . . . . . . . . . . . . . . . . . . . . 12
*( Exhibit A Tab )*
**JURY INSTRUCTION No. 11**
Patent Law — General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
**JURY INSTRUCTION No. 12**
Patent Law — Validity of Rambus's Patents . . . . . . . . . . . . . . . . . . . . 16
**JURY INSTRUCTION No. 13**
Patent Law — Validity Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
**JURY INSTRUCTION No. 14**
Patent Law — Testimony About Certain Technology Concepts . . . . . . . . . . 18
**JURY INSTRUCTION No. 15**
Patent Law — Infringement of Patents Listed on Chart . . . . . . . . . . . . . . 19
**JURY INSTRUCTION No. 16**
Patent Law — Amendments to Cover a Competitor's Products . . . . . . . . . . 20
*( Exhibit B Tab )*
**JURY INSTRUCTION No. 17**

Monopolization — Introductory Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**JURY INSTRUCTION No. 18**

Monopolization — General Purposes of the Antitrust and Patent Laws . . . . 22

**JURY INSTRUCTION No. 19**

Monopolization — Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**JURY INSTRUCTION No. 20**

Monopolization — Monopoly Power Generally . . . . . . . . . . . . . . . . . . . . . . 24

**JURY INSTRUCTION No. 21**

Monopolization — Relevant Market Generally . . . . . . . . . . . . . . . . . . . . . . 25

**JURY INSTRUCTION No. 22**

Monopolization — Relevant Technology Market . . . . . . . . . . . . . . . . . . . . 26

**JURY INSTRUCTION No. 23**

Monopolization — Relevant Geographic Market . . . . . . . . . . . . . . . . . . . . 28

**JURY INSTRUCTION No. 24**

Monopolization — Evidence of Monopoly Power . . . . . . . . . . . . . . . . . . . 29

**JURY INSTRUCTION No. 25**

Monopolization — Willful Acquisition or Maintenance of Monopoly Power
Through Anticompetitive Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**JURY INSTRUCTION No. 26**

Monopolization — Anticompetitive Behavior in Standard-Setting . . . . . . . 33

**JURY INSTRUCTION No. 27**

Monopolization — Rambus's Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**JURY INSTRUCTION No. 28**

Monopolization — Business Justification . . . . . . . . . . . . . . . . . . . . . . . . . 35

**JURY INSTRUCTION No. 29**

Monopolization — Interstate Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**JURY INSTRUCTION No. 30**

Monopolization — Injury and Causation . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**JURY INSTRUCTION No. 31**

Monopolization — Causation Resulting From Adoption of a JEDEC
Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*( Exhibit C Tab )*

**JURY INSTRUCTION No. 32**

Attempt to Monopolize — Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**JURY INSTRUCTION No. 33**

Attempt to Monopolize — Relevant Market . . . . . . . . . . . . . . . . . . . . . . . 41

**JURY INSTRUCTION No. 34**

Attempt to Monopolize — Anticompetitive Conduct . . . . . . . . . . . . . . . . . 42

**JURY INSTRUCTION No. 35**

United States District Court

For the Northern District of California

Attempt to Monopolize — Specific Intent . . . . . . . . . . . . . . . . . . . . . . . . . . 43
**JURY INSTRUCTION No. 36**
Attempt to Monopolize — Dangerous Probability of Success . . . . . . . . . . . . 44
*( Exhibit D Tab )*

**JURY INSTRUCTION No. 37**

Fraud and Deceit — Introductory Instruction . . . . . . . . . . . . . . . . . . . . . . . . 45
**JURY INSTRUCTION No. 38**
Fraud and Deceit — Intentional Misrepresentations . . . . . . . . . . . . . . . . . . 46
**JURY INSTRUCTION No. 39**
Fraud and Deceit — Concealment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
**JURY INSTRUCTION No. 40**
Fraud and Deceit — Definition of "Important Fact" . . . . . . . . . . . . . . . . . . . 48
**JURY INSTRUCTION No. 41**
Fraud and Deceit — Alleged Duty to Disclose Among JEDEC Members . . 49
**JURY INSTRUCTION No. 42**
Fraud and Deceit — Reliance on Statements or Omissions Made to JEDEC
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
**JURY INSTRUCTION No. 43**
Fraud and Deceit — Reasonable Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . 51
**JURY INSTRUCTION No. 44**
Fraud and Deceit — Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
**JURY INSTRUCTION No. 45**
Fraud and Deceit — Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
**JURY INSTRUCTION No. 46**
General — Duty to Deliberate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
**JURY INSTRUCTION No. 47**
General — Communication with the Court . . . . . . . . . . . . . . . . . . . . . . . . . 55
**JURY INSTRUCTION No. 48**
General — Return of Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56