E-filed: 7/15/2008

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RAMBUS INC., <br><br> Plaintiff, <br><br> v. <br><br> HYNIX SEMICONDUCTOR INC., HYNIX SEMICONDUCTOR AMERICA INC., HYNIX SEMICONDUCTOR MANUFACTURING AMERICA INC., <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SEMICONDUCTOR, INC., SAMSUNG AUSTIN SEMICONDUCTOR, L.P., <br><br> NANYA TECHNOLOGY CORPORATION, NANYA TECHNOLOGY CORPORATION U.S.A., <br><br> Defendants. | No. C-05-00334 RMW <br><br> ORDER DENYING RAMBUS'S MOTION FOR SUMMARY JUDGMENT ON SAMSUNG'S COUNTERCLAIMS I, II AND III. <br><br> [Re Docket Nos. 1772, 1840, 1872] <br><br> [PUBLIC REDACTED VERSION] |
| RAMBUS INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SEMICONDUCTOR, INC., SAMSUNG AUSTIN SEMICONDUCTOR, L.P., <br><br> Defendants. | No. C-05-02298 RMW <br><br> [Re Docket Nos. 836, 886, 904] <br><br> [PUBLIC REDACTED VERSION] |

Plaintiff Rambus Inc. ("Rambus") moves for summary judgment on Counts I, II and III asserted in Samsung's most recent pleading ("Samsung's Answer and Counterclaims") filed by defendants Samsung Electronics Co., Ltd., Samsung America Electronics, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.P. ("Samsung"). Samsung opposes the motion. The court has reviewed the papers and considered the arguments of counsel. For the reasons discussed below, the court DENIES Rambus's motion for summary judgment.

## I. BACKGROUND

### A.   The License Agreement

Beginning in early 2000, Rambus asserted various patents against Samsung's competitors in the semiconductor memory business, namely Hynix, Micron and Infineon. In those lawsuits, Rambus accused Hynix, Micron and Infineon of infringing its patents by making and selling SDRAM and DDR SDRAM. At the time, Rambus claimed that any DRAM manufacturer who chose to litigate would be forced to pay higher royalties than those who chose to license. *See, e.g.,* Bremer Decl., Ex. 2 (Rambus developer presentation). Samsung chose to license. In October 2000, Rambus and Samsung signed an agreement giving Samsung the right to manufacture various types of memory devices (including SDRAM and DDR SDRAM) for five years. *See* Gross Decl., Ex. A ("Agreement").

Section 3 of the Agreement detailed Samsung's monetary obligations to Rambus in exchange for the license. *Id.* at 15-17. Section 3.1 required Samsung to pay Rambus ▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Section 3.8 contained a "most favored licensee" or "MFL" provision requiring Rambus to notify Samsung if other licensees obtained more favorable royalty rates than Samsung and further requiring Rambus to extend those rates to Samsung. *Id.* at 16-17. Because this dispute turns on interpreting this provision, the court sets it out in its entirety:

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[REDACTED]

*Id.* (emphasis added). The parties memorialized Samsung's favored status in the recital clauses at the beginning of the Agreement:

[REDACTED]

*Id.* at 1.

Section 8 governed the term and termination of the Agreement. *Id.* at 22-23. Section 8.5 required the parties to meet six months prior to the expiration of the Agreement and to negotiate in good faith to reach either a new licensing agreement or an extension of the Agreement. *Id.* at 23. Specifically, [REDACTED]

Rambus's litigation campaign suffered a serious setback in the first part of 2001 when Rambus received an adverse jury verdict in its litigation against Infineon. In July 2001, the parties amended their Agreement. *See* Gross Decl., Ex. B ("Amendment"). The Amendment required [REDACTED] The Amendment retained a MFL clause similar to Section 3.8 of the Agreement, but the new MFL clause added:

[REDACTED]



ORDER DENYING RAMBUS'S MOTION FOR SUMMARY JUDGMENT ON SAMSUNG'S COUNTERCLAIMS I, II AND III
C-05-00334 RMW; C-05-02298 RMW
NED (TSF)                                3

*Id.* at 2-3. Finally, the Amendment provided that ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

### B. The *Infineon* Settlement

After a successful appeal of the *Infineon* judgment, *see Rambus Inc. v. Infineon Technologies AG*, 318 F.3d 1081 (Fed. Cir. 2003), Rambus's litigation against Infineon took a disastrous turn when the district court held on remand that Rambus had spoliated evidence and ruled from the bench that it would dismiss Rambus's infringement claims. *See Samsung Electronics Co., Ltd. v. Rambus, Inc.*, 440 F. Supp. 2d 512, 515 (E.D. Va. 2006), *vacated by* 523 F.3d 1374 (Fed. Cir. 2008). Before the district court could issue its findings of fact and conclusions of law, Rambus and Infineon settled. *Id.* Rambus's settlement required Infineon to pay a quarterly lump sum of $5,800,000 up to certain limits. *See* Gross Decl., Ex. C at 11-14. In exchange, Infineon received a license to all of Rambus's existing patents allowing Infineon to make a variety of memory products. *Id.* at 5-7.

Because Rambus licensed Infineon, Rambus terminated the Amendment to the Agreement on March 22, 2005. Bremer Decl., Ex. 24 (Rambus's termination letter to Samsung). It is unclear whether Rambus revealed the terms of the Infineon license to Samsung, but it is clear that Rambus failed to give Samsung the Infineon deal. *See id.*, Ex. 3 ¶ 11 (declaration of Jay Shim). The negotiations to extend the license broke down, and Rambus proposed a "standstill agreement" to give the parties a year to assess their relationship. *See, e.g., id.*, Ex. 35 (Rambus proposal). The parties could not agree, and on June 7, 2005, Rambus informed Samsung that it had filed these two cases against Samsung. *See id.*, Ex. 38 (letter from Rambus CEO Harold Hughes to Dr. Hwang at Samsung).

### C. Samsung's Counterclaims I, II and III

In Samsung's governing pleading, it asserted seven counterclaims, the first three of which are at issue here. Count I alleges that Rambus breached the Agreement when Rambus did not give Samsung the lower royalty payments of the Infineon settlement pursuant to Section 3.8. Samsung's Answer and Countercl. 45. Count II alleges that Rambus breached the Agreement by failing to notify Samsung of Infineon's lower royalty payments and failing to negotiate a new license

agreement in good faith as Section 8.5 of the Agreement required. *Id.* at 46-47. Count III alleges a breach of the duty of good faith and fair dealing when Rambus refused to give Samsung lower royalty rates after the Infineon settlement. *Id.* at 47.

## II. ANALYSIS

### A. Legal Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that there is no issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 472 U.S. 242, 248 (1986). For a dispute to be genuine, there must be sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Lastly, the court views all evidence in a light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

### B. California Contract Law

California law governs the interpretation of the Agreement. *See* Agreement at 23. "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 390 (2005). Generally, the parties' mutual intent is determined by objective manifestations such as the words used in the agreement, extrinsic evidence detailing the surrounding circumstances in which the parties negotiated the contract and the subsequent conduct of the parties. *People v. Shelton*, 37 Cal. 4th 759, 767 (2006). If possible, a court should determine the mutual intent of the parties from the contract alone. *Powerine Oil Co.*, 37 Cal. 4th at 377. But California law requires a more "realistic approach" to contract interpretation and courts must seek to enforce the actual understanding of the parties to a contract. *Scott v. Pac. Gas & Elec.*, 11 Cal. 4th 454, 463 (1995). The court therefore must consider extrinsic evidence that is "relevant to prove a meaning to which the language of the instrument is

reasonably susceptible." *Pac. Gas & Elec. v. Thomas Drayage & Rigging Co., Inc.*, 69 Cal. 2d 33, 37 (1968). If a term has two or more reasonable constructions, it is ambiguous. *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18 (1995). Resolving such ambiguity is a factual inquiry and summary judgment is not appropriate. *S. Cal. Edison Co. v. Superior Court*, 37 Cal. App. 4th 839, 852 (1995).

A court should apply the ordinary understanding of a word in a contract unless it is clear that the parties used the word in a special or technical sense. *Am. Alternative Ins. Corp. v. Superior Court*, 37 Cal. App. 4th 1239, 1245 (2006). Oftentimes, a court will refer to dictionaries to discover the ordinary and popular meaning of a word. *People ex rel Lockyer v. R.J. Reynolds Tobacco Co.*, 116 Cal. App. 4th 1253, 1263 (Cal. Ct. App. 2004). In contrast, "[t]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate." *Denver D. Darling, Inc. v. Controlled Env'ts Const., Inc.*, 89 Cal. App. 4th 1221, 1236 (Cal. Ct. App. 2001). Lastly, courts must interpret contracts as a whole to give force and effect to every provision, each helping to interpret another. Cal. Civ. Code. § 1641.

### C.   Count I: Breach of Section 3.8 of the Agreement

Rambus's motion for summary judgment on Count I turns solely on the interpretation of the words "royalty rate" in the "most favored licensee" or "MFL" clause of Section 3.8 of the Agreement. Before proceeding, it is noteworthy that "MFL clauses are inherently difficult to negotiate and, often, to apply." 3 ROGER M. MILGRIM, MILGRIM ON LICENSING 26-4 (Matthew Bender ed., 2008) (1990). Licensees frequently worry that a faithless licensor will grant others more favorable terms, yet conceal that information from the "most favored" licensee, therefore making it difficult to enforce the MFL clause. *Id.* Such "other favorable terms" could include lower running royalty rates, lower periodic licensing fees, forbearance from an infringement action, a release of other claims, transfers of technological information, or simple royalty-free licenses. *Id.* at 26-5 to 26-6 & nn. 2.1, 2.2 & 3. Because of the complexity of licensing arrangements, discerning the intended scope of any given MFL provision can be very difficult and has been the subject of frequent disputes. *Id.* at 26-5.

### 1. The Plain Language of Section 3.8

Given this context, it is not surprising that the MFL in Section 3.8 is difficult to interpret. The MFL clause required Rambus to notify Samsung of any lower "royalty rate" and automatically extend that "royalty rate" to Samsung. Rambus argues that the ordinary understanding of "royalty rate" is a running royalty per unit, and that because Infineon licensed Rambus's patents for a quarterly lump sum divorced from any quantity, Infineon did not receive a lower "royalty rate" under Section 3.8. Samsung disagrees, and argues that a lump sum payment can be easily converted into an effective royalty rate, which, if lower, required Rambus to notify Samsung about it and grant it to Samsung. Samsung also points out that Infineon pays a "rate," though the rate is an amount per unit of time, as opposed to per unit of sales.

Both parties' dictionary definitions suggest that the word "rate" is a ratio that compares two different kind of units. Mot. at 7 (citing several dictionaries defining rate as "a charge of payment calculated in relation to a particular sum or quantity" and "an amount of payment or charge based on another amount"); Opp. at 17 (citing dictionaries that define rate as "a proportional or relative value" and "a quantity measured with respect to another measured quantity"). This dictionary evidence suggests that the ordinary usage of the word "rate" could encompass both a percentage of net sales or a dollar amount per quarter.

Rambus argues that while quarterly lump sum payments may qualify as a royalty rate, the parties intended royalty rate to mean a percentage of net sales as structured in Section 3.1(b). The pertinent language in the contract of Section 3.8 states that:



Agreement at 16 (emphasis added). As discussed, Section 3.1(b) defines Samsung's royalty obligations as a percentage based on net sales of four types of products. *Id.* at 15. Rambus urges that Section 3.8 refers exclusively to a royalty payment structure as outlined in 3.1(b) and therefore

Rambus had no obligation to lower Samsung's rates when Rambus settled with Infineon.

But looking at the plain language of the contract, this is not the only reasonable interpretation of Sections 3.8's reference to Section 3.1(b). One can reasonably interpret the MFL to state that if a third party's royalty rates are lower than Samsung's royalty rates, then Samsung must be notified and given those lower rates. The cross-reference to 3.1(b) serves as a source to determine *Samsung's rates*, but not to impose a required structure on the third party's rates.

Used in its ordinary sense, "royalty rate" can refer to a ratio of dollars per unit time or to a percentage of net sales. Since the Agreement does not clearly limit "royalty rate" to one or the other, the contract is reasonably susceptible to both Samsung or Rambus's interpretations of the term and the court cannot grant summary judgment. *S. Cal. Edison Co.*, 37 Cal. App. 4th at 847-48.

### 2. The Jurisprudence Regarding Most Favored Licensee Clauses

Decades of case law demonstrate that MFL clauses engender frequent disputes and confirm the ambiguity of the clause at issue here. 3 MILGRIM, 26-5 n.3. For example, the radio industry, like the DRAM industry, saw its share of patent disputes, and the Hazeltine Corporation may well have been the Rambus of radio.[1] *See Hazeltine Co. v. Zenith Radio Co.*, 100 F.2d 10, 11-12 (7th Cir. 1938) ("Hazeltine Corporation, is engaged in research for the development of radio apparatus and conducts a laboratory and owns numerous patents; and its business operation is the granting of licenses under such patents to manufacturers and sellers of radio apparatus."). Hazeltine granted a license with a MFL clause providing that "the [licensee's] rate of royalty . . . shall be as low as the lowest rate of royalty specified in any other license . . ." *Id.* at 12. Hazeltine also began granting licenses that gave the licenees the option to elect between a running royalty (similar to Zenith's license) or an annual lump sum. *Id.* Zenith complained that a company doing a large volume of

---

[1]   Like Rambus, Hazeltine was no stranger to industry-wide litigation. *See also Detrola Radio & Television Corp. v. Hazeltine Corp.*, 313 U.S. 259 (1941) (finding combination claims obvious); *Hazeltine Corp v. Emerson Television-Radio*, 129 F.2d 580 (2d Cir. 1942) (narrowly construing claims); *Hazeltine Corp. v. Crosley Corp.*, 130 F.2d 344 (6th Cir. 1942) (affirming noninfringement); *Hazeltine Corp. v. Kirkpatrick*, 165 F.2d 683 (3d Cir. 1948) (denying petition for writ of mandamus to order declaratory judgment action dismissed).

business that paid an annual lump sum could effectively obtain a lower royalty rate than Zenith. *Id.* at 12-13.

After examining the contract, the court explained that the MFL "does not purport to define 'rate of royalty' nor to restrict Hazeltine to the adoption of any particular type or kind of 'rate of royalty.'" *Id.* at 16. Further, the court stated that the common definition of rate (an amount per unit) does not define or designate the unit, and that patent licensing agreements have linked such rates to devices manufactured, periods of use or fixed payments per unit of time. *Id.* The court admitted that it could not "escape the conclusion that a provision in a patent-license contract which provides for the payment of fixed sum of money per fixed period of time for the use of a patented invention states a rate of royalty within the generally understood and recognized meaning of that phrase." *Id.*[2]

In another analogous case, the MFL clause stated that if a third party obtains a license "at a more favorable royalty rate than the rate specified in Article II . . .," then the licensee would have the option to modify the agreement to get the more favorable royalty rate. *Cardinal of Adrian, Inc. v. Amerock Co.*, 208 U.S.P.Q. 822, 822-23 (E.D. Mich. 1979). The licensor (Cardinal) later settled litigation with Norris Industries by granting Norris a fully paid up license for a lump sum. *Id.* at 823. The licensee (Amerock) claimed that the failure to notify it of the settlement and offer it the lower rate constituted a breach of the MFL clause. *Id.* Cardinal claimed that the lump sum was calculated by applying past use projected into the future for the remaining life of the patent. *Id.* The court nonetheless held that Amerock has a right under the MFL clause to have the lump sum payment offered to Norris Industries. *Id.* The court noted that Norris "used" the patent less than Amerock, but that this was irrelevant because Norris had the right to use the patent as much as it wished. *Id.* The court concluded that "[t]he most favored nation clause is intended to guarantee to Amerock that no licensee will be given the *opportunity* to use this patent at a more favorable rate."

---

[2] Although the court determined that periodic lump sum payments were royalty rates, the court ruled in favor of Hazeltine. Zenith sought to continue to pay a percentage royalty (instead of an annual lump sum), but with reduced royalty rates equal to the lump sum divided by the largest lump sum licensees sales volume. *Id.* at 18. The court could not brook this because it ignored the value to Hazeltine of an upfront lump-sum, as opposed to auditing sales periodically and applying a running royalty rate. *Id.* at 17-18.

*Id.* (emphasis in original).

Rambus insists that the reference to Section 3.1(b) in the MFL clause is direct evidence that the parties intended the MFL only to apply when a third party obtained royalty rates with a similar payment structure. But the Cardinal MFL clause similarly referred to the section laying out the licensee's payment structure. Nonetheless, the *Cardinal* court declined to follow this interpretation and held that the MFL clause protected the running royalty rate licensee from the licensor entering into more favorable lump sum royalty arrangements. *Id.*

The Federal Circuit has reached a similar result in its limited case law on this matter. *See Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*, 105 F.3d 629 (Fed. Cir. 1997). *Hercules* concerned a MFL clause that gave Hercules "the benefit of any lower royalty rate or rates" given to third parties. *Id.* at 631. Hercules paid a one-time lump sum in addition to a percentage of sales for its royalty rate. *Id.* When the licensor granted a third party a "paid up" license for a lump sum alone, Hercules demanded this more favorable deal. *Id.* at 632. The Federal Circuit concluded that the "contract expressly and unambiguously provides Hercules with the right to obtain the terms of another license" as soon as the more favorable rates become effective for the third party. *Id.* at 634. In so holding, the court noted that "we see no distinction between one who makes an up-front, lump-sum payment and one who makes continuing royalty payments. Indeed, such a distinction would be doubly doubtful because a 'paid-up' license presumably includes potential future royalty payments discounted to their net present value." *Id.* at 633.[3]

A fourth case illustrates how parties can use broader language to ensure protection for the most favored licensee. *Epic Systems Corp. v. Allcare Health Management System, Inc.*, 2002 WL 31051023 (N.D. Tex. 2002). There, the MFL stated that the licensee, who was paying a percentage of sales royalty rate, would get the most favorable "financial terms" or "equivalent terms" of any other license. *Id.* at *3. The licensor claimed that a lump sum license did not trigger the MFL

---

[3] *Hercules* turned on the interpretation of the term "paying licensee." A distinction between a lump sum and running royalty rate licensee was unsuccessfully advocated by the licensor who argued that the MFL applied only to "paying licensee" and that one who paid up-front was not a "paying" licensee.

ORDER DENYING RAMBUS'S MOTION FOR SUMMARY JUDGMENT ON SAMSUNG'S COUNTERCLAIMS I, II AND III
C-05-00334 RMW; C-05-02298 RMW
NED (TSF)                                          10

clause. *Id.* at 5. The court disagreed. *Id.* It noted that a lump-sum fell within "equivalent terms" and that "had the parties intended to exclude lump-sum payments from the comparison, they could have done so." *Id.* at *4. The court also explained that the purpose of the MFL clause was to "guarantee that no other licensee will be given the opportunity to use the patent at a more favorable rate," and that the licensor's interpretation of the MFL clause would render it meaningless. *Id.* at *5.

The fact that the "most favored licensee" prevailed in all but one of these cases cannot escape notice. This is particularly salient given the actual language of the MFL clauses in each case. Every court that construed the term "royalty rate" or "rate of royalty" understood it to include lump sum payments of various types. In light of this understanding developed within the field of patent licensing that supports Samsung's position, the court cannot agree with Rambus that the contract is only reasonably susceptible to its interpretation.

### 3. The Parties Could Have Expressed Their Intent Unambiguously

As the *Epic Systems* court noted, had the parties wished to draft a clearer agreement, they could have done so. On one hand, Rambus could have defined "royalty rate" explicitly, for example, by using the phrase "running royalty rate" or perhaps "royalty rate based on percentage of Net Sales agreed to be paid or ordered to be paid by a Third Party (not to include lump sum licenses to a Third Party)." This would have clearly articulated the parties' intent that the MFL clause applied only when Rambus entered into a license agreement for a lower percentage of net sales than Samsung's rate as outlined in Section 3.1(b). On the other hand, the parties could have used language that would entitle Samsung to summary judgment. For example, the license could have used broad language similar to that in *Epic Systems* such as, "royalty, payment or other financial terms." The parties could have further clarified the MFL clause by including a methodology for converting lump sum arrangements into percentage of net sales royalty rates and vice versa.

In its reply brief, Rambus presents extrinsic evidence that it argues shows that the parties did not intend lump sum licenses to be covered under Section 3.8. Rambus's reply cites to a Samsung email proposing revisions to the MFL clause to cover a lump sum license. Gross Decl. in Supp. Rambus's Reply, Ex. B. Rambus argues that since the parties did *not* adopt this proposed version of

the MFL clause, the phrase "royalty rate" cannot include a lump sum payment.

This extrinsic evidence is not as persuasive as Rambus suggests. First, it refers to a "lump sum," and not a periodic lump sum payment. Second, Rambus's response to Samsung's proposal was to simply ignore it. *See id.*, Exs. D & E (response from Rambus and redline license agreement). Rambus did not comment on Samsung's more detailed proposal for the MFL clause and retained the "royalty rate" formulation. *Id.*, Ex. E at 18. Rambus also ███████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████ If Rambus intended to exclude lump sum licenses from the MFL clause, it could have clearly stated this during negotiations for the Agreement instead of sidestepping the issue.

### D. Counts II and III

Rambus asserts that it should receive summary judgment on counts II and III if the court grants summary judgment on count I. The court has declined to grant Rambus's motion with respect to count I. Because Rambus presents no other arguments to support granting its motion with respect to counts II and III, the court denies Rambus's motion in this regard.

### III. ORDER

For the foregoing reasons, the court DENIES plaintiff's motion for summary judgment on defendant's counterclaims I, II and III. An unredacted copy of this order will be publicly filed within seven (7) days of the date of this order, absent a meritorious request by a party that certain portions of the order be redacted from the publicly filed copy.

DATED: 7/9/2008

*Ronald M Whyte*

RONALD M. WHYTE
United States District Judge

Notice of this document has been e-mailed to: counsel for Rambus and Samsung.

| Counsel for Rambus Inc., all actions | | Counsel for Hynix entities, C-00-20905 and C-05-00334 | |
|---|---|---|---|
| Burton Alexander Gross | Burton.Gross@mto.com | Allen Ruby | ruby@allenrubylaw.com |
| Carolyn Hoecker Luedtke | carolyn.luedtke@mto.com | Belinda Martinez Vega | bvega@omm.com |
| Catherine Rajwani | crajwani@sidley.com | Daniel J. Furniss | djfurniss@townsend.com |
| Craig N. Tolliver | ctolliver@mckoolsmith.com | Geoffrey Hurndall Yost | gyost@thelenreid.com |
| David C. Yang | david.yang@mto.com | Jordan Trent Jones | jtjones@townsend.com |
| Douglas A. Cawley | dcawley@mckoolsmith.com | Joseph A. Greco | jagreco@townsend.com |
| Erin C. Dougherty | erin.dougherty@mto.com | Kenneth Lee Nissly | kennissly@thelenreid.com |
| Gregory P. Stone | gregory.stone@mto.com | Kenneth Ryan O'Rourke | korourke@omm.com |
| Jennifer Lynn Polse | jen.polse@mto.com | Patrick Lynch | plynch@omm.com |
| Keith Rhoderic Dhu Hamilton, II | keith.hamilton@mto.com | Susan Gregory VanKeulen | svankeulen@thelenreid.com |
| Kelly Max Klaus | kelly.klaus@mto.com | Theodore G. Brown, III | tgbrown@townsend.com |
| Miriam Kim | Miriam.Kim@mto.com | Tomomi Katherine Harkey | tharkey@thelen.com |
| Peter A. Detre | detrepa@mto.com | **Counsel for Micron entities, C-06-00244** | |
| Pierre J. Hubert | phubert@mckoolsmith.com | Aaron Bennett Craig | aaroncraig@quinnemanuel.com |
| Rosemarie Theresa Ring | rose.ring@mto.com | David J. Ruderman | davidruderman@quinnemanuel.com |
| Scott L Cole | scole@mckoolsmith.com | Harold Avrum Barza | halbarza@quinnemanuel.com |
| Scott W. Hejny | shejny@sidley.com | Jared Bobrow | jared.bobrow@weil.com |
| Sean Eskovitz | sean.eskovitz@mto.com | John D Beynon | john.beynon@weil.com |
| Steven McCall Perry | steven.perry@mto.com | Leeron Kalay | leeron.kalay@weil.com |
| Thomas N Tarnay | ttarnay@sidley.com | Linda Jane Brewer | lindabrewer@quinnemanuel.com |
| William Hans Baumgartner, Jr | wbaumgartner@sidley.com | Rachael Lynn Ballard McCracken | rachaelmccracken@quinnemanuel.com |
| | | Robert Jason Becher | robertbecher@quinnemanuel.com |
| | | Yonaton M Rosenzweig | yonirosenzweig@quinnemanuel.com |

| Counsel for Nanya entities, C-05-00334 | | Counsel for Samsung entities, C-05-00334 and C-05-02298 | |
|---|---|---|---|
| Chester Wren-Ming Day | cday@orrick.com | Ana Elena Kadala | anita.kadala@weil.com |
| Craig R. Kaufman | ckaufman@orrick.com | Claire Elise Goldstein | claire.goldstein@weil.com |
| Glenn Michael Levy | glevy@orrick.com | David J. Healey | david.healey@weil.com |
| Jan Ellen Ellard | jellard@orrick.com | Edward Robert Reines | Edward.Reines@weil.com |
| Jason Sheffield Angell | jangell@orrick.com | Matthew D. Powers | matthew.powers@weil.com |
| Kaiwen Tseng | ktseng@orrick.com | | |
| Mark Shean | mshean@orrick.com | | |
| Robert E. Freitas | rfreitas@orrick.com | | |
| Vickie L. Feeman | vfeeman@orrick.com | | |

| Counsel for intervenor, Texas Instruments, Inc., C-05-00334 | |
|---|---|
| Kelli A. Crouch | kcrouch@jonesday.com |
| **Counsel for intervenor, United States Department of Justice, C-00-20905** | |
| Eugene S. Litvinoff | eugene.litvinoff@usdoj.gov |
| May Lee Heye | may.heye@usdoj.gov |
| Nathanael M. Cousins | nat.cousins@usdoj.gov |
| Niall Edmund Lynch | Niall.Lynch@USDOJ.GOV |
| **Counsel for intervenor, Elpida Memory, Inc., C-00-20905 and C-05-00334** | |
| Eric R. Lamison | elamison@kirkland.com |
| John J. Feldhaus | jfeldhaus@foley.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program in each action.

**Dated:** 7/15/2008

TSF
**Chambers of Judge Whyte**